ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, a nonprofit corporation, Engineering Contractors Association, a nonprofit corporation, American Subcontractors Association, a nonprofit corporation, Los Angeles County Chapter, National Electrical Contractors Association, Inc., a nonprofit corporation, Steve P. Rados, Inc., a corporation, Griffith Company, a corporation, Gordon H. Ball, Inc., a corporation, Stoddard Enterprises, a sole proprietorship, and Granite Construction Company, a corporation, Plaintiffs,

v.

SECRETARY OF COMMERCE OF THE UNITED STATES DEPARTMENT OF COMMERCE, U. S. Department of Commerce, Los Angeles County, a body corporate and politic, Los Angeles County Board of Supervisors, Los Angeles Flood Control District, Los Angeles County Engineer, Facilities Department of Los Angeles County, City of Los Angeles, a Municipal Corporation, Los Angeles City Council, Department of Recreation and Parks of the City of Los Angeles, and Department of Public Works of the City of Los Angeles, Defendants.

Civ. No. 77–3738–AAH.

United States District Court,
C. D. California.

Nov. 2, 1977.

958

Ronald A. Zumbrun, John H. Findley and Sandra R. Johnson, Pacific Legal Foundation, Sacramento, Cal., and Lawrence H. Kay, Associated Gen. Contractors of California, Sacramento, Cal., for plaintiffs.

Peter H. Kane, Asst. U. S. Atty., Los Angeles, Cal., and Deborah P. M. Seymour, Trial Atty., Employment Section, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for federal defendants, Secretary of Commerce of the United States, and Dept. of Commerce.

Richard L. Landes, Deputy County Counsel, Los Angeles, Cal., for county defendants, Los Angeles County, Los Angeles County Bd. of Supervisors, Los Angeles Flood Control Dist., Los Angeles County Engineer and the Facilities Dept. of Los Angeles County.

John F. Haggerty, Asst. City Atty., Los Angeles, Cal., for city defendants, City of Los Angeles, Los Angeles City Council, Dept. of Recreation and Parks of the City of Los Angeles, and Dept. of Public Works of the City of Los Angeles.

## DECISION AND ORDER (GRANTING DECLARATORY AND INJUNCTIVE RELIEF AGAINST "RACE QUOTA" SYSTEM FOR FEDERAL GRANTS TO LOCAL LOS ANGELES AGENCIES)

HAUK, District Judge.

This matter arises upon plaintiffs' complaint for declaratory and injunctive relief based upon the alleged unconstitutionality of Section 103(f)(2) of the Public Works Employment Act of 1977, Pub.L.No.95–28, 91 Stat. 116–121, 42 U.S.C. § 6705(f)(2), which requires that 10 percent of the amount of each federal grant applied for under the Act be expended for "minority business enterprises." [1] The Act has been implemented by rules and regulations [2] issued by the Secretary of Commerce under the authority given to him in the original Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. §§ 6701–6735, which was amended by the Public Works Employment Act of 1977. Plaintiffs seek declaratory judgments that the Department of Commerce and Secretary of Commerce's (Federal Defendants) enforcement of the minority business enterprises provisions of Pub.L.No.95–28 and the regulations promulgated thereunder, as well as the policies of the City and County of Los Angeles and their agencies named defendants (Local Defendants) of devising, approving, advertising, and awarding bids in accordance with the provision of the statute and regulations, violated and violate plaintiffs' rights under the Fifth Amendment to the United States Constitution. Plaintiffs also sought injunctive relief, by way of a temporary restraining order, order to show cause why a preliminary injunction should not be granted, and a permanent injunction, restraining all defendants from enforcing and complying with the said minority business enterprises provisions.

After the October 6, 1977, initial hearing, this Court issued its temporary restraining order, extended it for an additional ten days, and set the hearing on the preliminary injunction for October 31, 1977. On October 21, 1977, the Federal Defendants filed a motion for summary judgment, for which motion an application shortening time to notice the motion to October 31, 1977, was properly made and approved. See Local Rules 3(e) and 3(f), Central District of California. The Local Defendants and the plaintiffs have orally made and

---

1. 1977 U.S.Code Cong. & Admin.News, 91 Stat. 116, at p. 117 (June, 1977) 42 U.S.C. § 6705(f)(2). For full text of Pub.L.No. 95–28, see Appendix A attached.

2. Chap. III, Part 317, especially Section 317.-19(b), 42 Fed.Reg. Sec. 317(b)(2), 27432 at 27434–5 (May 27, 1977). For full text of the rules and regulations, see 42 Fed.Reg. 27432–27440, Appendix B attached.

joined in the motion for summary judgment by their own motions and counter motions for summary judgment, whereupon the Court proceeded to hear and rule by consolidating the hearing on the preliminary injunction with the hearing on the merits on the permanent injunction, by way of hearing the motions and counter motions for summary judgment. Fed.R.Civ.P., Rule 65(a)(2).

# I

## STATUTORY BACKGROUND

■ The Local Public Works Capital Development and Investment Act of 1976, Pub.L.No.94–369 (July 22, 1976), 90 Stat. 999–1012, 42 U.S.C. §§ 6701–6735, with its authorization of $2 billion (42 U.S.C. § 6710) (hereinafter "LPW Act"), for the implementation of which Congress appropriated $2 billion in Pub.L.No.94–447 (Oct. 1, 1976), was enacted for the purposes of alleviating the problem of nationwide unemployment and stimulating the national economy by assisting state and local governments to build badly needed public facilities. See H.R.Rep.No.94–1077 re Pub. L.No.94–369, 94th Cong., 2d Sess. (1976).[3] The program was to be administered by the Secretary of Commerce acting through the Economic Development Administration (hereinafter "EDA"), which distributed program funds for construction of public works projects to state and local government applicants. In order to expedite the initiation of construction projects contemplated by the LPW Act, Congress provided that the Secretary shall make a final determination upon each application within 60 days of receipt, with failure to take action within the prescribed period deemed to be approval [42 U.S.C. § 6706]; that the Secretary shall prescribe any rules and regulations deemed

necessary to carry out the provisions of the LPW Act within 30 days of its enactment [42 U.S.C. § 6706]; and that on-site labor must begin within 90 days of project approval if funds are available [42 U.S.C. § 6705(d)]. Between October 26, 1976, and February 9, 1977 ("Round I"), approximately 2000 projects were approved and the appropriate Federal grants made, exhausting the $2 billion originally authorized and appropriated.

On May 13, 1977, Congress enacted the Public Works Employment Act of 1977, 91 Stat. 116–121, Pub.L.No.95–28 (hereinafter the "PWE Act"),[4] amending the LPW Act. The PWE Act (denoted "Round II") was designed to correct certain inadequacies of Round I and to increase funding for public works projects. By the PWE Act of 1977, a total of $6 billion was authorized to be expended in carrying out Round I and Round II under the provisions of the PWE Act, Pub.L.No.95–28, § 109 (May 13, 1977), of which an additional $4 billion was appropriated by Congress, Pub.L.No.95–29, Chap. III (May 13, 1977).[5] Congress remained aware of the importance of the infusion of Federal funds into the depressed construction industry, H.R.Rep.No.95–20, 95th Cong., 1st Sess. 1–2 (1977),[6] and, seeking to avoid any unnecessary delay in the implementation of the PWE Act, added the provision in the PWE Act that the Secretary shall not consider any application submitted subsequent to December 23, 1976, Pub.L.No. 95–28, § 107(h)(1) (May 13, 1977), in addition to retaining those deadlines originally set forth in 42 U.S.C. §§ 6705(d), 6706.

Included in the PWE Act was the following provision:

"(2) Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant

---

**3.** 1976 U.S.Code Cong. & Admin.News, Vol. 3, pp. 1746–7 (1976). For full text see pp. 1746–1767.

**4.** See footnote 1, *supra.*

**5.** Pub.L.No.95–29, 1977 U.S.Code Cong. & Admin.News, 91 Stat. 122 at pp. 123–4 (June

1977). For full text see Appendix A attached.

**6.** See legislative history of Pub.L.No.95–28, particularly H.Rep.No.95–20 (p. 1), 1977 U.S. Code Cong. & Admin.News, p. 150. For full text see footnote 18, *infra,* and Appendix D attached.

gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." Pub.L.No.95–28, 91 Stat. 117, Sec. 103(f)(2).[7]

This Minority Business Enterprises ("MBE") provision was introduced on the House floor during debate and was intended ostensibly to remedy the situation in which "The average percentage of minority contracts, of all Government contracts, in any given fiscal year is 1 percent—1 percent." 123 Cong.Rec. p. H–1437–8 (daily ed. February 24, 1977).[8] Economic Development Administration Guidelines for implementation of the MBE provision indicate that "[w]hen prime contractors are selected through competitive bidding, the Grantee [state or local government] must require that each bid include a commitment to use at least 10 percent of the contract funds for MBEs . . .. In the case of projects involving more than one contract . . . some of the contractors may themselves be MBEs . . .." MBE Guidelines,[9] pp. 8, 9.

Among the rules and regulations promulgated by the Secretary pursuant to his authority to prescribe necessary regulations [42 U.S.C. § 6706] is the provision that the MBE requirement may be waived as to any grant for which the Assistant Secretary determines that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area. Reg. 317.19(b)(2), 42 Fed.Reg. 27432, 27434–5 (May 27, 1977.[10] And the EDA Guidelines elaborate to some extent:

"The Grantee must demonstrate that there are not sufficient, relevant, qualified minority business enterprises whose market areas include the project location to justify a waiver. The Grantee must detail in its waiver request the efforts the Grantee and potential contractors have exerted to locate and enlist MBEs. The request must indicate the specific MBEs which were contacted and the reason each MBE was not used. EDA will consider the degree to which the Grantee and potential contractors have used available referral sources and related assistance in evaluating waiver requests." MBE Guidelines, pp. 13, 14.[11]

## II

## STATEMENT OF FACTS

Under Round II, and by September 30, 1977, the Secretary of Commerce had granted and obligated the entire $4 billion PWE Act authorization and the appropriation by

---

**7.** See footnote 1, supra, and Appendix A.

**8.** These, of course, are the remarks of Hon. Parren J. Mitchell (D.Md.) who introduced this provision as an amendment from the floor during debate on the PWE. For full text, see Appendix C attached.

**9.** These "Guidelines" of the EDA are not published anywhere that the Court can find, and are drawn from attachments to the Federal Defendants' briefs and affidavits herein, but, apparently, they were made available, if asked for, to the Local Defendants as applicant grantees for the Federal funds under Round II.

**10.** "(b) Minority business enterprise.

(1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.

(2) The restriction contained in paragraph (1) of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured."

**11.** See footnote 9, supra.

Public Law 95–29 [12] including $29,782,108 for Los Angeles City projects, and $28,109,085 for Los Angeles County projects. Bid openings for these projects were to commence on October 7, 1977; however, because of the issuance of the temporary restraining order, no contracts have been awarded under Round II.

Plaintiffs are four nonprofit incorporated contractors' associations and five businesses engaged in general contracting work. The associations allege that a substantial number of their members desire to bid on contracts to be funded under the PWE Act, and on behalf of these members, allege that the MBE provision in Pub.L.No.95–28 and the rules and regulations thereunder issued constitute discrimination on the bases of race in the awarding of public funds in violation of the Fifth Amendment to the United States Constitution. The individual contractors allege that sufficient qualified [13] minority contractors do not exist to enable compliance with the MBE provision, and that the MBE provision increases the bid price which such contractors must submit. There is no allegation that any plaintiff has requested the Local Defendants to seek a "waiver" of the MBE provisions of Sec. 317.19(b)(1) of the rules and regulations pursuant to § 317.19(b)(2) thereof. 42 Fed.Reg. 27432 at 27435 (May 27, 1977.) [14]

## III

### ADMINISTRATIVE REMEDY

Defendants' initial contention is that the waiver procedure authorized in § 317.19(b)(2) of the rules and regulations, and set forth in the MBE *Guidelines,* affords an administrative remedy which renders un-

meritorious plaintiffs' allegation that there is an insufficient number of qualified MBEs in the Los Angeles area.[15]

■ While the Court recognizes the conflict in authorities dealing with the question of exhaustion of administrative remedies when a constitutional claim is at issue [K. Davis, Administrative Law of the Seventies (1976), § 20.04], it is apparent that the seeking of a waiver of the applicability of the MBE provision would result simply in circumvention of the issue which plaintiffs seek to have resolved. Plaintiffs complain of injury under an allegedly unconstitutional statute, and "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Oestereich v. Selective Service Board,* 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968) (citations omitted). The purposes of the exhaustion doctrine, avoidance of interruption of the agency's duty to apply a statute in the first instance, development of the factual background upon which decisions should be based, and deference to the agency's discretion and expertise, *McKart v. United States,* 395 U.S. 185, 193–94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), are not served by requiring constitutional issues to be argued before an administrative agency.

■ No further development of the facts is necessary in this case; no administrative discretion is involved; no determination of the applicability of the MBE provisions to plaintiffs is needed. Unlike the claim in *Montana Chapter of Association of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165 (9th Cir. 1975), plaintiffs' primary claim before this Court is the infringement upon their Constitutional rights. In *Young, su-*

---

12. For Pub.L.No.95–29, see 1977 U.S.Code Cong. & Admin.News, June 1977, enacted May 13, 1977, 91 Stat. 122 at 91 Stat. pp. 123–124. Appendix A has full text.

13. "Qualified" is defined in the MBE Guidelines, pp. 3–4.

14. See footnote 2, *supra,* Appendix B for full text.

15. The effect of plaintiffs' failure to pursue this alleged procedure is also an important aspect of all defendants' arguments that plaintiffs lack standing to bring this action and that the case is not ripe for judicial review, since only claimed final agency action is subject to review under the Federal Administrative Procedure Act. 5 U.S.C. § 704.

pra, the claim was for a declaration that certain issues upon which defendant refused to negotiate were in fact the proper subject for negotiation pursuant to an Executive Order. Thus, "[t]he necessity of deciding the constitutional issues may well . . . [have been] avoided by the grant of alternative administrative relief," [16] because the Constitutional issue would never arise if the agency determined that the issues were negotiable. In the case here before us, the Constitutional issue has arisen, but it may never be decided if it is insisted that plaintiffs go before an administrator and ask him to rule upon something which he has no authority to decide. *See also Public Utilities Commission v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 451, 2 L.Ed.2d 470 (1958) (United States not required to exhaust state administrative remedy; "an administrative proceeding might leave no remnant of the constitutional question . . . . [b]ut where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right.")

■ Further, the administrative remedy to be pursued here belongs to the Local Defendants, not to plaintiffs: the MBE *Guidelines* state that "[o]nly the Grantee can request a waiver." MBE *Guidelines,* p. 14. Thus, while plaintiffs may ask the Local Defendants to request a waiver, this possibility obviously allows plaintiffs no control over either the decision to seek a waiver or its presentation to the Secretary. Such a procedure hardly affords any administrative remedy which could preclude judicial determination of plaintiffs' claim.

In addition to arguing that the exhaustion doctrine precludes standing, defendants contend that plaintiffs have suffered no injury at this point in the administration of Round II. With respect to associational standing, the Supreme Court said in *Warth*

*v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975),

"[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members. *E. g., National Motor Freight Assn. v. United States,* 372 U.S. 246, [83 S.Ct. 688, 9 L.Ed.2d 709] (1963). . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. [citation omitted] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."

■ Plaintiff contractors, and contractors represented by associations, which are before this Court are clearly suffering the immediate, threatened injury of bidding on construction contracts on terms with which they are unfamiliar, of distinguishing between subcontractors on grounds allegedly unrelated to the characteristics upon which contractors normally employ subcontractors, and submitting bids higher than they otherwise might expect to submit. Plaintiff subcontractor, and subcontractors represented by associations, are threatened with being denied a prescribed percentage of the construction dollar in Los Angeles County due to the application of the MBE provisions.

In *Warth v. Seldin, supra,* the Supreme Court held that an association of firms engaged in residential construction lacked standing to challenge the constitutionality of a city ordinance which allegedly precluded persons of low and moderate income from residing in the city. The Court ruled

16. *Montana Chapter of Ass'n of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165, 1167–68 (9th Cir. 1975).

that, because the association sought damages rather than declaratory or injunctive relief, any injury was peculiar to the individual member, and would necessitate individual proof. The Court also held that there had been no averment that the ordinance had been responsible for the denial of a building permit for any specific project contemplated by the association. In the case before this Court, however, plaintiffs seek injunctive and declaratory relief from a provision which allegedly removes them from consideration for an identified percentage of construction funds targeted for specific, planned projects. Thus, injury to plaintiffs is clear, and they have standing to bring this action.

█ Moreover, this case presents "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). This Court rejects Federal Defendants' argument that facial constitutional invalidity can never be asserted where there is a waiver provision. Accordingly, there is a justiciable controversy between plaintiffs and defendants which is appropriate for judicial determination.

█ The Court also notes that laches is inapplicable to this case. Plaintiffs brought this action five days after the September 30, 1977, deadline for obligating the entire $4 billion in PWE Act funds appropriated by Congress. Any earlier action by plaintiffs would not have defined a concrete controversy, since additional projects might have been approved by the Secretary until September 30. The test of laches is prejudice to the opposing party. *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Federal Defendants are not prejudiced in this case because they have fully performed their function of granting and obligating the funds appropriated and approving the necessary projects. Local Defendants offer

no indication of prejudice flowing from the *timing* of the filing of this action, as opposed to prejudice flowing simply from the *filing* of the action.

## IV

## CONSTITUTIONAL DUE PROCESS AND EQUAL PROTECTION

█ The gravamen of plaintiffs' complaint is that the MBE provisions infringe upon their rights to due process of law, by creating a classification which denies the granting of Federal construction funds solely on the basis of race. Although the Fifth Amendment to the United States Constitution does not contain an equal protection clause, discrimination which contravenes the Equal Protection Clause of the Fourteenth Amendment violates the due process clause of the Fifth Amendment. *Johnson v. Robison*, 415 U.S. 361, 364, n.4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

The initial question confronting this Court is whether the MBE provisions in fact create a "classification" or whether they constitute a "remedy" for past discrimination. Programs which eliminate discrimination are clearly necessary, and have been judicially decreed or approved to dismantle dual school systems which impermissibly perpetuate separation of the races in public schools. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Further, Title VII of the Civil Rights Act of 1964 [17] has been held to mandate the award of retroactive seniority to victims of discrimination in hiring on the basis of race, *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and a state redistricting plan, which was drawn with racial considerations aimed at correcting past discrimination, has been upheld under the Voting Rights Act of 1965 and found not to contravene the Fourteenth Amendment. *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Thus, it is clear that,

17. 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.*

"[j]ust as . . . race . . . must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

However, it is also clear that a generalized assertion of "remedy" cannot exempt a racial classification from careful judicial examination, lest such an assertion be invoked as justification for obviously invidious discrimination. In fashioning a remedy for racial discrimination, there must be no discrimination against innocent non-minorities. In *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 165, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), Justice White, with Justices Stevens and Rehnquist concurring, stated:

"There is no doubt that in preparing the 1974 legislation, the State deliberately used race in a purposeful manner. But its plan represented no racial slur or stigma with respect to whites or any other race, and we discern no discrimination violative of the Fourteenth Amendment . . . . ."

In the case before this Court, there is no doubt that nonminority contractors and subcontractors are denied a specified percentage of Federal funds solely on the basis of their race. In addition to depriving these plaintiffs of equal treatment under the PWE Act, the MBE provisions, as a result of their asserted role in remedying "past discrimination," indicate that plaintiffs are members of an industry guilty of a history of discrimination against minorities, a contention which has not been substantiated in this case.

Moreover, at least in the area of desegregation, the Supreme Court has suggested that the school desegregation remedies there discussed may be limited to the specific context of achieving unitary public school systems:

"It would not serve the important objective of *Brown I* [*Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954) ] to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination." *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 22–23, 91 S.Ct. at 1279.

The remedies discussed in the above-mentioned cases also appear to be directed only at eliminating the racial injustice practiced, rather than at attempting to establish an arbitrary level of compensation which will counterbalance prior wrongs. In this respect, *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), and *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), are inapposite, since they deal with classification on the basis of gender, rather than race. Hence, this Court concludes that the MBE provisions constitute a purely racial classification and must be examined as such.

It should also be noted at this point that, while the Supreme Court has recognized that the Fourteenth Amendment was precipitated by discrimination against Blacks [*Strauder v. West Virginia,* 100 U.S. 303, 306, 25 L.Ed. 664 (1879); *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1873) ], its protection extends to all races, including whites. *Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 72, 21 L.Ed. 394 (1873). *See also United Jewish Organizations, Inc. v. Carey, supra,* 430 U.S. at 165, 97 S.Ct. 996; *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 51, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), outlawing a race quota in medical school, and *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), holding that 42 U.S.C. § 1981 prohibits private employment discrimination against whites as well as nonwhites.

Classifications based solely upon race must be subjected to the most rigid

judicial scrutiny. *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Bolling v. Sharpe, supra,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). In related circumstances, this scrutiny has been held to require that the government must establish a compelling governmental interest for the classification, which interest is unrelated to race, and show that there are no alternative means to advance that interest which would impose a lesser burden on the group disadvantaged. *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Dunn v. Blumstein,* 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Constructors Association of Western Pennsylvania v. Kreps,* 441 F.Supp. 936 (W.D.Pa., 1977); *Bakke v. Regents of the University of California, supra,* 18 Cal.3d at 49, 132 Cal.Rptr. 680, 553 P.2d 1152.

The legislative history of the PWE Act indicates that it was intended "to help revitalize the Nation's financially-pressed communities and reactivate the distressed construction industry with its hundreds of thousands of jobless workers . . . ." H.R.Rep.No.95-20, 95th Cong., 1st Sess. 1 (1977).[18]

While the legislative history includes no mention of the MBE provisions, Federal Defendants cite the Court to the remarks of Representative Mitchell, sponsor of the MBE amendment on the floor of the House of Representatives, which indicate a desire to correct the situation in which minority businesses are given only 1 percent of all government contracts in any fiscal year. 123 Cong.Rec.H. 1436-1437.[19] Congress apparently became concerned with unemployment in minority communities and the rate of dissolution of minority businesses, mainly by the persuasive rhetoric of Congressman

Mitchell, but no study was made and there is no legislative history of this Mitchell Amendment.

▆▆▆▆ The Court recognizes the laudable goal of directing aid to that portion of the community which is suffering from severe unemployment. However, the MBE provision does not advance a governmental purpose unrelated to race. In fact, it is based on race alone—an invidious race quota. It is not contended here that minority business enterprises are more capable than nonminority businesses. No racially neutral justification is offered for the MBE provisions. Indeed, the specific objective asserted for this classification is the preference of one group of races over another. It is not a permissible governmental objective to direct financial assistance to segments of the community which are classified solely on the basis of race to the exclusion of other segments.

Moreover, the "remedy" versus "classification" distinction is inapplicable in this situation, where no discrimination against the minority business enterprises sought to be assisted by this legislation has been alleged. Federal Defendants have contended that a Congressional desire to remedy prior discrimination is "implicit" in Congressman Mitchell's remarks, but no specific evidence of such discrimination was shown by him, nor has any such evidence been offered by Federal Defendants, or any parties to this lawsuit.

Further, the MBE provisions fail the second part of the compelling governmental interest test, since underemployed minorities in the construction industry could be aided by racially neutral legislation having less of a detrimental impact upon nonminority contractors. For example, the 10 percent set-aside could be directed at those businesses which have experienced a low prescribed level of unemployment or income within the preceding year, and the Department of Commerce could take affirmative

**18.** 1977 U.S.Code Cong. & Admin.News, June 1977, pp. 150-184. For full text see Appendix D attached.

**19.** See footnote 8, *supra,* for floor debate when Congressman Mitchell introduced these "race quota" provisions as an amendment on February 24, 1977. Appendix C has full text.

steps to ensure that businesses in geographical areas of high unemployment become particularly aware of Federally funded projects which were being planned and to familiarize such businesses with the larger general contractors which customarily bid on Federally funded projects.

Prior to and at the hearing on Summary Judgment, Federal Defendants supplied the Court with an Opinion and Order of the Honorable Daniel J. Snyder, Jr., United States District Judge, 441 F.Supp. 936 (W.D.Pa. No. 77–1035, 1977), in the case of *Constructors Association of Western Pennsylvania v. Kreps,* a case with issues identical to ours. In that Opinion and Order, Judge Snyder denied a preliminary injunction on the grounds that while the same 10% racial quota for subcontractors deserved the strictest scrutiny of the Court since it is inherently constitutionally suspect, *id.* at 950, nevertheless, and while viewing the lack of legislative history as "troublesome," he concluded that the 10% quota · based on race alone "is the only effective way to crack the competitive barriers and end the cycle which continually excludes minority businesses from proportionate participation." *Id.* at 953, 945, 942–944. To this conclusion, I take exception and therefore, with his Opinion and Order I disagree, with all due respect and humility. Perhaps the *Bakke* case now before the Supreme Court on certiorari will settle the matter for both Judge Snyder and this Court. *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977), argued before the United States Supreme Court, 1977. —— U.S. ——, 98 S.Ct. 46, 54 L.Ed.2d 67.

██ Quotas are absolutely invidious and unconstitutional. Whether used to exclude minorities as in the old collegiate 10% quota system, or used to include minorities under this new public works subcontractors 10% quota system, as here, every quota based on race or national origin alone is constitutionally invalid and impermissible. In this situation the "10% quota-ed" persons are the stigmatized, and the remaining "non quota-ed" persons are the illegitimatized, whether hurt or helped. All discrimination solely on the basis of race or national origin, direct or reverse, converse or inverse, is invidious and unconstitutional.

Affirmative action and goals are permissible; race quotas are not. It is simple as that, but even worse and inevitably, race quotas do not achieve or even approach the goals desired—personal, familial, economic, educational, recreational and all kinds of human equality, regardless of race or national origin.

Equal protection and non-discrimination in every phase and activity of human life is mandated by equal protection to all persons guaranteed in the Federal Constitution. Race quotas necessarily run counter to this Constitutional mandate and must be struck down if this Court, and indeed all of us, are to live under and abide by the United States Constitution.

## V

## THE APPLICABILITY OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, SECTIONS 601 AND 602, 42 U.S.C. §§ 2000d and 2000d–1

Title VI of the Civil Rights Act of 1964, Sec. 601, 42 U.S.C. § 2000d [20] provides that no

---

20. The full text follows:

§ 2000d. **Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color, or national origin**

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Pub.L. 88–352, Title VI, § 601, July 2, 1964, 78 Stat. 252.

### Historical Note

**Legislative History.** For legislative history and purpose of Pub.L. 88–352, see 1964 U.S.Code Cong. and Adm.News, p. 2355.

person in the United States shall on the ground of race, color, or national origin be excluded from, denied the benefits of, or be subjected to discrimination under *any* program or activity receiving Federal financial assistance. This unequivocal statutory statement by Congress of the Constitutional guarantee of equal protection and non-discrimination solely on the basis of race, color, or national origin is specifically directed to be enforced by every Federal department or agency rendering Federal assistance to any program or activity. 42 U.S.C. § 2000d–1.[21] A plain uncomplicated reading of these two statutes would clearly invalidate the 10% "race quota" system set forth in the "race quota" law here in question, Public Law No. 95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2),[22] and the rules and regulations issued by the Commerce Department thereunder especially Sec. 317.17(b), 42 Fed.Reg. 27432 at 27434–5.[23] But let us consider these statutes in the light of appropriate statutory construction.

 The Court is aware of the general rules of statutory construction, which are hornbook law, and which are ordinarily controlling in a problem involving conflicting statutes:

(1) Where there is no clear intention to the contrary, a specific statute will not be controlled or nullified by a general one, irrespective of the priority of enactment.[24]

---

**21.** Full text (italics added):

§ 2000d–1. **Federal anthority and financial assistance to programs or activities by way of grant, loan, or contract other than contract of insurance or guaranty; rules and regulations; approval by President; compliance with requirements; reports to Congressional committees; effective date of administrative action**

*Each Federal department and agency* which is empowered to extend Federal financial assistance to *any program* or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, *is authorized and directed to effectuate* the provisions of section 2000d of this title with respect to *such program* or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

Pub.L. 88–352, Title VI, § 602, July 2, 1964, 78 Stat. 252.

**Historical Note**

**Equal Opportunity in Federal Employment.** Nondiscrimination in government employment and in employment by government contractors and subcontractors, see Ex.Ord. No.11246, Sept. 24, 1965, 30 F.R. 12319 and Ex.Ord. No.11478, Aug. 8, 1969, 34 F.R. 12985, set out as notes under section 2000e of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 88–352, see 1964 U.S.Code Cong. and Adm.News, p. 2355.

**22.** Full text is referenced in footnote 1 *supra,* and appears in Appendix A.

**23.** Full text is referenced in footnote 2 *supra,* and appears in Appendix B.

**24.** *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961).

(2) In resolving irreconcilable conflicts between successive statutory enactments, the later enactment should be given "primary consideration" over the prior.[25]

But the Court is compelled to go beyond the hornbook and must ascertain the purposes underlying any such conflicting enactments, and may not dispose of the problem solely by using such mechanical judicial slide-rules. *Fanning v. United Fruit Co.,* 355 F.2d 147, 149 (4th Cir. 1966). The two hornbook principles are not to be applied when the results are "extraordinary,"[26] or when the results do not reflect the true "presumed intention of the law making body."[27] It follows that when an overriding public interest is demonstrably clear, in that the prior general statute sets forth the true Constitutional mandate, and the later specific statute is less conducive to the public welfare, then the public good controls and the general statute will invalidate the specific statute. So also will the prior invalidate the subsequent.

In our case here, where the prior statutes, 42 U.S.C. § 2000d and § 2000d–1, set forth in clear and unmistakable terms the overriding mandate of the Federal Constitution for equal protection and non-discrimination, they obviously express the true policy of the United States, the true intent of Congress, and the true Constitutional mandate. Any attempt to invalidate them by the "race quota" statute and rules and regulations thereunder would give us, indeed, extraordinary results. Thus, even though they are general and not specific and even though they are prior in time, the Court must necessarily uphold these general and prior statutes and decree the invalidity of the "race quota" system contained in the specific and subsequent 10% "race quota" law and regulations.

The legislative history of Title VI of the Civil Rights Act of 1964, and more particularly Sections 601 and 602, thereof, 42 U.S.C. §§ 2000d[28] and 2000d–1,[29] unmistakably and in the plainest of language, sets forth the Congressional mandate in enacting these two statutes. They codify into statutory formula the equal protection and non-discrimination guarantees of the Federal Constitution.

For instance, House Report No. 914, 88th Congress, 2d Session, in reporting H.R. 7152, later amended and then enacted as 42 U.S.C. § 2000d (Sec. 601 of Title VI of the Civil Rights Act of 1964) to the floor, printed out as "Purpose and Content," that Title VI "prohibits discrimination in any Federal financial assistance program."[30] And in the Sectional Analysis portion, the House Report emphatically proclaims as to Title VI:

"This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance and authorizes and directs the appropriate Federal departments and agencies to carry out this policy."[31]

---

**25.** *Araya v. McLelland,* 525 F.2d 1194, 1196 (5th Cir. 1976).

**26.** *Shelton v. United States,* 83 U.S.App.D.C. 32, 35, 165 F.2d 241, 244 (1947).

**27.** *United States v. Windle,* 158 F.2d 196, 199 (8th Cir. 1946).

**28.** Full text at footnote 20, *supra.*

**29.** Full text at footnote 21, *supra.*

**30.** 1964 U.S.Code Cong. & Admin.News, pp. 2391–2394, at 2391. For full text see Appendix E attached.

**31.** In full, the Sectional Analysis of Title VI, 1964 U.S.Code Cong. & Admin.News, pp. 2400–2401, APPENDIX E, follows:

TITLE VI—NONDISCRIMINATION
IN FEDERALLY ASSISTED
PROGRAMS
General
 This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance and authorizes and directs the appropriate Federal departments and agencies to take action to

In stark contrast, the "race quota" provisions in Pub.L.No.95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2) have absolutely no legislative history.[32] The most that the defendants can dredge up are the remarks of the Hon. Parren J. Mitchell (D.Md.), United States Congressman from Maryland, who for the first time on the floor of the House at the time of the debate upon Pub.L.No. 95–28, introduced the 10% "race quota" amendment which, after slight modification, has become Section 103(f)(2) of Pub.L.No. 95–28, 42 U.S.C. § 6705(f)(2). But, of course, this is not legislative history. It is only the debate rhetoric of a partisan who sponsored the amendment.

This is not astounding, because, as defendants admit, and as the legislative history of Pub.L.No.95–28 demonstrates, the amendment sponsored by Congressman Mitchell was never considered by the House or by the Judiciary Committee, and is not mentioned anywhere in House Report No. 914, which reported the Bill to the House Floor without Mitchell's amendment.

The "race quota" provisions in Pub.L.No. 95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), the specific and subsequent law, and in the regulations issued pursuant to it cannot be held to invalidate by any kind of theory or implication the overriding Congressional, National, and Constitutional policy in 42 U.S.C. § 2000d and d–1, mandating the Federal Constitutional guarantees of equal protection and non-discrimination, even though the "race quota" ostensibly is claimed to benefit minorities, which of course, it does not in reality do. On the contrary, it is a glaring and flagrant violation of both the Congressional intent and National policy, as well as the Constitutional mandate.

It follows that this Court is obliged to declare the "race quota" provision of Pub.L. No.95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f) (2), and the rules and regulations issued thereunder, especially Section 317.19, 42 Fed. Reg. 27432 at 27434–5, invalid and illegal under and by virtue of Title VI of the Civil Rights Act of 1964, Sections 601 and 602, 42 U.S.C. § 2000d and d–1.

carry out this policy. This title is not intended to apply to foreign assistance programs.

Section 601.—This section states the general principle that no person in the United States shall be excluded from participation in or otherwise discriminated against on the ground of race, color, or national origin under any program or activity receiving Federal financial assistance.

Section 602 directs each Federal agency administering a program of Federal financial assistance by way of grant, contract, or loan to take action pursuant to rule, regulation, or order of general applicability to effectuate the principle of section 601 in a manner consistent with the achievement of the objectives of the statute authorizing the assistance. In seeking to effect compliance with its requirements imposed under this section, an agency is authorized to terminate or to refuse to grant or to continue assistance under a program to any recipient as to whom there has been an express finding pursuant to a hearing of a failure to comply with the requirements under that program, and it may also employ any other means authorized by law. However, each agency is directed first to seek compliance with its requirements by voluntary means.

Section 603 provides that any agency action taken pursuant to section 602 shall be subject to such judicial review as would be available for similar actions by that agency on other grounds. Where the agency action consists of terminating or refusing to grant or to continue financial assistance because of a finding of a failure of the recipient to comply with the agency's requirements imposed under section 602, and the agency action would not otherwise be subject to judicial review under existing law, judicial review shall nevertheless be available to any person aggrieved as provided in section 10 of the Administrative Procedure Act (5 U.S.C. 1009). The section also states explicitly that in the latter situation such agency action shall not be deemed committed to unreviewable agency discretion within the meaning of section 10. The purpose of this provision is to obviate the possible argument that although section 603 provides for review in accordance with section 10, section 10 itself has an exception for action "committed to agency discretion," which might otherwise be carried over into section 603. It is not the purpose of this provision of section 603, however, otherwise to alter the scope of judicial review as presently provided in section 10(e) of the Administrative Procedure Act.

**32.** We search in vain for any legislative history on Pub.L.No.95–28, Sec. 103(f)(2), 42 U.S.C. 6705(f)(2), although as we have seen there is voluminous legislative history on Pub.L.No.95–28 itself. See footnote 18, *supra,* for reference and Appendix D for full text.

## VI

## PROPRIETY OF THE REMEDIES SOUGHT

### (a) *Declaratory Judgment*

The Federal Judicial Code has since 1948, as amended in 1976, provided that "[i]n a case of actual controversy within its jurisdiction . . . any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

This statutory determination of the availability of declaratory relief "in a case of actual controversy" is, under Rule 57, Fed.R. Civ.P., available in accordance with all of the Federal Rules of Civil Procedure, including the Rule governing the entry of Summary Judgments, Rule 56, Fed.R.Civ.P. And the remedy of Declaratory Judgment is available "whether or not further relief is or could be sought." 28 U.S.C. § 2201.

█ As we have demonstrated heretofore, the case before us is a "justiciable controversy." See in this connection, 6A Moore's Federal Practice, Paragraph 57.-18[2] (2d ed. 1974, as kept up to date by the 1976–77 Cumulative Supplement) "Constitutionality of Public Acts," and cases there cited. The case before us concerns "the rights and other legal relations" of the plaintiffs under the unconstitutional provisions of Pub.L.No.95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2). Not only have these unconstitutional 10% "race quota" provisions been applied, but they are clearly threatened to be applied in the future, and since the plaintiffs have standing, declaratory relief is properly, factually, and legally invoked here and should be issued, not only with regard to the unconstitutionality of Pub.L.No.95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), but also with respect to the relevant rules and regulations issued thereunder by the Federal Defendants, especially Section 317.19(b), 42 Fed.Reg. 27432, 27434–5. Based on race alone they are unconstitutional on their face and as applied; and we might add, since they are threatened to be applied in this situation, a declaratory judgment is obligatory.

Since we have also found that Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and d–1 are applicable to invalidate Pub.L.No. 95–28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), declaratory relief should also be granted to plaintiffs upon this ground.

### (b) *Injunctive Relief*

While the basic elements of injunctive relief are present here where we have an unconstitutional and illegal "10% race quota" system, the Affidavit of Arthur J. Sulvetta, Attachment N to Federal Defendants' Motion for Summary Judgment, makes it clear that any restraint retroactively or retrospectively applied would work a serious and irreparable injury upon the Local Defendants and upon the people and economy of Los Angeles County and Los Angeles City.

As Sulvetta, who is Chief, Program Analysis Division, Economic Development Administration, U.S. Department of Commerce and an apparently extremely well qualified economist, under oath declares, a nationwide total of $4 billion out of the $6 billion appropriated to date have been granted, including more than $57 million for the Local Defendants: $29,782,108 for the City of Los Angeles and its departments, offices and projects; and $28,109,085 for the County of Los Angeles, and its departments, offices and projects.

Moreover, Sulvetta estimates that those projects will generate approximately 5,613 to 6,068 person-years of jobs, involving 1,910,901 hours of employment, the equivalent of a full year of employment for 1,517 construction workers, translated into 12,265 workers to be employed on these local projects. He further estimates 489 person-years in indirect jobs associated with

the construction industry here on these projects in Los Angeles City and County.

Finally, Sulvetta estimates that a one-year delay in project construction activities would increase costs an additional $7.6 million over and above the $59 million for the Local Defendants; and a two-year delay would result in $16.1 million increase in costs.

Founded as they are on reliable studies by the Rand Corporation and other equally reliable studies and statistics, Sulvetta's Affidavit convinces the Court that retroactive or retrospective application of injunctive relief would be in essence a financial, economic, and fiscal disaster for the Local Defendants, their residents, and their economies.

And, of course, Sulvetta's estimates are substantiated in every material respect by the affidavits submitted by the Local Defendants, specifying in some detail the public injury that would result if projects were held up for any length of time, consisting as they do of police facilities, schools, recreation centers, senior citizen facilities, storm drains, sewerage facilities, flood control projects, hospital additions, medical and surgical augmentations, fuel storage facilities, landscaping, and numerous other public works.

■ We are thus fully aware of the tremendous detriment and harm that necessarily would befall the defendants if any injunctive relief were to be made retroactive, as so clearly demonstrated by the most recent affidavits of the defendants and the acts of the plaintiffs themselves by their undue delay and even fault in filing their action and in failing and refusing to bid, even though they were under the clear threat of the defendants to deny awards to any such bids. This awareness obliges this Court to apply any injunctive relief solely and only in the future and prospectively. This is not to say that the statute is not unconstitutional for we have already held that it is. But the Court does have equitable discretion to consider all of the circumstances in determining how far reaching and in what time frame restraint should be ordered. The Court finds and concludes that it should operate only in the future, balancing as it must the needs of and detriment that might be suffered on both sides, depending on the prospective or retroactive thrust of injunctive relief.

It is abundantly clear, therefore, that the injunctive relief in the Judgment should be fashioned so as to apply only prospectively in accordance with the principles laid down by the Supreme Court in *Linkletter v. Walker*, 381 U.S. 618, 627–29, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and *Chicot County District v. Bank,* 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329 (1940). In fashioning this prospective injunctive application we should keep in mind two dates today, October 31, 1977, with respect to the Federal Defendants, and December 31, 1977, with respect to the Local Defendants.

And just as absolutely clear from the Sulvetta Affidavit it is that no injunctive relief should be issued, applied, or even contemplated with respect to Federal grants made to local agencies throughout the United States, other than the Local Defendants. To do so would be to pass judgment on some $4 billion worth of projects and controversies throughout the nation with totally unacceptable and undoubtedly baleful consequences. It is wholly repugnant to this Court, and, of course, will not be ordered.

## VII

### ORDER

By reason of the foregoing Decision, Findings of Fact and Conclusions of Law it is hereby ordered that judgment be entered for plaintiffs and against defendants for declaratory relief and permanent injunction in accordance herewith.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Appendices to follow.

APPENDIX A

PUBLIC LAW 95–28 [H.R. 11]; May 13, 1977

## LOCAL PUBLIC WORKS CAPITAL DEVELOPMENT AND INVESTMENT ACT OF 1976

*For Legislative History of Act, see p. 716*

An Act to increase the authorization for the Local Public Works Capital Development and Investment Act of 1976.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Local Public Works Capital Development and Investment Act of 1976, authorization increase.
Public Works Employment Act of 1977.
42 USC 6701 note.
42 USC 6701.
Public works project.

### TITLE I

SECTION 101. This title may be cited as the "Public Works Employment Act of 1977".

SEC. 102. (a) Paragraph (2) of section 102 of the Local Public Works Capital Development and Investment Act of 1976 is amended by striking out "and American Samoa." and inserting in lieu thereof the following: "American Samoa, and the Trust Territory of the Pacific Islands.".

(b) Section 102 of such Act is amended by adding at the end thereof the following:

"(4) 'public works project' includes a project for the transportation and provision of water to a drought-stricken area.".

Grants and contracts, requirements.
42 USC 6705.
Competitive bidding.

SEC. 103. Section 106 of the Local Public Works Capital Development and Investment Act of 1976 is amended by adding at the end thereof the following new subsections:

"(e) (1) No part of the construction (including demolition and other site preparation activities), renovation, repair, or other improvement of any public works project for which a grant is made under this Act after the date of enactment of this subsection shall be performed directly by any department, agency, or instrumentality of any State or local government. Construction of each such project shall be performed by contract awarded by competitive bidding, unless the Secretary shall affirmatively find that, under the circumstances relating to such project, some other method is in the public interest. Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.

Illegal aliens.

"(2) No grant shall be made under this Act for any local public works project unless the State or local government applying for such grant submits with its application a certification acceptable to the Secretary that no contract will be awarded in connection with such project to any bidder who will employ on such project any alien in the United States in violation of the Immigration and Nationality Act or any other law, convention, or treaty of the United States relating to the immigration, exclusion, deportation, or expulsion of aliens.

8 USC 1101 note.

U.S.-made products.

"(f) (1) (A) Notwithstanding any other provision of law, no grant shall be made under this Act for any local public works project unless only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manu-

factured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, and supplies mined, produced, or manufactured, as the case may be, in the United States, will be used in such project.

"(B) Subparagraph (A) of this paragraph shall not apply in any case where the Secretary determines it to be inconsistent with the public interest, or the cost to be unreasonable, or if articles, materials, or supplies of the class or kind to be used or the articles, materials, or supplies from which they are manufactured are not mined, produced, or manufactured, as the case may be, in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality.

"(2) Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

*Grant allocation requirements.*

*"Minority business enterprise."*

*Minority group members.*

"(g) No grant shall be made under this Act for any project for which the applicant does not give assurances satisfactory to the Secretary that the project will be designed and constructed in accordance with the standards for accessibility for public buildings and facilities to the handicapped and elderly under the Act entitled 'An Act to insure that certain buildings financed with Federal funds are so designed and constructed as to be accessible to the physically handicapped', approved August 12, 1968 (42 U.S.C. 4151 et seq.). The Architectural and Transportation Barriers Compliance Board established by the Rehabilitation Act of 1973 (P.L. 93–112) is authorized to insure that any construction and renovation done pursuant to any grant made under this Act complies with the accessibility standards for public buildings and facilities issued under the Act of August 12, 1968.".

*Accessibility standards for handicapped and elderly.*

*29 USC 701 note.*

SEC. 104. Section 107 of the Local Public Works Capital Development and Investment Act of 1976 is amended by inserting after the third sentence thereof the following new sentence: "The Secretary, in consultation with the Secretary of Labor, and consistent with existing applicable collective bargaining agreements and practices, shall promulgate regulations to assure special consideration to the employment in projects under this Act of qualified disabled veterans (as defined in section 2011(1) of title 38, United States Code) and qualified Vietnam-era veterans (as defined in section 2011(2)(A) of such title 38).".

*Employment of disabled veterans, regulations. 42 USC 6706.*

SEC. 105. Subsection (a) of section 108 of the Local Public Works Capital Development and Investment Act of 1976 is amended to read as follows:

*Funds, allocation. 42 USC 6707.*

"(a) The Secretary shall allocate funds appropriated after the date of enactment of the Public Works Employment Act of 1977 under section 111 of this Act as follows:

*Post, p. 119.*

"(1) 2½ per centum of such funds shall be set aside and shall be expended only for grants for public works projects under this Act to Indian tribes and Alaska Native villages. None of the

remainder of such funds shall be expended for such grants to such tribes and villages.

"(2) After the set aside required by paragraph (1) of this subsection, $70,000,000 shall be set aside and expended only for grants for any public works project the application for a grant for which was made under this Act after the date of enactment of this Act and before December 24, 1976, and which application was not received, was not considered, or was rejected solely because of an error by an officer or employee of the United States. Any allocation made to an applicant pursuant to regulation shall be reduced by the amount of any grant made to such applicant under this paragraph.

"(3) After the set asides required by paragraphs (1) and (2) of this subsection, 65 per centum of such funds shall be allocated among the States on the basis of the ratio that the number of unemployed persons in each State bears to the total number of unemployed persons in all the States and 35 per centum of such funds shall be allocated among those States with an average unemployment rate for the preceding twelve-month period in excess of 6.5 per centum on the basis of the relative severity of unemployment in each such State, except that (A) no State shall be allocated less than three-quarters of one per centum or more than 12½ per centum of such funds for local public works projects within such State, except that in the case of Guam, the Virgin Islands, American Samoa, and the Trust Territory of the Pacific Islands, not less than one-half of one per centum in the aggregate shall be granted for such projects in all four of these jurisdictions, and (B) no State whose unemployment data was converted for the first time in 1976 to the benchmark data of the current population survey annual average compiled by the Bureau of Labor Statistics shall receive a percentage of such funds less than the percentage of funds allocated to such State under this Act from funds appropriated to carry out this Act prior to the date of enactment of the Public Works Employment Act of 1977.".

SEC. 106. Subsection (b) of section 108 of the Local Public Works Capital Development and Investment Act of 1976 is amended by—

42 USC 6707.

(1) inserting "(1)" immediately after "(b)"; and

(2) adding at the end thereof the following new paragraphs:

"(2) In making grants for projects for construction, renovation, repair, or other improvement of buildings, the Secretary shall also give consideration as between such building projects to those projects which will result in conserving energy, including, but not limited to, projects to redesign and retrofit existing public facilities for energy conservation purposes, and projects using alternative energy systems.

"(3) In making grants under this Act, the Secretary shall also give priority and preference to any public works project requested by a State or by a special purpose unit of local government which is endorsed by a general purpose local government within such State.

"(4) A project requested by a school district shall be accorded the full priority and preference to public works projects of local governments provided in section 108(b) of this Act.".

SEC. 107. (a) The first sentence of subsection (c) of section 108 of the Local Public Works Capital Development and Investment Act of 1976 is amended by striking out "three most recent consecutive months" each place it appears and inserting in lieu thereof at each such place "twelve most recent consecutive months".

Waiver.

(b) Subsection (c) of section 108 of such Act is amended by adding

at the end thereof the following new sentence: "The Secretary may waive the application of the first sentence of this subsection to any State which receives a minimum allocation pursuant to paragraph (3) of subsection (a) of this section."

(c) Subsection (d) of section 108 of such Act is amended to read as follows: 42 USC 6707.

"(d) Whenever a State or local government submits applications for grants under this Act for two or more projects, such State or local government shall submit as part of such applications its priority for each such project.".

(d) Subsection (e) of section 108 of such Act is amended by striking out "of direct benefit to," and all that follows down through and including the period at the end of the sentence and inserting in lieu thereof: "to be constructed in such community or neighborhood.".

(e) Subsection (f) of section 108 of such Act is hereby repealed. Repeal.

(f) Section 108 of such Act is amended by adding at the end thereof the following new subsections:

"(h)(1) Except as provided in paragraph (2) of this subsection, the Secretary shall not consider or approve or make a grant for any project for which any application was not submitted for a grant under this Act on or before December 23, 1976.

"(2) The Secretary may receive applications for grants for projects under this Act—

"(A) from the Trust Territory of the Pacific Islands;

"(B) from Indian tribes and Alaska Native villages;

"(C) from any applicant to use any allocation which may be made pursuant to regulation, to the extent necessary to expend such allocation, if a sufficient number of applications were not submitted on or before December 23, 1976, to use such allocation.

"(i) The Secretary may allow any applicant which has received a grant for a project under this Act to substitute one or more projects for such project if in the judgment of the Secretary (1) the Federal cost in the aggregate of such substituted project or projects does not exceed such grant, (2) such substituted project or projects comply with section 106(d) of this Act, and (3) such substituted project or projects *Ante,* p. 118. will in fact aid in alleviating drought or other emergency or disaster-related conditions or damage. Section 106(a) of this Act shall not apply to projects substituted under this subsection.

"(j) Notwithstanding subsection (h)(1) of this section, grants may be made from appropriations made under section 111 of this Act after *Post,* p. 120. September 30, 1977, to States or local governments for projects for the construction, renovation, repair, or other improvements of health care or rehabilitation facilities owned and operated by private nonprofit entities.".

SEC. 108. The first sentence of section 109 of the Local Public Works Capital Development and Investment Act of 1976 is amended by striking 42 USC 6708. out "by contractors or subcontractors".

SEC. 109. Section 111 of the Local Public Works Capital Development and Investment Act of 1976 is amended by striking out 42 USC 6710. "$2,000,000,000 for the period ending September 30, 1977," and inserting in lieu thereof "$6,000,000,000 for the period ending December 31, 1978,".

SEC. 110. (a) The Secretary of Commerce is authorized and directed to study public works investment in the United States and the implications for the future of recent trends in such investment.

(b) The study authorized by this section shall include, but not be limited to, the following:

Public works investment, study. 42 USC 6701 note.

(1) The historical scope and nature of public works investment, including—

(A) shifts in the types of public facilities constructed over the last thirty years and the implications of such shifts;

(B) the patterns of regional distribution of investment;

(C) the role of the Federal Government, States, and local communities in funding public facilities;

(D) the impact upon unemployment in minority groups.

(2) The proportion of the gross national product devoted to public works investment over the last thirty years.

(3) Methods by which the aggregate need for public works can be determined.

(4) How public works are financed and how financing arrangements affect the pattern and type of investment.

(5) The level of maintenance or renovation of existing public facilities needed, compared to that provided.

Report to Congress.

(c) The Secretary of Commerce shall submit to Congress a report with respect to its findings and recommendations no later than eighteen months after the date of enactment of this section. A preliminary report putting forth the study design shall be submitted to Congress within four months after the date of enactment of this section.

42 USC 6710 note.

SEC. 111. The Secretary of Agriculture and the Secretary of the Interior shall immediately initiate the construction of those Federal public works projects (A) which are the responsibility of their respective departments, (B) which have been authorized, and (C) which can be commenced within 60 days of the date of enactment of this section and completed no later than the 180th day after commencement of construction. No funds authorized by section 111 of the Local Public Works Capital Development and Investment Act of 1976 (Public Law 94–369) may be used to carry out this section.

Funds, prohibition. 42 USC 6710.

## TITLE II—FEDERAL PUBLIC WORKS PROJECTS CONTINUATION

SEC. 201. The Congress hereby finds and declares that:

(A) the construction projects listed in Public Law 94–355, the Public Works for Water and Power Development and Energy Research Appropriations Act, 1977, and in Public Law 94–351, the Agriculture and Related Agencies Programs Appropriations Act, 1977, represent the foundation of our national public works activity. Such projects are essential to the reduction of unemployment;

90 Stat. 889.

90 Stat. 851.

(B) such projects provide long-term benefits to communities, to States, and to the entire Nation in terms of water management, flood control, navigation, recreation, and enhanced economic activity; and

(C) such projects have been authorized by the Congress after protracted hearings and consideration extended over many years. Appropriations have been made and are being made pursuant thereto. It is the judgment of Congress that such projects should not be discontinued except by following the legislative process provided by the Constitution of the United States and the provisions of Public Law 93–344, the Congressional Budget and Impoundment Control Act of 1974.

31 USC 1301 note.
Budget deferrals and rescissions, exception.

SEC. 202. Notwithstanding the deferral and rescission provisions of Public Law 93–344, all appropriations provided in Public Laws 94–355 and 94–351 for construction projects or for investigation, plan-

ning, or design related to construction projects shall be made available for obligation by the President and expended for the purposes for which the appropriations are made, with the exception of those appropriations or expenditures relating to the Meramec Park Lake project in Missouri.

SEC. 203. With the exception noted relating to the Meramec Park Lake project in Missouri, section 202 of this Act shall be equivalent to and have the legal effect of a resolution disapproving any deferral of budget authority previously provided for construction projects in Public Law 93–355 or in any prior law appropriating funds for the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation, or for construction projects in Public Law 94–351 or any prior law appropriating funds for construction projects in the Department of Agriculture as provided for in section 1013(b) of Public Law 93–344, the Congressional Budget and Impoundment Control Act of 1974. With the exception noted relating to the Meramec Park Lake project in Missouri, section 202 is also equivalent to a congressional statement of intent not to uphold any rescission of budget authority with regard to funds appropriated for construction projects in Public Law 94–355 or Public Law 94–351 or for construction projects in any prior law appropriating funds for the United States Army Corps of Engineers, the Department of the Interior Bureau of Reclamation, or the Department of Agriculture, as provided for in section 1012(b) of Public Law 93–344. *90 Stat. 889. 90 Stat. 851. 31 USC 1403. Ante, p. 120. 31 USC 1402.*

SEC. 204. It is hereby reiterated that the interest rates or rates of discount to be used to assess the return on the Federal Government's investment in projects of the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation, shall be those interest rates or rates of discount established by Public Law 93–251, the Water Resources Development Act of 1974, or by any prior law authorizing projects of the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation. *Intrerest rates and rates of discount. 42 USC 1962d–17 note. 88 Stat. 12.*

Approved May 13, 1977.

---

LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 95–20 (Comm. on Public Works and Transportation) and No. 95–230 (Comm. of Conference).
SENATE REPORTS: No. 95–38 accompanying S. 427 (Comm. on Environment and Public Works) and No. 95–110 (Comm. of Conference).
CONGRESSIONAL RECORD, Vol. 123 (1977):
Feb. 24, considered and passed House.
Mar. 10, considered and passed Senate, amended, in lieu of S. 427.
Apr. 5, House concurred in Senate amendment with an amendment.
Apr. 28, 29, Senate agreed to conference report.
May 3, House agreed to conference report.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 13, No. 20:
May 13, Presidential statement.

## APPROPRIATIONS—ECONOMIC STIMULUS, ETC.

,An Act making economic stimulus appropriations for the fiscal year ending September 30, 1977, and for other purposes.

**Economic stimulus appropriations, 1977.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for economic stimulus appropriations for the fiscal year ending September 30, 1977, and for other purposes, namely:

### TITLE I

### CHAPTER I

### DEPARTMENT OF THE TREASURY

PAYMENTS TO STATE AND LOCAL GOVERNMENT FISCAL ASSISTANCE TRUST FUND

For payments to the State and Local Government Fiscal Assistance Trust Fund, as authorized by the State and Local Fiscal Assistance Act of 1972, as amended (31 U.S.C. 1221–1263), $4,991,085,000.

ANTIRECESSION FINANCIAL ASSISTANCE FUND

For an additional amount for the "Antirecession Financial Assistance Fund", $632,500,000, to remain available until September 30, 1978.

### NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

RESEARCH AND DEVELOPMENT

For an additional amount for "Research and development", $95,000,000, to remain available until expended.

### ENVIRONMENTAL PROTECTION AGENCY

CONSTRUCTION GRANTS

**33 USC 1286.**

For payment of reimbursement claims pursuant to section 206(a) of the Federal Water Pollution Control Act, as amended, $300,000,000, to remain available until expended.

# CHAPTER II

## DEPARTMENT OF LABOR

### EMPLOYMENT AND TRAINING ADMINISTRATION

#### PROGRAM ADMINISTRATION

For an additional amount for "Program administration", $4,397,000, together with not to exceed $100,000 which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

#### EMPLOYMENT AND TRAINING ASSISTANCE

For an additional amount for "Employment and training assistance", $2,578,000,000, to remain available until September 30, 1978.

#### TEMPORARY EMPLOYMENT ASSISTANCE

For financial assistance as authorized by Title VI of the Comprehensive Employment and Training Act of 1973, as amended, $6,847,000,000, to remain available until September 30, 1978.

29 USC 961.

#### COMMUNITY SERVICE EMPLOYMENT FOR OLDER AMERICANS

For an additional amount for "Community service employment for older Americans", $59,400,000, of which $44,500,000 is to carry out section 906(a)(1) of the Older Americans Act.

42 USC 3056d.

### BUREAU OF LABOR STATISTICS

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and expenses", $500,000.

### DEPARTMENTAL MANAGEMENT

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and expenses", $602,000.

# CHAPTER III

## DEPARTMENT OF COMMERCE

### ECONOMIC DEVELOPMENT ADMINISTRATION

#### DROUGHT ASSISTANCE PROGRAM

For expenses necessary to carry out a community emergency drought assistance program, $175,000,000: *Provided*, That this appropriation shall be available only upon enactment into law of authorizing legislation.

#### LOCAL PUBLIC WORKS PROGRAM

For an additional amount for "Local public works program", $4,000,000,000: *Provided*, That not to exceed $15,000,000, to remain available until September 30, 1979, may be used for necessary admin-

istrative expenses, including expenses for program evaluation by the Secretary of Commerce.

## CHAPTER IV

## DEPARTMENT OF TRANSPORTATION

### FEDERAL AVIATION ADMINISTRATION

#### GRANTS-IN-AID FOR AIRPORTS (AIRPORT AND AIRWAY TRUST FUND)

Section 302 of the Department of Transportation and Related Agencies Appropriation Act, 1977 (Public Law 94–387) is amended by striking out "$510,000,000" and inserting in lieu thereof: "$545,000,000".

90 Stat. 1184.

### FEDERAL HIGHWAY ADMINISTRATION

#### OFF-SYSTEM RAILWAY-HIGHWAY CROSSINGS

For necessary expenses for the elimination of hazards of railway-highway crossings on roads other than those on any Federal-aid system in accordance with the provisions of section 203 of the "Highway Safety Act of 1976", to remain available until September 30, 1980; $75,000,000.

23 USC 130 note.

#### SAFER OFF-SYSTEM ROADS

For necessary expenses to carry out the provisions of 23 U.S.C. 219; $200,000,000, to remain available until September 30, 1980.

#### TRAFFIC CONTROL SIGNALIZATION DEMONSTRATION PROJECTS

For necessary expenses to carry out the provisions of section 146 of the "Federal-Aid Highway Act of 1976"; $10,000,000, to be derived from the Highway Trust Fund and to remain available until September 30, 1980.

23 USC 135 note.

#### HIGHWAYS CROSSING FEDERAL PROJECTS

For an additional amount for "Highways crossing Federal projects" authorized by 23 U.S.C. 156; $15,000,000, to remain available until September 30, 1979.

#### RAILROAD-HIGHWAY CROSSINGS DEMONSTRATION PROJECTS

For necessary expenses of railroad-highway crossings demonstration projects, as authorized by section 163 of the Federal-Aid Highway Act of 1973, as amended, and title III of the National Mass Transportation Assistance Act of 1974, to remain available until expended, $16,000,000 of which $10,666,667 shall be derived from the Highway Trust Fund.

23 USC 130 note.
49 USC 1605 note.

### FEDERAL RAILROAD ADMINISTRATION

#### NORTHEAST CORRIDOR IMPROVEMENT PROGRAM

For an additional amount for the Northeast Corridor improvement program, $50,000,000, to remain available until expended.

RAILROAD REHABILITATION AND IMPROVEMENT FINANCING FUNDS

For an additional amount pursuant to sections 502, 505–507, and 509 of the Railroad Revitalization and Regulatory Reform Act of 1976 (Public Law 94–210) as amended, $50,000,000, to remain available until September 30, 1978.

45 USC 822, 825–827, 829.

## DEPARTMENT OF THE TREASURY

### OFFICE OF THE SECRETARY

#### INVESTMENT IN FUND ANTICIPATION NOTES

For an additional amount for investment in fund anticipation notes, $50,000,000, to remain available until September 30, 1978.

## CHAPTER V

## DEPARTMENT OF THE TREASURY

### INTERNAL REVENUE SERVICE

#### ACCOUNTS, COLLECTION AND TAXPAYER SERVICE

For an additional amount for "Accounts, collection and taxpayer service", $2,000,000.

## TITLE II

## GENERAL PROVISIONS

SEC. 201. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

Approved May 13, 1977.

---

LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 95–66, No. 95–66, pt. II (Comm. on Appropriations) and No. 95–238 (Comm. of Conference).
SENATE REPORT No. 95–58 (Comm. on Appropriations).
CONGRESSIONAL RECORD, Vol. 123 (1977):
 Mar. 15, considered and passed House.
 May 2, considered and passed Senate, amended.
 May 4, House agreed to conference; receded and concurred in certain Senate amendments with amendments.
 May 5, Senate agreed to conference report; concurred in House amendments to Senate amendments.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 13, No. 20:
 May 13, Presidential statement.

## RULES AND REGULATIONS

### Title 13—Business Credit and Assistance

CHAPTER III—ECONOMIC DEVELOPMENT ADMINISTRATION, DEPARTMENT OF COMMERCE

PART 317—ROUND II OF THE LOCAL PUBLIC WORKS CAPITAL DEVELOPMENT AND INVESTMENT PROGRAM

### Grants of Assistance

AGENCY: Economic Development Administration, Department of Commerce.

ACTION: Final rule.

SUMMARY: These regulations contain the requirements and procedures governing the grant of assistance under round II of the Local Public Works program. They implement the amendments made to the Local Public Works Capital Development and Investment Act of 1976 by the Public Works Employment Act of 1977, Pub. L. 95–28, and administrative decisions regarding the grant of assistance under that Act.

DATES: Effective date: May 27, 1977. Comments by: June 27, 1977.

ADDRESS: Send comments to: Assistant Secretary for Economic Development, U.S. Department of Commerce, Room 7800B, Washington, D.C. 20230.

FOR FURTHER INFORMATION CONTACT:

James F. Marten, U.S. Department of Commerce, Room 7009, Washington, D.C. 20230 (202–377–5441).

SUPPLEMENTARY INFORMATION:

STATEMENT OF PROGRAM OBJECTIVES

The national economy and the economies of many areas and regions in this country continue to exhibit levels of distress that are excessive and, consequently, incompatible with our goals as a nation. This distress is reflected in a variety of ways, including high unemployment and inadequate public capital stock. The purpose of this program is to address such problems by providing for the expeditious construction of useful public works and development facilities in these areas.

Previous experience has demonstrated that local and State governments in every section of the country possess the capability to undertake public works projects within a very short time span. Experience has further proven that such projects furnish needed public facilities as well as generate employment. In many cases, this stimulus and the employment generated continue beyond the period of project construction and contribute to the area's long-term development.

On the basis of our knowledge about public works expenditures and the needs of economically disadvantaged areas

and regions, round II of this program has been developed to authorize the immediate funding of local and State government public works facilities in accordance with the following objectives.

To target projects, to the greatest degree possible, to those areas of greatest unemployment.

To reduce previous funding inequities among different areas and governmental units.

To place maximum emphasis on local decision-making in establishing priorities and the selection of projects.

To increase the program's efficiency decision-making in establishing priorities and the selection of projects.

To increase the programs' efficiency while reducing the administrative workload.

To make the program more predictable so that participants and the general public can assess it more readily.

Because these regulations relate to an EDA grant program, they are exempted from the procedures described in section 553 of the Administrative Procedure Act (5 U.S.C. 553). However, in the spirit of public policy set forth in that Act, interested persons may submit written suggestions regarding these regulations to the Assistant Secretary for Economic Development at the above address.

Consideration has been given as to whether matters set forth in these regulations constitute a major proposal with an inflationary impact within the meaning of OMB Circular A–107 and the interpretative guidelines as issued by the Department of Commerce. A determination has been made that these regulations do not extend beyond the statute, and therefore there is no inflationary impact of these regulations beyond the statute.

Accordingly, 13 CFR Chapter III is amended by adding a new Part 317 to read as follows:

#### Subpart A—Introduction

Sec.
317.1 Purpose.
317.2 Definitions.

#### Subpart B—Eligibility Criteria

317.10 Eligible applicants.
317.11 Eligible areas.
317.12 Eligible applications for round II funding.
317.13 Types of grants.
317.14 Eligible projects.
317.15 Ineligible projects.
317.16 Projects ineligible unless accompanied by unusual circumstances.
317.17 Project costs.
317.18 Ineligible project costs.
317.19 Construction requirements.
317.20 Maximum project cost.

## Subpart C—Application Procedure

Sec.
317.30 Revival of applications currently on file.
317.31 New applications.
317.32 Acceptance of revived and new applications.
317.33 Project areas.
317.34 Determination of unemployment data.
317.35 Certifications.
317.36 False or inaccurate statements.
317.37 Applicant's priority rating of projects.
317.38 Amendment of existing applications.

### Subpart D—Allocation of Program Funds
317.40 Allocation of funds to the States.
317.41 Statutory minimum and maximum State allocations.
317.42 Indian tribe set-aside.
317.43 Procedural errors set-aside.

### Subpart E—Planning Targets
317.50 General considerations.
317.51 State planning target.
317.52 Sub-State area planning targets.
317.53 Sub-State applicant planning targets.

### Subpart F—Project Selection Procedure
317.60 Conserving energy.
317.61 Projects selected from national set-asides.
317.62 Projects selected from State-wide planning targets.
317.63 Projects selected from sub-State planning targets.
317.64 Undue concentration.
317.65 Similar applications.

### Subpart G—General Requirements
317.70 Environmental considerations.
317.71 Compliance with other Federal requirements.
317.72 Transfer of grant awards to drought-related projects.
317.73 Lease of project facilities.
317.74 Final determination.
317.75 Suspension and termination.

### Subpart H—Eligibility of Non-Profit Entities
317.80 Grants for non-profit entities.

AUTHORITY: Section 701, Pub. L. 89–136, 79 Stat. 570 (42 U.S.C. 3211); Pub. L. 94–369, 90 Stat. 999 (42 U.S.C. 6701); Pub. L. 95–28, 91 Stat. 116; Department of Commerce Organization Order 10–4 (September 30, 1975), as amended (40 FR 56702 as amended at 40 FR 58878 and 41 FR 35548).

## Subpart A—Introduction

### § 317.1 Purpose.

The purpose of this part is to set forth the requirements and procedures pursuant to which eligible applicants may receive grants under the "Local Public Works Capital Development and Investment Act of 1976," as amended by the "Public Works Employment Act of 1977," Pub. L. 95–28.

### § 317.2 Definitions.

"Assistant Secretary" means the Assistant Secretary of Commerce for Economic Development or his delegate.

"Endorsement" means the process by which an applicant can select a project, which was originally submitted by another applicant, for consideration for funding from its planning target.

"General purpose unit of local government" means any city, county, town, parish, Indian tribe, or any other "unit of general local government" as included within the definition of that term by section 104 of the Intergovernmental Cooperation Act of 1968 (42 U.S.C. 4201 et seq.).

"Indian tribe" means the governing body of a tribe, nonprofit Indian corporation (restricted to Indians), Indian authority, or other tribal organization, or entity, or Alaskan native village.

"Initiation of construction" means that notice to proceed or its equivalent has been issued or on-site labor has begun, except where on-site labor has commenced on the project but the project was abandoned due to lack of funds or where the project is to expand or modify a completed facility which has integrity in and of itself.

"Local Public Works Act" means the "Local Public Works Capital Development and Investment Act of 1976," as amended by the "Public Works Employment Act of 1977," Pub. L. 95–28.

"Local government" means any city, county, town, parish, or other political subdivision of a State (including local school districts), and any Indian tribe.

"Maintenance costs" means costs that are incurred for any necessary repairs or upkeep of property which neither add to the permanent value of the property nor appreciably prolong its intended life, but rather keep it in an efficient operating condition.

"Minority business enterprise" means a business at least fifty percent of which is owned by minority group members or, in the case of a publicly owned business, at least fifty-one percent of the stock of which is owned by minority group members.

"Minority group member" means a citizen of the United States who is Negro-Spanish-speaking, Oriental, Indian, Eskimo, or Aleut.

"Non-primary city" means any city, township, or village with a population less than 50,000 persons.

"Pocket of poverty" means a project area with a population of 4,000 or more

persons and an unemployment rate of at least 8.5 percent which becomes qualified for assistance using the procedures contained in section 108(e) of the Local Public Works Act. A pocket of poverty must be located within a primary city which did not receive a planning target.

"Political subdivision of a State" means the agencies, instrumentalities and authorities established or authorized by State law including, but not limited to, special districts and regional authorities formed by local governments.

"Project area" means a primary city; the balance of a county in which a primary city is located; a county without a primary city; a pocket of poverty; or an Indian reservation or tribal land (trust and/or restricted land), as appropriate under the provisions of § 317.-33. ·

"Primary city" means any city or township (which performs the same services as a city) with a population of 50,000 or more persons, as determined by the Bureau of the Census 1973 estimates.

"Renovation, repair, or other improvements" means only those activities which either substantially or appreciably increase the value or prolong the life of a public facility and excludes those activities which keep the public facility in ordinary efficient operating condition during its probable useful life.

"Round I" of funding under the local Public Works program refers to the funding of projects with money appropriated by Pub. L. 94–447.

"Round II" of funding under the Local Public Works program refers to the funding of projects with money appropriated by Pub. L. 95–29.

"State" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Trust Territory of the Pacific Islands.

### Subpart B—Eligibility Criteria

§ 317.10 Eligible applicants.

A State or a local government, as defined in § 317.2, is eligible for assistance under this part if it is located in an area described in § 317.11.

§ 317.11 Eligible areas.

(a) Subject to the provisions of subsection (b) of this section, assistance under this part may only be extended to eligible applicants located in project areas, as defined in § 317.2, for which planning targets have been established. Planning targets have been established in the following manner, subject to the provisions of § 317.42 and Subpart E of this part.

(1) Where the State average unemployment rate is 6.5 percent or higher, planning targets have been established for project areas with unemployment rates of at least 6.5 percent.

(2) Where the State average unemployment rate is less than 6.5 percent, planning targets have been established for project areas with unemployment rates of at least the State average unemployment rate.

(3) Notwithstanding the provisions of paragraphs (1) and (2) of this subsection, planning targets have been established for pocket of poverty project areas only where such areas have unemployment rates of at least 8.5 percent.

(b) In States which are receiving the statutory minimum allocation of Local Public Works funds and for which the Assistant Secretary has waived the priority ranking of applicants required by section 108(c) of the Local Public Works Act, assistance under this part may be extended to eligible applicants in project areas as necessary to expend the statutory minimum allocation.

§ 317.12 Eligible applications for round II funding.

The following applications shall be eligible for consideration for funding under round II of the Local Public Works program:

(a) Applications for Local Public Works projects submitted by eligible applicants located in eligible areas, as defined in § 317.11, which were received by EDA before December 24, 1976, including applications originally filed before that date which were returned for deficiencies; and

(b) New applications from eligible applicants located in eligible areas subject to the requirements of § 317.31.

§ 317.13 Types of grants.

(a) *Direct grants.* (1) The Assistant Secretary may make direct grants to any State or local government for construction (including demolition and other site preparation activities), renovation, repair, or other improvement of local public works projects, including those for which Federal financial assistance is authorized under provisions of law other than the Local Public Works Act. Such grants may include funds for the completion of plans, specifications and estimates where additional architectural and engineering work or related planning is required to permit construction of the project under this section.

(2) Applications under this section will be approved only if the applicant submits with its application, if applicable and required by EDA, a written certification from the other Federal agency/agencies primarily concerned with projects of the type involved in the application that the project meets all applicable Federal statutory and regulatory requirements to the extent necessary to assure the utilization of the project for the services intended.

(3) The Federal share of any project for which a grant is made under this subsection shall be 100 percent of the cost of the project exclusive of any funds budgeted and available or otherwise specifically committed for the project by the applicant.

(b) *Supplemental grants.* (1) The Assistant Secretary may make supplemental grants for the purpose of increasing the Federal contribution to 100 percent of the project cost for any Federally assisted public works project authorized by any Federal law other than the Local Public Works Act.

(i) Ordinarily, the Assistant Secretary will award supplemental grants increasing the Federal contribution to 100 percent of the project cost exclusive of any funds budgeted and available or otherwise specifically committed for the project by the applicant.

(A) For the funding of revived applications during round II, the Assistant Secretary may waive the requirement of paragraph (b)(i) of this section where:

(1) The applicant had provided the assurance that no funds were budgeted and available or otherwise specifically committed for the project in round I; and

(2) The applicant demonstrates that local funds apparently available were diverted from some other use solely to meet the additional requirements of other Federal programs caused by the delay in funding between rounds I and II.

(ii) The applicant shall submit with its application a written certification that actual construction of the project has not yet been initiated because of lack of funding for the non-Federal share.

(A) The Assistant Secretary may waive this requirement where he finds that construction was initiated after filing of the application under round I due to the requirements of the other Federal program.

(iii) The applicant shall submit written certification obtained from the other Federal agencies involved in the project that:

(A) Federal financial assistance for the project has been approved and the funds are immediately available for the project; and

(B) the project meets all applicable Federal statutory and relevant related requirements.

(2) The Assistant Secretary also may make grants in an amount necessary to provide all or part of the required State or local share (but not both shares) of the cost of any public works project for which financial assistance is authorized by State or local law requiring such contribution if the applicant submits with its application a written certification from the appropriate authority that:

(i) The share of financial assistance not applied for has been properly approved and is immediately available for the project;

(ii) The project meets all applicable statutory and other relevant requirements of the law; and

(iii) Construction of the project has not yet been initiated.

(3) Grants under this subsection may include funds for the completion of plans, specifications, and estimates where additional architectural and engineering work or related planning is required to permit construction of the project under this section.

§ 317.14 Eligible projects.

Eligible projects include projects for the construction of public works facilities, including but not limited to municipal offices, courthouses, libraries, schools, police and fire stations, detention facilities, water and sewer lines, streets and roads (including curbs), sidewalks, lighting, recreational facilities, convention centers, civic centers, museums, other public facilities, and the transportation of and providing of water to drought-stricken areas as designated by the Federal Disaster Assistance Administration or other Federal agency or department authorized to designate drought-stricken areas.

§ 317.15 Ineligible projects.

The following projects shall be ineligible for funding under this part:

(a) Canals and watercourses. Unless the requirements of § 317.72 are met, no grant shall be made under this part for any project having as its principal purpose and permanent effect:

(1) The channelization, damming, diversion, or dredging of any natural watercourse, or

(2) The construction or enlargement of any canal except a canal or raceway designated for maintenance as a historic site.

(b) *Projects on which construction has been initiated.* (1) For projects seeking a supplemental grant under § 317.13 (b) (1), the project will be eligible where construction has been initiated if the Assistant Secretary determines that construction was initiated after filing the application under round I due to the requirements of the other Federal program.

(c) Projects on which on-site labor cannot begin within 90 days after receipt of notification of project approval.

(d) Projects with extremely high ratios of labor costs to total project costs (greater than 80 percent) and projects with extremely low ratios of labor costs to total project costs (less than 10 percent).

(e) Projects whose costs exceed the planning targets established by subpart E.

### § 317.16 Projects ineligible unless accompanied by unusual circumstances.

Projects will not normally be approved where any of the following conditions exist.

(a) The applicant has not obtained rights to the project site, including easements and rights-of-way, in one of the following ways:

(1) The eligible applicant owns the project facility and/or site clear of any encumbrances;

(2) The eligible applicant holds a non-cancellable long-term lease on the project facility and/or site which is defined as 20 years or the useful life of the facility, whichever is longer; or

(3) The eligible applicant holds a clearly enforceable option through time of grant approval to purchase the project facility and/or site and demonstrates that it has sufficient funds available to complete the purchase.

(b) The project request is for a grant supplemental to another Federal, State or local grant which has not been approved by the applicable grant agency.

(c) The project's construction will involve the use of raw materials not mined or produced in the United States, or United States manufactured articles not substantially made from raw materials mined or produced in the United States, or manufactures not manufactured in the United States.

(1) The restriction contained in paragraph (c) of this section will not apply to any project for which the Assistant Secretary makes one of the following determinations:

(i) The restriction is not in the public interest; or

(ii) The restriction would cause unreasonable project costs; or

(iii) Materials or articles, either raw or manufactured, needed in the construction of the project are not available in the United States in reasonable and sufficient commercial quantity and satisfactory quality.

### § 317.17 Eligible project costs.

(a) The following types of project costs are eligible for funding under this part.

(1) Construction and facility improvement costs;

(2) Eligible expenses and payments under Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Pub. L. 91–646);

(3) Costs for capital equipment not included in the construction contract;

(4) Costs for completing and updating plans, specifications, and estimates— where either architectural design/preliminary engineering or related planning has already been undertaken, and where additional architectural and engineering work or related planning is required to permit construction of the project;

(5) Other A/E costs such as inspection fees and test borings;

(6) Administrative costs including legal and audit costs; and

(7) Other costs not inconsistent with the Local Public Works Act and allowed by Federal Management Circular No. 74–4.

### § 317.18 Ineligible project costs.

(a) *Real property.* No part of any grant made under this part may be used for the acquisition of any interest in real property.

(b) *Maintenance.* No part of any grant made under this part may be used for the payment of maintenance costs in connection with a project constructed (in whole or in part) with Federal financial assistance under the Local Public Works Act.

(c) *Cost overruns.* No part of any grant made under this Act may be used for cost overruns for public works projects previously funded under this Act.

(d) *Prior expenses.* No part of any grant made under this part may be used for project costs for administration, plans, specifications, estimates or other A/E costs, which have been incurred prior to the date of original application.

(e) *Construction by State or local governments or Indian tribes.* No part of any grant made under this part may be used for the payment of construction activ-

ities *directly* performed by any department, agency or instrumentality of any State or local government or any Indian tribe.

(f) *Interest.* No part of any grant made under this part may be used for interest on interim construction financing except for supplemental grants where authorized by other program legislation.

§ 317.19 Construction requirements.

(a) *Competitive bidding.* (1) Construction of each project funded under this part shall be performed by contract awarded by competitive bidding, unless

(i) The Assistant Secretary makes a determination that, under circumstances relating to that project, a method of contract award other than competitive bidding is in the public interest.

(2) If the Assistant Secretary does not waive the competitive bidding requirement, the following procedures apply.

(i) Contracts for the construction of such projects shall be awarded on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility.

(ii) The award of a contract for the construction of a project funded under this part may be subject to review by the Assistant Secretary. The Assistant Secretary may withhold his concurrence from the award of a contract for good cause.

(iii) No requirements or obligations shall be imposed as conditions precedent to the award of a contract or to the Assistant Secretary's concurrence in the award unless such requirements or obligations are lawful and set forth in the advertised specifications.

(b) *Minority business enterprise.* (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.

(2) The restriction contained in paragraph (1) of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.

§ 317.20 Maximum project cost.

The maximum amount of financial assistance made available under this part should not exceed $5 million for each project; however, the Assistant Secretary may, in his discretion, waive this policy for good cause.

## Subpart C—Application Procedure

§ 317.30 Revival of applications currently on file.

(a) Unfunded applications meeting the criteria described at § 317.12(a), with the exception of applications described in subsection (b) of this section, will be revived if the project area in which such applicants are located receives a planning target or set-aside. EDA will revive these applications for consideration under the second round of funding of the Local Public Works program in the following manner.

(1) EDA will revise and update these applications to bring them into conformance with the new program requirements and procedures as described in these regulations.

(2) The applicant will provide EDA with such additional information and certifications, including revised project cost estimates, as required to bring the application into conformance with the legislative and administrative changes to the Local Public Works program.

(i) The information and certifications described in paragraph (2) of this subsection will be provided to EDA on such forms and in such manner as the Assistant Secretary directs.

(b) Pocket of poverty applications currently on file and non-pocket of poverty applications currently on file for which applicants request consideration as pocket of poverty applications will be revived for consideration under round II of the Local Public Works program in the following manner.

(1) Where an applicant requests use of the pocket of poverty criteria in determining its project area, that request will be granted only if the applicant meets the requirements of § 317.51(a) (1).

(2) All projects using the pocket of poverty criteria must be located in the community or neighborhood proposed as the project area. Where necessary, applicants will revise their applications to locate the projects within the community or neighborhood proposed as the pocket of poverty area.

(3) Pocket of poverty applicants will provide EDA with the following information:

(i) An exact description of the community or neighborhood proposed as the project area;

(ii) The appropriate unemployment data for the project area obtained from the State Employment Security Agency; and

(iii) Such additional information and certifications, including revised project cost estimates, as required to bring the application into conformance with the legislative and administrative changes to the Local Public Works program.

(c) Applications currently on file will be deemed revived by EDA when all relevant and necessary materials for the re-evaluation of the application are received in the proper form and manner from the applicant.

§ 317.31 New applications.

(a) Subject to the provisions of § 317.53(c)(2), new applications shall be received where necessary to use a State's allocation or an applicant's planning target or an Indian tribe set-aside.

(b) Any new application under this part must be properly prepared on appropriate forms, as prescribed by the Assistant Secretary, and must contain all the information and certifications required by this part.

(c) New applications shall only be submitted to the appropriate EDA Regional Office as provided in 13 CFR 301.31.

(d) New applications shall be recorded and deemed received upon their arrival at the appropriate EDA Regional Office.

§ 317.32 Acceptance of revived and new applications.

EDA shall endeavor, within five working days from the date a new or revived application is actually received by the appropriate Regional Office, to determine if the application has been completely and properly prepared. An application may be rejected (denied) unless it contains full and accurate information as required by this part. The Regional Director should notify the applicant if the application contains deficiencies and state what is needed to properly complete the application. EDA reserves the right during the 60 day period after receipt of an application to reject an application for substantially being incomplete, improperly prepared, or otherwise failing to meet the requirements of this part.

§ 317.33 Project areas.

The project area of eligible applicants shall conform to the following requirements:

(a) *Counties with no primary cities.* The project area shall be the county for all applicants.

(b) *Counties with one or more primary cities.*

(1) Projects located in the primary city: the project area shall be the city.

(2) Projects located outside primary cities: the project area shall be the balance of the county excluding the primary cities.

(c) *Pocket of poverty applicants.* The project area shall be the community or neighborhood of the primary city, as described in § 317.51(a)(1), in which the project is located.

(d) *Indian tribe applicants.* The project area shall be the reservation or tribal land on which the project will be located.

§ 317.34 Determination of unemployment data.

(a) In considering applications during the round II of funding, EDA shall utilize the following data:

(1) The average number of unemployed persons in the applicant's project area during the twelve most recent consecutive months available; and

(2) The average unemployment rate of the applicant's project area for the twelve most recent consecutive months available.

(b) Unemployment data for project areas of applications currently on file and new applications will be determined as follows:

(1) *Primary city applicants.* EDA shall utilize the appropriate data for the city from the Bureau of Labor Statistics of the Department of Labor.

(2) *Balance of county and county without primary city applicants.* EDA shall utilize the appropriate data from the Bureau of Labor Statistics of the Department of Labor.

(3) *Pocket of poverty applicants.* The applicant shall define the exact location of the community or neighborhood in which the project will be located. Unemployment data will be obtained from the State Employment Security Agency for that community or neighborhood.

(4) *Indian tribe applications.* The Assistant Secretary may use population data as a proxy for unemployment data EDA shall utilize the appropriate data from the Bureau of Indian Affairs.

§ 317.35 Certifications.

An application shall be rejected unless it includes all the following materials:

(a) It contains adequate certification by the applicant and by any "other parties" as defined in 15 CFR Subtitle A, Part 8, that no person shall, on the grounds of race, color, sex (as required by section 110 of Pub. L. 94–369), or national origin, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under the proposed project.

(1) The application shall also contain an assurance that the applicant is not involved in any civil rights litigation; or, if it is involved in a lawsuit or Federal administrative action alleging discrimination, the applicant shall provide a brief narrative description of the action alleging discrimination and its outcome.

(2) The application shall also contain assurances of compliance with: Title VI of the Civil Rights Act of 1964; 28 CFR Part 42, Subpart F to the extent set forth in EDA's policies and guidelines; and Executive Order 11246 "Equal Employment Opportunities."

(b) It contains a certification by the applicant that construction on the project has not yet been initiated unless the provisions of § 317.15(b)(1) or §317.43 (b)(3) are met.

(c) It contains a certification, satisfactory to the Assistant Secretary, that on-site labor can begin within ninety days of project approval.

(d) Where applicable, it contains a certification that the applicant has related the proposed project to existing approved plans and programs of a local community development or regional development nature so as to avoid harmful or costly inconsistencies or contradictions.

(e) Where appropriate, it contains certification and evidence that the proposed project will promote or advance longer range plans and programs.

(f) It contains certification, by the properly authorized official of the Federal agency or State or local government, that no funds budgeted and available or otherwise specifically committed for the project applied for in its application shall be reduced, diminished, or replaced by funds requested under this part.

(1) With respect to supplemental grants under § 317.13(b)(1), this certification is not necessary if the applicant has obtained a waiver from the Assistant Secretary under § 317.13(b)(1)(i)(A).

(g) It contains adequate assurances that all laborers and mechanics employed on the proposed project will be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5).

(h) It contains a certification by the applicant that no contract for the project will be awarded to a bidder who will employ illegal aliens.

(i) It contains adequate assurances that the project will be constructed from raw materials mined or produced in the United States and from United States manufacturers substantially made from materials mined, produced or manufactured in the United States, unless the Assistant Secretary has made a determination under § 317.16(c)(1) that this requirement is not applicable to the applicant's project.

(j) Unless the Assistant Secretary has made a determination of inapplicability under § 317.19(b)(2), it contains certification satisfactory to the Assistant Secretary that at least ten percent of the amount of the grant will be expended for contracts with and/or supplies from minority business enterprises.

(k) It contains certification satisfactory to the Assistant Secretary that the project will be designed and constructed in accordance with the requirements for providing access to the physically handicapped and elderly as contained at 42 U.S.C. 4151 et seq.

(1) The Architectural and Transportation Barriers Compliance Board, established by the Rehabilitation Act of 1973, is authorized to insure that any construction and renovation done pursuant to any grant made under the Local Public Works Act complies with the accessibility standards for public buildings and facilities issued under the Act of August 12. 1968.

(l) Where an application uses the pocket of poverty project area, it contains certification satisfactory to the Assistant Secretary that employment engendered by the project will be offered preferentially to the residents of the neighborhood or community which defines the project area.

(m) Where an application involves a project normally funded by another Federal agency, it contains certification as required in § 317.13 (a)(2) and (b).

(n) It contains certification that special consideration shall be given to the employment on the project of qualified veterans who:

(1) Have a disability rating of 30 percent or more, or

(2) Served on active service for more than 180 days in Vietnam and were discharged or released from service—other than dishonorably—within 48 months.

### § 317.36 False or inaccurate statements.

(a) An application shall be rejected unless it is, in the opinion of the Assistant Secretary, accurate and complete.

(b) Applicants should be advised that false representations and/or certifications in connection with applications for assistance under this part may be the basis for criminal liability under title 18 of the United States Code.

### § 317.37 Applicant's priority rating of projects.

(a) An applicant who has more than one application eligible for funding under the second round of the Local Public Works program shall submit as part of each such application its priority rating for each project for which it has applied.

(b) State governments, county governments, primary city governments, and any general purpose unit of local government may endorse a project of another applicant. If such a project is funded, it will apply against the planning target of the endorsing applicant but not the planning target of the receiving applicant.

### § 317.38 Amendment of existing applications.

Applications on file from round I may be amended to modify or change the project when, in the opinion of the Assistant Secretary, a compelling reason for such modification or change exists.

### Subpart D—Allocation of Program Funds

### § 317.40 Allocation of funds to the States.

(a) Subject to program administrative costs, statutory minimum and maximum allocation requirements and statutory set-asides, 65 percent of the amounts appropriated for round II of the Local Public Works program will be allocated to each State based on its share of the total number of unemployed persons in all the States; the remaining 35 percent of the amounts appropriated for round II of the Local Public Works program will be allocated to those States with an average unemployment rate for the preceding twelve month period in excess of six and one-half percent (6½ percent) on the basis of the relative severity of unemployment in such States.

(b) Amounts allocated to the States according to this formula constitute State planning targets.

### § 317.41 Statutory minimum and maximum State allocations.

(a) The minimum allocation to each State of all amounts appropriated after the date of enactment of the Public Works Employment Act of 1977 to carry out this part shall be determined as follows:

(1) Subject to the provisions of paragraph (2) of this subsection, each State will receive at least three-quarters of one percent of such amounts appropriated to carry out this part.

(2) Guam, the Virgin Islands, American Samoa, and the Trust Territory of the Pacific Islands, in the aggregate, shall receive not less than one-half of one percent of such amounts appropriated to carry out this part.

(i) Population and other factors, as may be determined by the Assistant Secretary, will be used to establish planning targets for these territories.

(b) States whose unemployment data was converted for the first time under a new methodology to the benchmark data of the current population survey annual average compiled by the Bureau of Labor Statistics shall receive a percentage of funds under round II at least as great as the percentage of funds allocated to that State under round I prior to January 1, 1977.

(c) The maximum allocation for any State of all amounts appropriated after the date of enactment of the Public Works Employment Act of 1977 to carry out this part shall be twelve and one-half percent of such appropriation.

### § 317.42 Indian tribe set aside.

(a) The maximum allocation of all amounts appropriated after the date of enactment of the Public Works Employment Act of 1977 for projects sponsored by Indian tribes shall be two and one-half percent of such appropriation.

(b) All projects applied for by Indian tribes will be funded from this allocation, with the exception of those projects which qualify for funding under § 317.43.

(c) Each Indian tribe will receive a planning target determined in the following manner.

(1) Subject to the provisions of paragraph (c)(2) of this section, each Indian tribe's planning target will be based on population data, as determined by the Assistant Secretary.

(2) No Indian tribe will receive a planning target exceeding twelve and one-half percent (12½ percent) of the amount determined by subsection (a) of this section plus the amount of round I funds expended on Indian applications.

(d) In the event applications have not been filed to exhaust the planning targets established under this section by September 1, 1977, such planning targets may be administratively reapportioned by the Assistant Secretary.

### § 317.43 Procedural errors set aside.

(a) An applicant who made an application before December 24, 1976 and whose application was not received, was not considered, or was rejected solely because of an error by an officer or employee of the United States may petition the Assistant Secretary to reconsider his

application, subject to the provisions of § 317.61(b).

(b) In order to be funded from this set-aside, a project must meet all of the following requirements:

(1) The project would have been selected for funding under round I of the Local Public Works program but for the error described in subsection (a) of this section;

(2) The project has been identified by EDA as eligible for funding from the procedural error set-aside; and

(3) The project met all the requirements of the Local Public Works Act as in effect at the time of the error.

(c) Not to exceed seventy (70) million dollars may be used to fund projects under the authority of this section.

### Subpart E—Planning Targets

#### § 317.50 General considerations.

In order to insure an equitable geographic distribution of funds, EDA has established planning targets for States, sub-State areas and sub-State applicants.

(a) Sub-State area planning targets are computed for project areas which have unemployment rates equalling or exceeding the lower of 6.5 percent or the State average unemployment rate.

(1) Within each State, these planning targets will be ranked and projects will be selected from high ranking areas until the amount of planning target is expended.

(2) Sub-State area planning targets and sub-State applicant planning targets will reflect the total six (6) billion dollar Local Public Works program authorization, constructively following the sub-State 65/35 formula, as set forth in §317.52(a), for round I funds. Projects which were selected for funding during the round I of the program will be deducted from the sub-State area planning targets and sub-State applicant planning target.

(3) Certain eligible sub-State areas and sub-State applicants will not receive planning targets due to the procedure described in paragraphs (a) (1) and (2) of this section which will result in insufficient funds.

(4) A minimum planning target level of 75,000 dollars will be set in order to carry out the public works aspect of this program. In the case of areas which would receive a planning target below this minimum, no planning target would be established.

(i) Planning target funds below the 75,000 dollar minimum will be administratively reapportioned to the county government.

(b) Funds requested for projects may not exceed the appropriate planning targets.

(c) EDA will use sub-State area and applicant planning targets as aids in the distribution of funds under this part. These planning targets do not, however, constitute entitlements. The Assistant Secretary reserves the right to adjust these planning targets as necessary to assure that each eligible area and applicant receives a planning target commensurate with its distress. If an eligible area or applicant does not receive a planning target which reflects its level of distress due to miscalculation, the Assistant Secretary may re-adjust other sub-State planning targets to rectify the miscalculation.

#### § 317.51 State planning target.

Each State's overall planning target was established pursuant to the allocation formulae described in §§ 317.40 and 317.41, as appropriate. From each State's planning target, the following State-wide planning targets will be deducted.

(a) *Pocket of poverty planning target.* An amount, determined by multiplying the number of primary cities as described in paragraph (1) of this subsection by one (1) million dollars, will be deducted to fund applications from pocket of poverty areas. However, not more than twenty million dollars shall be available in any one State to fund these projects.

(1) Projects to be funded from this deduction must be located in a city which did not receive a planning target.

(2) Each pocket of poverty area must have a population of 4,000 or more persons and an unemployment rate of at least 8.5 percent for the most recent twelve months. A pocket of poverty must be a contiguous area and separate and distinct from other pocket of poverty areas. A pocket of poverty area may not be subdivided.

(3) Applicants with planning targets may fund projects in pocket of poverty areas from their planning targets.

(b) *State government planning target.* Except as the Assistant Secretary determines for the Commonwealth of Puerto Rico, State governments will be given a planning target which will be eight (8) percent of the total State allocation. The amount of this planning target is based on the approximate proportion of the dollar value of State government applications on file to the dollar value of the total number of applications from all States on file from round I.

(c) In the event applications have not been filed to exhaust the planning

targets established under this section by September 1, 1977, such planning targets will be administratively reapportioned within the State by the Assistant Secretary.

§ 317.52 Sub-State area planning targets.

The amount of each State's allocation available for sub-State area planning targets will consist of the State's statutory allocation less the amount of the planning targets described in § 317.51.

(a) EDA has established planning targets for eligible sub-State areas, subject to the provisions of § 317.50(a), based on the sub-State 65/35 formula, which is the relative need of an area as determined by its number of unemployed persons compared to the number of unemployed persons in all eligible areas of the State and its unemployment rate compared to the lower of 6.5 percent or the State unemployment rate. Planning targets have been stablished in this manner for the following types of areas:

(i) Primary city;
(ii) Balance of county;
(iii) County with no primary cities.

(b) The sub-State areas described in subsection (a) of this section will be ranked according to their respective planning targets which will reflect the relative distress in each of the areas.

§ 317.53 Sub-State applicant planning targets.

EDA has divided the sub-State area planning targets into sub-State applicant planning targets. Subject to the provisions of § 317.50, EDA has established these applicant planning targets for the following types of applicants.

(a) County government. This planning target will be determined for each State, based on the relative activity of county governments as determined by the dollar value of county government applications filed with EDA during round I compared to the total dollar value of applications filed by all applicants, with the exception of Indian tribes, in that State during round I. Subject to the joint priority agreement with the school district set forth in paragraph (d) of this section, this planning target shall be available for funding projects of the county government.

(b) Primary city government. Subject to the joint priority agreement with the school district set forth in paragraph (d) of this section and subject to any incorporated area in the city which will share in the planning target, this planning target shall be available for funding projects of the city government.

(c) Non-primary cities/townships located in balance of county and county without primary city areas. The funds allocated to the balance of county and county without primary city have been further distributed to non-primary cities and townships within these areas as applicant planning targets.

(1) These applicant planning targets are based on the unemployment data of the non-primary city or township, calculated by EDA according to the census share method and according to the sub-State 65/35 formula.

(2) Normally, EDA has established these planning targets only for non-primary city/township applicants which had submitted applications in round I. Provided, however, when an area's planning target funds exceed existing applications on file by 25 percent or $200,000, whichever is greater, the excess funds in the planning target will be made available for new applications to be filed by applicants in the area. Provided further, however, that in accepting applications from these applicants, EDA will allow only that applicant(s) with the highest distress factors to file such application.

(3) Subject to the joint priority agreement set forth in paragraph (d) of this section, these applicant planning targets shall be available for projects of the non-primary city or township.

(d) School districts. School districts will share in the applicant planning targets established for primary cities and non-primary cities and townships. School districts will also share in the county government planning target if the school district serves the whole county or a major region. By joint agreement between the school district and the above applicants, these applicants will submit the priority ratings of their projects as required by § 317.37.

(1) In order to share in the planning target of these applicants, the school district must have authority under local law to file an application.

(2) In order to share in the applicant planning target of a primary city or non-primary city/township, the school district project must serve the residents of the primary city or non-primary city/township.

(3) In order to share in the county government planning target the school district project must serve the population of the whole county or major region.

(4) Should the school district and the applicant whose planning target it shares fail to come to an agreement with respect to prioritizing their proj-

ects, EDA will select their projects according to factors which include but are not limited to:

(i) Job creating potentials;

(ii) Time necessary to complete the project;

(iii) Energy conservation;

(iv) Long-term economic benefits;

(v) Critical local needs.

(e) In the event applications have not been filed to exhaust the planning targets established under this section by September 1, 1977, such planning target funds will be administratively reapportioned by the Assistant Secretary.

### Subpart F—Project Selection Procedure

### § 317.60 Conserving energy.

(a) In making grants for projects for construction, renovation, repair or other improvement of buildings, EDA shall also give consideration as between such building projects to those projects which will result in conserving energy. Such projects include, but are not limited to, projects to redesign existing public facilities for energy conservation purposes and projects using alternative energy systems.

(b) In giving such consideration EDA will permit increased funding for projects which meet the provisions of this section subject to the requirements of § 317.50(b).

### § 317.61 Projects selected from national set-asides.

(a) *Indian set-aside.* Each Indian reservation or tribal land has a planning target.

(1) In approving projects under this set-aside, EDA will take into consideration the number and dollar amount of projects approved under round I.

(b) *Procedural error set-aside.* (1) In order to be funded from this set-aside, a project must meet all the following conditions.

(i) The project must be eligible under § 317.43.

(ii) The project is located in an area which does not have a planning target.

(iii) The project met the requirements of the Local Public Works Capital Development and Investment Act of 1976, as enacted on July 22, 1976.

(2) Error projects located in eligible areas which receive planning targets will be funded from State and sub-State planning targets, but only if chosen by their applicants as priority projects.

(i) In the event the applicant's planning target is insufficient to fund the error project completely, the applicant may request the Assistant Secretary to fund the remainder from the error set-aside.

(ii) Projects funded in this manner will be counted against the appropriate area and applicant planning targets or set-asides as calculated on the basis of the total Local Public Works Act authorization.

(3) In exercising its privilege of prioritizing projects, an applicant shall be under no obligation to request priority for any project which may have been previously denied in error, but such choice of another or other projects shall be deemed a waiver of any claim of entitlement or priority for funding of any such project which may have been previously denied as a result of error.

(4) Projects eligible for funding under this subsection must have met all the requirements of the Local Public Works Act as in effect at the time of the error.

### § 317.62 Projects selected from State-wide planning targets.

(a) *Pocket of poverty planning target.* Each primary city eligible for funding under § 317.51(a) will submit to EDA a description of its pocket of poverty area, setting forth the numbers and rates of unemployment and total population for that area. Such figures must be certified by the State Employment Security Agency. EDA will then assign a planning target to each pocket of poverty based on its relative needs as measured by its number and rate of unemployment.

(b) *State government planning target.* The Governor shall submit a priority ranking of State government projects up to the amount of the State government planning target, provided such projects are located in areas with unemployment rates equally or exceeding the State's average unemployment rate or 6.5 percent, whichever is lower unless the State receives the statutory minimum allocation.

(1) EDA will select projects in accordance with the Governor's priorities up to an amount as close as is administratively feasible to the amount of the State government planning target.

### § 317.63 Projects selected from sub-State applicant planning targets.

(a) *County government, primary city government, and primary city school district projects.* County governments, primary city governments, and primary school district applicants which submitted one or more applications shall submit priority rankings of their projects in accordance with §§ 317.37 and 317.53 (a), (b) and (d). EDA will select projects in accordance with § 317.50 and local

priorities up to the amount of county government's/school district's planning target and primary city government's/primary city school district's planning target.

(b) *City/township projects in balance of county or counties without primary cities.* (1) Non-primary city/township and school district applicants which have planning targets and which submitted one or more applications shall submit a priority ranking of their projects in accordance with §§ 317.37 and 317.53 (c) and (d). EDA will select projects in accordance with § 317.50 and local priorities up to the amount of their planning targets.

(2) If a town has already exceeded its planning target in round I, it would receive no further projects. Similarly, once a town has reached its planning target with a round II project, no further projects would be selected.

(3) If all local (general purpose and school) projects have been funded or there are no projects available for funding after following the procedures of § 317.53(c)(2), any surplus funds will be administratively reapportioned by the Assistant Secretary.

§ 317.64 Undue concentration.

The Assistant Secretary reserves the right to vary the selection procedure as necessary to avoid undue concentration of funds in any geographic region of a State receiving the minimum statutory allocation and as necessary to comply with the objectives of the Act.

§ 317.65 Similar applications.

Any application for a project which serves similar needs, in the same general area, as an existing project or application under the Local Public Works program or any other program administered by the Economic Development Administration may be denied by the Assistant Secretary for that reason.

### Subpart G—General Requirements

§ 317.70 Environmental considerations.

(a) *The National Environmental Policy Act.* (1) The Local Public Works Act requires applications to be processed within 60 days of their acceptance. EDA will not be able to prepare environmental impact statements for those projects which may significantly affect the quality of the human environment. However, to the fullest extent possible within this time period, EDA will analyze a project's potential environmental impacts and give appropriate consideration to environmental impacts in making its final decisions.

(2) In order that EDA may conduct its environmental analysis of proposed projects, applicants shall include the following materials with their application:

(i) A description of those elements of the proposed project which will have an impact on the environment, the nature of the environment which will be affected, and data on the expected environmental impact;

(ii) Alternatives to the proposed project;

(iii) Any environmental analysis previously conducted by local, State, Federal agencies; and

(iv) Evidence of public reaction to the project, such as transcripts of local public hearings held on the proposal.

If the materials required by paragraphs (a)(2)(iii) and (iv) of this section are not available, the applicant must so certify in the application.

(3) EDA will independently review and analyze environmental information submitted by applicants.

(i) Where appropriate, EDA, within the 60 day limit, may seek the views of other government agencies which have jurisdiction by law or special expertise with respect to any environmental impact involved.

(ii) If a project appears to be highly controversial for environmental reasons and there is a need to further understand the basis of the controversy, EDA may, within the 60 day limit, request the views of concerned residents through a newspaper notification or a public information meeting held near the project site.

(4) EDA shall deny an application if, after consideration of the benefits of a project against any environmental costs, it concludes that the environmental costs exceed the benefits. EDA may deny any application solely on the basis that its environmental impact analysis discloses that unacceptable adverse impacts will or are likely to result. EDA, where necessary, may condition approval of a project upon the adoption of specified measures designed to mitigate any adverse environmental impacts.

(b) *The National Historic Preservation Act.* (1) Applicants shall include with their applications either a statement of their State Historic Preservation Officer's views of the proposed project or shall certify that their State Historic Preservation Officer was provided with a detailed project description and request for comments prior to the application's submission to EDA. Such description shall include:

(i) A narrative of the elements of the project and its location;

(ii) A map of the project site and surrounding area indicating the specific location of the project site in relation to adjacent streets and other identifiable objects;

(iii) Line drawings or sketches of the project; and,

(iv) If the building demolition or renovation is involved, photographs of the affected properties.

(2) If necessary, EDA will attempt to complete the coordination of proposed projects with the Advisory Council on Historic Preservation. EDA will use the results of this coordination process, even though completion of this process may not be possible, as a factor in making a final decision on the project.

### § 317.71 Compliance with other Federal requirements.

Each applicant shall, as a condition to its receipt of a grant under this part, comply with the following relevant Federal requirements.

(a) All labor standards including those relating to the payment of wages, working conditions, anti-kickback prohibitions and equal employment as provided 13 CFR 309.6.

(b) Those requirements concerning relocation and related payments to all persons displaced as a result of the development of a public works project with funds received under this part, as provided for in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4601 et seq., and 13 CFR Part 310.

(c) If a project involves the construction of a detention facility, the applicant must certify that the project complies with those sections of Part E of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, found at 42 U.S.C. 3750(b) (1) and (4)–(9).

(d) The provisions of OMB Circular A–95, with the following modification.

(1) Applicants must submit their full applications or notifications of intent to apply to the appropriate clearinghouse as early as possible.

(2) Upon submission of an application to EDA, the application must certify that he has submitted the full application to the appropriate clearinghouse.

(3) EDA may begin processing the application upon its receipt but will make no final approval of an application until 30 days after its receipt unless clearinghouse response is received before 30 days have elapsed.

(4) Applications received by EDA need not have State application identifier numbers.

(5) Clearinghouse comments will be sumitted directly to EDA; EDA will con-

sider such comments until it has finished processing the application.

(e) All environmental requirements, to the maximum extent possible, as determined by the Assistant Secretary, including, but not limited to:

(1) The National Environmental Policy Act of 1969; as amended (42 U.S.C. 4321 et seq.) and EDA's requirements found in § 317.70;

(2) The Clean Air Act, as amended (42 U.S.C. 1857–1858a);

(3) The Federal Water Pollution Control Act, as amended (33 U.S.C. 1251–1376);

(4) The National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.) and EDA's requirements found in § 317.-70;

(5) The Wild and Scenic Rivers Act (16 U.S.C. 1271–1287);

(6) The Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(7) The Historical and Archeological Data Preservation Act, as amended (16 U.S.C. 469 et seq.); and

(8) The Safe Drinking Water Act (42 U.S.C. 300f–j9).

(f) 13 CFR 309.9, entitled "Records and audit."

(g) 13 CFR 309.27, entitled "Land use near Federal airfields."

(h) 13 CFR 309.26, entitled "Project modification."

(i) 13 CFR Part 314, entitled "Property management standards" except 13 CFR 314.6(a), 13 CFR 314.6(b), and 13 CFR 314.50.

(j) The National Flood Insurance Program and EDA's requirements regarding flood hazards found at 13 CFR 309.15.

(k) Other laws affecting this program.

### § 317.72 Transfer of grant awards to drought-related projects.

(a) Subject to the Assistant Secretary's approval, applicants who have been awarded a grant, or who have so prioritized a project as to be tantamount to a grant award by EDA, may request EDA to transfer the funds from the project listed on their application to one or more other projects intended to alleviate drought or other emergency or disaster related conditions or damage.

(b) The Assistant Secretary may approve such a transfer after making the following determinations;

(1) The Federal cost in the aggregate of such project or projects will not be increased beyond the cost of the original award;

(2) Construction on the project or projects proposed for substitution can begin within ninety days; and

(3) The project or projects proposed for substitution will in fact aid in alleviating drought or other emergency or disaster related conditions or damage.

(c) Section 106(a) of the Local Public Works Act and § 317.15(a) will not apply to projects substituted under the authority of this section.

## § 317.73 Lease of project facilities.

Normally, public works projects constructed with funds under this part must retain their public character. The project facility may be leased under the following conditions.

(a) The project facility may be leased by the grantee to a non-profit operator providing the applicant maintains a continuing significant economic interest in the project and is not acting simply in a passive role for a prospective lessee, and such facility is used for the purpose of the grant.

(b) The project facility may be leased by the grantee to a profit making operator provided all of the following conditions are met:

(1) The lease is incidental to the project and not its principal purpose;

(2) The lease does not change the public nature or character or the purpose of the project as a whole; and

(3) The applicant maintains a continuing significant economic interest in the project and is not acting simply in a passive role as applicant for a prospective lessee.

## § 317.74 Final determination.

(a) All applications for assistance under this part shall be processed by the appropriate EDA Regional Office.

(b) The Regional Director shall notify the applicant, in writing, when its application has been rejected and state the reasons therefor.

(c) The Regional Director shall forward to the Assistant Secretary in Washington, D.C., all applications which he deems are properly completed and eligible for assistance under this part.

(d) The Assistant Secretary shall review all applications received from the Regional Directors and make the final determination.

(e) If no determination has been made by the end of the sixtieth day after the application was received, the application will be deemed to be approved.

## § 317.75 Suspension and termination.

(a) *Suspension or termination for cause.* EDA may initiate a suspension or termination of a project approved under this part for failure by the grantee to adhere to the requirements of the grant. EDA shall promptly notify the grantee in writing of the suspension or termination, specifying the reasons for the action and its effective date. Payments made to the grantee or recoveries by EDA under grants suspended or terminated for cause shall be in accord with the legal rights and liabilities of the parties.

(b) *Suspension or termination for convenience.* EDA or the grantee may initiate a suspension or termination of a project approved under this part when both parties agree that the continuation of the project would not produce beneficial results commensurate with the further expenditure of funds. The two parties shall agree upon the conditions of the action, including the effective date, and in the case of partial suspension or termination, the portion to be suspended or terminated. The grantee shall not incur new obligations for the suspended or terminated portion, after the effective date, and shall cancel as many outstanding obligations as possible. EDA shall allow full credit to the grantee for the Federal share of the non-cancellable obligations which were properly incurred by the grantee prior to suspension or termination.

## Subpart H—Eligibility of Non-Profit Entities

## § 317.80 Grants for non-profit entities.

After September 30, 1977, grants may be made from appropriations under the Local Public Works Act to States or local governments for projects for the construction, renovation, repair, or other improvements of health care or rehabilitation facilities owned and operated by private non-profit entities.

(a) In the even that EDA has obligated all funds appropriated under this Act prior to or on September 30, 1977, this section will not take effect.

(Section 701, Pub.L. 89–136, 79 Stat. 570 (42 U.S.C. 3211); Pub.L. 94–369, 90 Stat. 999 (42 U.S.C. 6701); Pub.L. 95–28, 91 Stat. 116; Department of Commerce Organization Order 10–4 (September 30, 1975), as amended (40 FR 56702 as amended at 40 FR 58878 and 41 FR 35548).)

Dated: May 24, 1977.

ROBERT T. HALL,
*Assistant Secretary
for Economic Development.*

[FR Doc. 77–15266 Filed 5–26–77;8:45 am]

APPENDIX C

**CONGRESSIONAL RECORD—HOUSE** *February 24, 1977*

AMENDMENT OFFERED BY MR. MITCHELL OF
MARYLAND

Mr. MITCHELL of Maryland. Madam Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. MITCHELL of Maryland: Page 2, line 23, insert "(1)" immediately before "Notwithstanding."

Page 3, line 7, strike out the quotation marks and the period immediately following the quotation marks.

Page 3, immediately after line 7, add the following:

"(2) Notwithstanding any other provision of law, no grant shall be made under this Act for any local public works project unless at least 10 per centum of the dollar volume of each contract shall be set aside for minority business enterprise and, or, unless at least 10 per centum of the articles, materials, and supplies which will be used in such project are procured from minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

Mr. MITCHELL OF Maryland (during the reading). Madam Chairman, I ask unanimous consent that the amendment be considered as read and printed in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from Maryland?

There was no objection.

Mr. MITCHELL of Maryland. Madam Chairman, the minority and the majority side have been provided with a revised copy of the amendment. I ask unanimous consent to merely insert the words "10 per centum of the dollar volume of each contract shall be set aside for minority business enterprise."

Madam Chairman, I am merely asking unanimous consent to modify the amendment at this point to include that phrase. That is in the revised amendment that is before the Chair.

The CHAIRMAN. The Chair will advise the gentleman from Maryland (Mr. MITCHELL) that if that language is in the revised language at the desk, his unanimous consent request is not necessary.

Mr. MITCHELL of Maryland. Madam Chairman, it is in the revised language at the desk, and it is in the copies provided the minority side and the majority side.

The CHAIRMAN. Then the request of the gentleman would not be necessary.

Mr. HARSHA. Madam Chairman, if the gentleman will yield, would the gentleman care to tell us where this language that he would like to insert would appear.

Mr. MITCHELL of Maryland. The language referred to appears at page 3, immediately after line 7, in the revised amendment that the gentleman has before him.

It is in the revised amendment that the gentleman has before him, it says:

Notwithstanding any other provision of law, no grant shall be made under this Act any local public works project unless at least 10 per centum of the dollar volume of each contract shall be set aside for minority business enterprise.

That is the only insertion.

Mr. HARSHA. Madam Chairman, I thank the gentleman.

Mr. MITCHELL of Maryland. Madam Chairman and my colleagues, all this amendment attempts to do is to provide that those who are in minority businesses get a fair share of the action from this public works legislation.

I want to commend the chairman and the members of the committee who have done a great deal to make this public works bill far more equitable than it was last year. They have targeted and have amended the legislation to cover areas of high unemployment and they have improved the legislation so that it is a much better bill. But there is one shortcoming that I see in the bill that I am attempting to address through my amendment. That shortcoming is that there will be numerous contracts awarded at the local level for various public works projects, but in that there is no targeting—and I repeat—there is no targeting for minority enterprises.

Let me tell the Members how ridiculous it is not to target for minority enterprises. We spend a great deal of Federal money under the SBA program creating, strengthening and supporting minority businesses and yet when it comes down to giving those minority businesses a piece of the action, the Federal Government is absolutely remiss. All it does is say that, "We will create you on the one hand and, on the other hand, we will deny you." That denial is made absolutely clear when one looks at the amount of contracts let in any given fiscal year and then one looks at the percentage of minority contracts. The average percentage of minority contracts, of all Government contracts, in any given fiscal year, is 1 percent—1 percent. That is all we give them. On the other hand we approve a budget for OMBE, we approve a budget for the SBA and we approve other budgets, to run those minority enterprises, to make them become viable entities in our system but then on the

other hand we say no, they are cut off from contracts.

In the present legislation before us it seems to me that we have an excellent opportunity to begin to remedy this situation.

I know what the points in opposition will be. The first point in opposition will be that you cannot have a set-aside. Well, Madam Chairman, we have been doing this for the last 10 years in Government. The 8–A set-aside under SBA has been tested in the courts more than 30 times and has been found to be legitimate and bona fide. We are doing it in this bill. We are targeting for various groups of people. We are targeting for the Indians, that is a set-aside. All that I am asking is that we set aside also for minority contractors.

I would point out also that this concept of a set-aside is becoming increasingly popular. Many States and many local subdivisions have moved into the process of setting aside contracts for minorities. That is because that is the only way we are going to get the minority enterprises into our system.

Let me continue, and, very seriously— and perhaps it is unfortunate, maybe, that I am not balancing all of these matters in proper perspective—because I think this is so important. We cannot continue to hand out survival support programs for the poor in this country. We cannot continue that forever. The only way we can put an end to that kind of a program is through building a viable minority business system. So I am deadly serious about it.

The other objection that will be raised is the objection that everybody else is going to go on a competitive bid basis; why should not the minority enterprise people go on a competitive bid basis? The answer is very simple: we cannot. We are so new on the scene, we are so relatively small that every time we go out for a competitive bid, the larger, older, more established companies are always going to be successful in underbidding us. That is an absolute truism.

The third objection that will be heard—and I can anticipate all of them—will be that this will cause a delay in getting certain projects off the ground. Indeed, it will not. It will not cause any delay because I do not know of any single State of the 50 States that under its EDA program has not already developed a roster of capable minority enterprises ready to do the job. All we have to do is go down that list of companies capable of doing the job.

I think I have raised the objections, and I think I have answered them. This is the only sensible way for us to begin to develop a viable economic system for minorities in this country, with the ultimate result being that we are going to eventually be able to pull down deficits in spending; we are going to be able to end certain programs which are merely support survival programs for people which do not contribute to the economy. I support those programs because at present we have nothing else to offer. On the other hand, I would urge adoption of my amendment because to the extent we are willing to let minorities do business with the government, we will be able to reduce survival support programs now paid for by the Federal Government. I urge the Members' support.

Mr. KAZEN. Madam Chairman, will the gentleman yield?

Mr. MITCHELL of Maryland. I yield to the gentleman from Texas.

Mr. KAZEN. I thank the gentleman for yielding.

I can agree with practically everything the gentleman has said, but, as I understand his amendment, it is mandatory that 10 percent be set aside; am I correct?

Mr. MITCHELL of Maryland. That is correct.

Mr. KAZEN. All right. What happens in the rural areas where there are no minority enterprises? Will the 10 percent be held up in order to bring minority enterprises from somewhere else where there is no unemployment into a place where there is unemployment and there is no minority enterprise?

Mr. MITCHELL of Maryland. In response to the gentleman's question, the answer is "No."

The CHAIRMAN. The time of the gentleman has expired.

(By unanimous consent, Mr. MITCHELL of Maryland was allowed to proceed for 2 additional minutes.)

Mr. MITCHELL of Maryland. Let me tell the gentleman why that would not occur. When Presidents Nixon and Ford put out their Executive orders to all the agencies to utilize minority contractors, the agencies then established certain guidelines which said, all right, we will utilize these minority contractors wherever possible, but where there are none, there can be no utilization, and therefore no project should be delayed.

For example, I would not expect to take my minority contractors from Maryland into Idaho to meet that State's requirement. That will not be an issue.

Mr. KAZEN. If the gentleman would yield further, this is what I wanted the gentleman to clarify, that where there are no minority enterprise contractors than this provision would not be in effect; am I correct?

Mr. MITCHELL of Maryland. That is absolutely correct, and that is done by administrative action already on the books with all of the agencies.

Mr. KAZEN. Does the gentleman's amendment leave room for that type of discretion in the Secretary?

Mr. MITCHELL of Maryland. I assume that it does. It would be my intent that it would because that is existing administrative law.

Mr. KAZEN. I thank the gentleman.

Mr. ROE. Madam Chairman, I move to strike the last word.

(Mr. ROE asked and was given permission to revise and extend his remarks.)

Mr. ROE. Madam Chairman, I sympathize completely with the gentleman from Maryland and have reviewed his proposed amendment. I might want to suggest a point for consideration by the Committee. What the gentleman is attempting to do is see that there is an equitable relationship for minority contractors and suppliers to be able to participate, which I think is right and is proper.

On the other hand the way the amendment is drafted, it would indicate that the 10 percent would be set aside. I do not know where that 10 percent would be set aside. This is a very important amendment, if we would just like to think it out. I want to vote for this issue but I am pointing out some technical problems in the draftsmanship of it. To me the way this appears to be written is that if we are talking about a 10-percent set-aside, where are we talking about the set-aside?

I would appreciate it if the gentleman would join me in a colloquy. The way this bill functions now is that funds are allocated among the States depending on their respective unemployment. Under that particular posture the EDA reviews the applications coming in from the subdivisions within that State, whatever they happen to be, and they make the grant approval to the city or the community or the county before the project goes out for bid.

Mr. MITCHELL of Maryland. And that is where the set-aside occurs. Under the procedures that are now existing in many political subdivisions using Federal funds, at the time of that approval, at the time of the submission of the request from the local political subdivision by way of illustration EDA simply says.

O.K. It looks awfully good to us. We would recommend that you set aside 10 percent for minority contractors.

Indeed, this occurs, if my distinguished chairman will listen, many times.

Mr. ROE. Oh, he is listening.

Mr. MITCHELL of Maryland. This occurs even before any submissions are made, very often, by agencies. The agency will say:

O.K. We are about to embark on this program in your district. We would ask you to adhere to a set-aside.

And that becomes a part of the original guidelines, and then the State or city or the county takes the responsibility of actually carrying out the set-aside operation, not EDA.

Mr. ROE. May I build on that. That sounds good in theory, but let me tell the gentleman how it works. There are many States that have prohibitions in their constitutions or they require, for example, that a particular community, say X community, was awarded a grant for some project by EDA, and they then have to take that grant and go out to public bidding. The contractors, the prime contractors have to bid on that public bid. I do not know how we can say. and I am just asking how the gentleman's thought processes go, if we have say 5 contractors that want to bid and the minority contractor has a bid which is higher than any—is the gentleman suggesting that the contract then would have to be awarded to the highest bidder because he is the minority bidder?

Mr. MITCHELL of Maryland. Oh, no.

Mr. ROE. That is what this amendment says.

Mr. MITCHELL of Maryland. It does not say that or operate in that fashion at all.

My State of Maryland has a proviso requiring competitive bidding. In addition to that proviso my State of Maryland, without benefit of law, has suggested to the agencies:

Why do we not do something to try to bring minority businesses into government participation?

It further suggests that of all the contracts that are let, x percent should be set aside to be handled on a noncompetitive basis for minorities. That is an administrative action. It is not the law of Maryland but it is one way, one means by which we are able to move toward solving the problem in my State.

Mr. ROE. I think the question raised by the other gentleman who brought it out is that we are only looking for an answer, and the question raised is that in many areas of the country we do not have minorities. We do not have a mi-

nority problem at that point. We are trying to understand the gentleman's amendment and how we can apply it uniformly across the country, because the way it is written now it automatically does apply and there would be a 10-percent set-aside at every level of government. This is the way it appears to be written. Then we would come back and say, whether it is a State or a county or a municipal project, that 10 percent of the contracting and 10 percent of the supplies would have to be secured from a so-called minority contractor at that point.

Mr. MITCHELL of Maryland. Let me clarify one issue. It is 10 percent of the contracts and/or supplies. That gives a great deal of leeway to the governments, so that if they do not have minorities capable of providing the supplies, they have got people capable of performing the contracts. That is the first point I want to make.

The second point, and I reiterate what I said earlier, that we already have in existence within the agency structure the SOP administrative law that says this kind of amendment would not apply where there are no minority contractors or where there are no minorities. It is already in the law.

The CHAIRMAN. The time of the gentleman from New Jersey has expired.

(By unanimous consent, Mr. ROE was allowed to proceed for an additional 3 minutes.)

Mr. ROE. Madam Chairman, that does not hold on the point of law. If there is an administrative director, let me tell the gentleman, that in this bill we have made very careful adjustments to meet what were the minority interests. We did have a group of people from the civil rights group and minority interest groups.

Mr. MITCHELL of Maryland. Madam Chairman, if the gentleman will yield further, I applauded the gentleman for his interest in that direction.

Mr. ROE. I know the gentleman did.

I think we have to allow elbow room in the amendment to make it workable.

I have a suggestion for an amendment which I would like to discuss with the gentleman from Maryland which is something in words to the effect:

Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 percent of the amount of each grant shall be expended for minority business enterprises. For purpose of this paragraph, the term 'minority business enterprise' means a business at least 50 percent of which is owned by minority group members or,

And then it takes in the rest of the gentleman's language.

What the gentleman is saying here is that they are mandated to go to 10 percent where the material and supplies are available and the contractors are available; but if we get into an area where they are not available, we have another problem. We have to go to another State to get those people in.

Does the gentleman see what I am getting at?

Mr. MITCHELL of Maryland. Madam Chairman, if the gentleman will yield further, if my understanding of the gentleman's amendment is correct, I am inclined to accept it, if that would help clarify the matter of not importing minority contractors and businesses from another State.

Mr. ROE. Madam Chairman, that is exactly what I am saying.

Mr. MITCHELL of Maryland. Madam Chairman, if the gentleman will yield further, that is acceptable with the caveat that there must be a mandate, because, I say to the Members of the House, every agency of the Government has tried to figure out a way to avoid doing this very thing. Believe me, these bureaucracies can come up with 10,000 ways to avoid doing it. That is why I am insisting it be mandated.

Mr. ROE. Well, my amendment can accomplish both goals. We are saying each grant shall be expended for minority enterprises. We are mandating it in this amendment.

Mr. MITCHELL of Maryland. Madam Chairman, if the gentleman will yield further, if my understanding is correct, I willingly accept the gentleman's amendment.

Mr. ROE. We want to make it clear.

Mr. MITCHELL of Maryland. Madam Chairman, if the gentleman will yield further, I think the local municipalities should have the right to utilize minority enterprises and his amendment will support that right.

Madam Chairman, I accept the amendment to my amendment.

AMENDMENT OFFERED BY MR. ROE TO THE AMENDMENT OFFERED BY MR. MITCHELL OF MARYLAND

Mr. ROE. Madam Chairman, I offer an amendment to the amendment offered by the gentleman from Maryland (Mr. MITCHELL) and ask unanimous consent that it be adopted.

Mr. HARSHA. Madam Chairman, reserving the right to object, I would like to know exactly the language of the gentleman's amendment.

The Clerk read as follows:

Amendment offered by Mr. Roe to the amendment offered by Mr. Mitchell of Maryland: In lieu of the Mitchell amendment insert the following:

Page 3, in lieu of the matter proposed to be inserted after line 7, insert the following: "(2) Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 percent of which is owned by minority group members or, in case of a publicly owned business, at least 51 percent of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

Mr. ROE. Madam Chairman, I ask unanimous consent that the wording of the amendment may be corrected so that after the word "amount" insert the word "of" and after "in case of" insert the word "a" and correct the spelling of the word "Eskimos".

The CHAIRMAN. Is there objection to the request of the gentleman from New Jersey?

Mr. HARSHA. Madam Chairman, reserving the right to object, may I further inquire, the language I have says:

Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 percent of the amount of each grant shall be expended for minority business enterprises.

Does this mean each and every grant?

Mr. ROE. Madam Chairman, if the gentleman will yield, that is what the amendment of the gentleman from Maryland (Mr. Mitchell) said originally. What we are saying in this amendment, wherein that is not possible to comply with, because different regions in the country do not have minorities concentrated in the construction trades and it would not apply.

Mr. HARSHA. Does the gentleman mean by the language which says to the extent that the Secretary determines otherwise, that that gives the Secretary the authority to set aside this provision for their own minority business enterprises?

Mr. OBERSTAR. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from Minnesota.

Mr. OBERSTAR. Madam Chairman, I think that is part of the gentleman's amendment, to give the Secretary the authority to determine in a place where there is no minority enterprise.

The CHAIRMAN. Without objection the Clerk will re-report the amendment to the amendment.

The Clerk read as follows:

Amendment offered by Mr. Roe to the amendment offered by Mr. Mitchell of Maryland:

Page 3, in lieu of the matter proposed to be inserted after line 7, insert the following: "(2) Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 percent of which is owned by minority group members or, in case of a publicly owned business, at least 51 percent of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

The CHAIRMAN. Is there objection to the unanimous-consent request of the gentleman from New Jersey to amend the amendment offered by the gentleman from Maryland?

Mr. HARSHA. Madam Chairman, reserving the right to object, I want to try to clarify this.

Do I take it now that this language, the gentleman feels, gives the Secretary the authority to exempt a particular project from this provision if there is no minority business enterprise within the project area or within the employment area?

Mr. ROE. It appears to me that what we are saying here is that no grant shall be made under this act for any public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 percent of the amount of each shall be expended for minority business enterprises, meaning suppliers or whatever; however, if that situation does not prevail and the minority business people are not in that area, then the Secretary has to make a judgment on it.

Mr. HARSHA. Then who certifies whether or not there is a minority business enterprise available with the material needed in a project?

Mr. ROE. Well, the way this proposed amendment to the amendment is written, it would have to be determined by certification, I think, from the applicant.

Then, any question that would arise in the Secretary's interpretation—

Mr. MITCHELL of Maryland. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from Maryland.

Mr. MITCHELL of Maryland. It seems to me that the distinguished gentleman from New Jersey has resolved the major part of our dilemma.

The CHAIRMAN. The gentleman will suspend. Does the gentleman from Ohio object to the unanimous-consent request of the gentleman from New Jersey?

Mr. HARSHA. I still reserve the right to object.

The CHAIRMAN. Rather than proceed under the gentleman's reservation of objection, the Chair will treat the amendment offered by the gentleman from New Jersey to the amendment offered by the gentleman from Maryland as pending and proceed under the 5-minute rule, so that debate can then take place in the proper way.

Mr. HARSHA. Well, I want to clarify this, Madam Chairman, because the report may include in this such minority groups as Indians, and we have already set aside 2½ percent for Indians. How much more are we going to give Indians? We are talking about 10 percent of $4 billion, which is $400 million. I want to get to that point. I do not want to object to the gentleman offering his amendment, so that we can get rid of this issue.

Madam Chairman, I withdraw my reservation of objection.

PARLIAMENTARY INQUIRY

Mr. ROE. Madam Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. ROE. Is it possible for others who desire to do so to reserve the right to object?

The CHAIRMAN. The Chair will put the question on the amendment offered by the gentleman from New Jersey to the amendment offered by the gentleman from Maryland, unless further Members desire to debate the issue under the 5-minute rule.

The gentleman from New Jersey (Mr. ROE) is recognized for 5 minutes on his amendment.

PARLIAMENTARY INQUIRY

Mr. HOWARD. Madam Chairman, I have a parliamentary inquiry.

The CHAIRMAN. Does the gentleman yield for a parliamentary inquiry?

Mr. ROE. Of course, Madam Chairman. I yield to the distinguished gentleman from New Jersey.

Mr. HOWARD. Madam Chairman, I would ask the Chair if unanimous consent was granted for the amendment offered by the gentleman from New Jersey to be before the House.

The CHAIRMAN. That was not necessary. It is still an amendment to an amendment which is pending business to be voted on by the committee.

Mr. ROE. Now that we have settled that down, let us get to the issue.

Mr. HARSHA. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from Ohio (Mr. HARSHA) to pursue the point further.

Mr. HARSHA. I thank the gentleman for yielding.

Madam Chairman, I am just trying to clarify what we are doing here. I have no objection to the purpose of the gentleman from Maryland, but in fairness to everybody concerned, we are setting aside 10 percent of this authorization, which is for $4 billion, which is $400 million. We have also set aside specifically for the Indians 2½ percent of the total authorization. If we are going to set that much more aside, it seems to me we are getting to a percentage which is going to discriminate against the rest of them.

Madam Chairman, I recognize the validity and the merit of what the gentleman from Maryland is saying, that if we are going to have minority contractors they have to be able to compete. In many instances they cannot compete against established contracts. On the other hand, if we set aside 10 percent of the sum here for minority contractors, then we get a number of contractors that are not minority contractors but who hire minorities, and they then are deprived of bidding on that 10 percent.

How do we resolve the issue of discrimination?

Mr. ROE. Madam Chairman, I think the gentleman is striking at an important point. We must remember the facts. More mistakes are made due to lack of facts than due to poor judgment.

We have set aside 2½ percent for Indian tribes. There is no provision in the law as presently constituted which says that the person working for the Indian tribe has to be an Indian. He can be an Oriental, or somebody else. I do not think that clouds the issue.

Let us take the second point of when we are talking about companies held by minority groups or 51 percent held by stock groups. Certainly people of a variety of backgrounds are included in that. That is not really a measurement. They are talking about people in the minority and deprived.

What we are saying here, basically, is that the Secretary can determine if this provision or proposal can be implemented in the given area. If we do not have Spanish-speaking people, Negroes, Orientals, Indians, Eskimos or Aleuts, then he has to make that judgment.

The only thing I can see is that the applicant who has the project, in the first place, has to give satisfactory assurance to the Secretary that at least 10 percent of the amount of each grant shall be expended for minority business enterprises. It does not talk about whether it is the contractor, necessarily, or the supplier. Some part of the enterprise would be oriented toward that group. That is what the amendment says.

Mr. HARSHA. If the gentleman will yield further, that is the crux which I was trying to get at. There are many areas where this cannot apply, and I would not want to deny an area a project certainly because of the fact that they did not have a minority enterprise available or could not provide the material, the equipment, contractors, or what have you, from the minority groups.

If I interpret the gentleman's explanation of it correctly, the gentleman has assured me that that will not occur.

Mr. ROE. That is my understanding.

Mr. DON H. CLAUSEN. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from California.

Mr. DON H. CLAUSEN. Madam Chairman, as the gentleman knows, referring to these contracts, they are handled like contracts in any other political subdivision under the EDA program as far as sharing, and so forth. But there is one question that comes to my mind after listening to the gentleman from Maryland (Mr. MITCHELL).

The gentleman indicated, if I understood him correctly, that they have worked out their problem administratively in the State of Maryland. If this resolves their problem in the State of Maryland, why should we clutter up the legislation for the balance of the country if in fact his situation in the State of Maryland has been worked out through the administrative processes of the State of Maryland?

The CHAIRMAN. The time of the gentleman from New Jersey (Mr. ROE) has expired.

(On request of Mr. MITCHELL of Maryland and by unanimous consent, Mr. ROE was allowed to proceed for 5 additional minutes.)

Mr. MITCHELL of Maryland. Madam Chairman, will the gentleman yield to me?

Mr. ROE. I yield to the gentleman from Maryland.

Mr. MITCHELL of Maryland. Madam Chairman, I thank the gentleman for yielding.

In response to the query of the gentleman from California (Mr. DON H. CLAUSEN), let me point out that I am very pleased with the rate at which my State and my city happen to be moving in terms of solving this problem. We have not reached the millennium by any means, but I think we are moving well.

On the other hand, I think we must look at other States and cities around this country that have not really addressed the problem at all and do not have any lever on which to hang an operation designed to begin to redress this grievance that has been extant for so long.

For example, it is my belief that in the State of Michigan there has not yet been a movement toward set-asides, even on an administrative basis. There are other States in which that situation obtains. By setting the tone at the Federal level, I would point out to the gentleman, what we do in terms of these local political subdivisions is to give them the added impetus to do those things which are right and fair.

Mr. CONYERS. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from New York.

Mr. CONYERS. Madam Chairman, I would like to comment to some extent on the apparent resolution that this body is working toward between the proposal offered by the gentleman from Maryland (Mr. MITCHELL) and the amendment as perfected by the gentleman from New Jersey. There are two points that ought to be made clear.

First of all, minority contractors and businessmen who are trying to enter in on the bidding process—and my office is replete with examples of this—get the "works" almost every time. The bidding process is one whose intricacies defy the imaginations of most of us here. The sad fact of the matter is that minority enterprises usually lose out, and subsequently end up in a congressional office or some other unlikely place complaining bitterly. Not all of them come to the offices of members of the congressional Black Caucus either, because many other Members have had the same dismaying experience of trying to give solace to small businessmen who through no fault of their own simply have not been able to get their foot in the door.

The second point, and one that is very critical, is the fact that this amendment

does not jeopardize any application in any Member's district or community where there may not be in existence a minority enterprise element in that community. We have in the amendment the language that specifically allows the Secretary to exclude them from application, so if the district does not have black businessmen, it does not mean that the applications will be delayed or denied; it simply means that the provisions of the amendment will not apply in that situation.

Mr. PEASE. Madam Chairman, will the gentleman yield?

Mr. ROE. I yield to the gentleman from Ohio.

Mr. PEASE. Madam Chairman, I would like to support this general concept. I have a very fine minority contractors association in my county that I have been working with, and I would like to see a workable proposal.

I would like to ask first, if I may, how this fits in with the competitive bidding process and the requirement of the State law in many States that bids must be let to the lowest and best bidder.

Mr. ROE. Well, they would have to be let to the lowest and best bidder, but as part of that bid, when there are subcontractors and what-have-you, 10 percent of it would have to relate by certification to the fact that they are dealing with a minority interest.

Mr. PEASE. Madam Chairman, if the gentleman will yield further, what happens if in the bidding process there do not happen to be any minority enterprises as the low bidders in any of these areas?

Mr. ROE. Madam Chairman, they are going to have to buy their material, that is, 10 percent of their material and services, from minority enterprise businessmen.

Mr. PEASE. Madam Chairman, if the gentleman will yield for one more question, the idea of this bill is to get public works projects moving as quickly as possible in order to stimulate the economy.

Does the gentleman have any idea at all as to how long it would take for the administrative requirements of the Secretary reviewing these situations and what kind of a delay that would cause in the letting of these contracts?

Mr. ROE. No. I would not presume to try to answer because I do not know. I think it is a sticky issue. The fact remains that it is a movement which merely says that 10 percent will participate in minority enterprise and minority business.

I think in view of the fact that the originator of the amendment, the gentleman from Maryland (Mr. MITCHELL), has gone along with what seems to be a reasonable compromise is in itself significant. We are saying, "If the Secretary shall determine." In other words, there is movement there. There is movement to set up a provision in the rules and regulations; and this committee is going to oversee those rules and regulations and is going into the document itself when it is presented to it.

Mr. HAMMERSCHMIDT. Madam Chairman, I move to strike the last word.

I rise in support of the perfecting amendment of the gentleman from New Jersey (Mr. ROE) to the amendment of the gentleman from Maryland (Mr. MITCHELL).

I believe that the concerns expressed by our ranking minority member (Mr. HARSHA) in the colloquy with the gentleman from New Jersey (Mr. ROE), the chairman of the subcommittee, cleared up any apprehensions that I had and which several of us may have had over the way in which this amendment would be administered.

Therefore, Madam Chairman, with that cleared up, I am ready to support the amendment.

Mr. BIAGGI. Madam Chairman, will the gentleman yield?

Mr. HAMMERSCHMIDT. I yield to the gentleman from New York.

(Mr. BIAGGI asked and was given permission to revise and extend his remarks.)

Mr. BIAGGI. Madam Chairman, I rise to indicate my full support of the amendment offered by my distinguished colleague from Maryland as amended by the gentleman from New Jersey (Mr. ROE). I consider the amendment wholly complimentary to the bill as its objective is to guarantee to minority business enterprises that they too will benefit from the passage of this legislation.

This Nation's record with respect to providing opportunities for minority businesses is a sorry one. Unemployment among minority groups is running as high as 35 percent. Approximately 20 percent of minority businesses have been disolved in a period of economic recession. The consequences have been felt in millions of minority homes across the Nation.

What the amendment seeks to do is guarantee that at least 10 percent of all funds in this legislation will go to contracts which will be awarded to minority business enterprises. This is not an unreasonable demand—in fact it is quite modest. If implemented however it could have great benefits to the entire minority community. Fiscal year 1976 figures in-

dicate that less than 1 percent of all Federal procurement contracts went to minority business enterprises. This is a situation which must be demedied.

The objectives of this legislation are both necessary and admirable. Yet without adoption of this amendment, this legislation may be potentially inequitable to minority businesses and workers. It is time that the thousands of minority businessmen enjoyed a sense of economic parity. This amendment will go a long way toward helping to achieve this parity and more importantly to promote a sense of economic equality in this Nation.

Mr. SISK. Madam Chairman, today, we consider legislation designed to reduce a substantial amount of our national unemployment. I am deeply worried, however, that whatever efforts we may undertake—such as this proposed legislation—will be completely useless. Our unemployment problem—despite our best efforts to create jobs—will still remain and will in fact get far worse. Unfortunately, for every one of the 800,000 public service jobs created by President Carter's economic proposals, at least two illegal applicants will be competing with each jobless American citizen.

A minimum of 1.7 million people illegally entered and stayed in American last year, looking for work which would otherwise be available to Americans. Another 400,000 people were admitted as immigrants. And finally, 1.3 million Americans were added to our population last year.

These figures may seem insignificant. But taken together, they result in ominous facts. America is now growing by greater numbers than any other nation in the world—except for China and India. We add each year 3.6 million people to our country, equivalent to the combined populations of Alaska, Wyoming, Vermont, Delaware, Nevada, North Dakota, and South Dakota. We are, in a sense, adding seven States to our Union each year. And that number is dramatically increasing each year.

According to Mr. Tom Braden in an article in the Washington Post of February 12, 1977, the U.S. population has been swollen by at least 5 million illegal immigrants in the past 5 years. Within 10 years, according to the environmental fund, the United States will be adding over 12 million people annually if present trends continue, a number just a few million less than the number of people being added to India each year. By 1986, for example, the United States would approach a population of 300 million. In just 47 years, the U.S. population would double to almost 450 million people.

In short, Madam Chairman, the United States may very soon have the highest population growth rate in the world, even though our birth rate has declined substantially. Illegal immigration is rapidly changing the face of this Nation. It is raising serious questions of civil liberties and law enforcement. It is changing our schools and communications. And it is propelling us toward what Mr. Braden describes as a "separatist language system and a population larger than environmentalists believe we can sustain." And it is costing the U.S. taxpayer over $16 billion annually.

But no one seems to care to do anything about it. For example, while President Jose Lopez Portillo of Mexico and President Carter recently had extended discussions on relations between our two nations, the problem of population growth and illegal immigration was hardly dealt with. And it is rapid population growth which is at the heart of Mexico's extreme poverty, her 40 percent or more unemployment and our substantial illegal alien problem.

Mr. James Reston of the New York Times commented on this in a February 18 column. He wrote that the two leaders could "not really deal with these problems so long as Mexico's population growth outruns its industrial and agricultural production and its ability to produce jobs at living wages for the millions of Mexican's who are entering the United States illegally." Unfortunately, both the United States and Mexico refuse to acknowledge that they both have a population problem.

Madam Chairman, in 1900 Mexico contained 13 million people, with over 5 acres of arable land to support each of its citizens. But today, it has over 63 million people, increasing at 3.8 percent a year, with much of that increase simply leaving for the United States. And Mexico now has only 1 acre of arable land from which to support each of its citizens.

Mexico's population, at current growth rates, will double in less than 20 years. In the lifetime of a child born today, Mexico could become a nation with as many people as China has today. Obviously, since Mexico cannot adequately support even her present population, most of these people will look elsewhere for food, shelter, and work. And most of them will come to the United States.

In conclusion, Madam Chairman, in our efforts to create jobs for the almost 10 million Americans out of work, as well as to help deal with Mexico's substantial economic and agricultural problems, population growth and illegal immigra-

**1006**

tion must be high on the agenda of this country as serious problems that must soon be dealt with now.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New Jersey (Mr. ROE) to the amendment offered by the gentleman from Maryland (Mr. MITCHELL).

The amendment to the amendment was agreed to.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Maryland (Mr. MITCHELL), as amended.

The amendment, as amended, was agreed to.

LEGISLATIVE HISTORY
P.L. 95-28

# LOCAL PUBLIC WORKS CAPITAL DEVELOPMENT AND INVESTMENT ACT OF 1976

*P.L. 95-28, see page 91 Stat. 116*

House Report (Public Works and Transportation Committee)
No. 95-20, Feb. 16, 1977 [To accompany H.R. 11]

Senate Report (Environment and Public Works Committee)
No. 95-38, Mar. 4, 1977 [To accompany S. 427]

House Conference Report No. 95-230, Apr. 28, 1977
[To accompany H.R. 11]

Senate Conference Report No. 94-110, Apr. 28, 1977
[To accompany H.R. 11]

Cong. Record Vol. 123 (1977)

## DATES OF CONSIDERATION AND PASSAGE

House February 24, April 5, May 3, 1977

Senate March 10, April 29, 1977

The House bill was passed in lieu of the Senate bill. The House
Report and the House Conference Report are set out.

## HOUSE REPORT NO. 95-20

[page 1]

The Committee on Public Works and Transportation, to whom was
referred the bill (H.R. 11) to increase the authorization for the Local
Public Works Capital Development and Investment Act of 1976, having considered the same, report favorably thereon with an amendment
and recommend that the bill as amended do pass.

\* \* \*

### INTRODUCTION

This bill, H.R. 11, amends and extends the Local Public Works
Capital Development and Investment Act of 1976, which is Title I
of a major economic recovery measure entitled "The Public Works
Employment Act of 1976."

The concept of local public works projects as a dual purpose instrument to help revitalize the Nation's financially-pressed communities
and reactivate the distressed construction industry with its hundreds
of thousands of jobless workers was initiated by the House congressional leadership early in 1975.

At that time, the United States was suffering its most serious economic recession since the Great Depression of the 1930's, and the major
victim was the construction industry, whose unemployment rate was—
and still is—two to three times that of the general economy. It was

[page 2]

felt that construction represented the most promising arena for congressional action, both because of its impact on all other areas of economic life and because Federal assistance in this sector offered the most immediate and effective help to the States, cities, towns, and rural areas that could no longer afford many of the essential facilities and services needed by their citizens.

The problem was referred to the House Committee on Public Works and Transportation and to its Subcommittee on Economic Development, which devoted much of the next 1½ years to the shaping of a program that would help meet the rising demand for jobs and public facilities without adding further to the threat of inflation. Witness after witness, from the ranks of labor, from State, county, and municipal government, and from a wide assortment of public interest groups, journeyed to Washington to testifiy to the urgent need for some such program, but it was not until late in July 1976, that the Congress was able to enact over a Presidential veto its first massive response to the national crisis—the Public Works Employment Act of 1976.

Title I of that Act authorized $2 billion of direct, 100 percent Federal grants to State and local governmental jurisdictions for the construction, repair, rehabilitation, or other improvement of local facilities, such as schools and hospitals, police and fire protection facilities, and water and sewer systems, that could be started with a minimum of delay and that would have direct and substantial job-creating impact.

The time period for filing requests for this Federal help extended from October 26 to December 3, and when the deadline expired it was found that some 24,000 applications had been filed for a total of $24 billion. Out of that overwhelming response, only 1,988 projects were processed and cleared for Federal grants that exhausted the $2 billion fund.

Now, with a new national administration wholeheartedly supporting a redoubled public works jobs effort as part of its overall economic recovery package, and with the experience of the 1976 program as a guide, we have every ground for confidence that H.R. 11 can and will continue to make an early and substantial contribution to our economic comeback.

## HEARINGS

In the course of 6 days of public hearings conducted by the Subcommittee on Economic Development, January 27 and 28, and February 1, 2, 3, and 4, 1977, it became clear that major changes must be made in the 1976 Act in order to target the Federal assistance more accurately into the areas of greatest need.

More than 100 witnesses appeared before the subcommittee, including administration spokesmen, Members of Congress, State, county, and municipal government officials, labor leaders, environmentalists, Indian groups, and public interest organizations. Without exception, they testified to the need for the public works jobs program and for increased Federal funding. There was unanimous agreement that the program, properly directed, would be a significant factor in the attack on unemployment. Furthermore, they noted the lasting contribution that would be made to the economic stability and well-being of communities all over America through these public works projects.

[page 3]

The hearings on the first round of funding of the Local Public Works Act clearly showed that the next round of funding should do a better job of—

1. Insuring a more equitable distribution of projects.

2. Simplifying administration by making the program regulations more easily understood.

3. Reflecting local priorities.

4. Eliminating "gerrymandering" of project areas so that program investments are oriented more toward the areas of greatest distress.

The amendments made by the bill will meet these objectives.

In addition to the amendments in this bill, the committee intends to continue holding oversight hearings as the new program regulations are developed to help achieve these objectives. We expect that the next round of funding will depend on the applications already filed.

The hearings clearly established that the first round of funding under the Local Public Works Act was marked by serious inequities caused by (1) the 30 percent "set-aside" for projects in areas where the unemployment rate was over 6½ percent and under the national average; (2) the "gerrymandering" of project areas by smaller communities to take advantage of the higher numbers of unemployed in adjoining communities; (3) the heavy weight given to per capita income in the project selection system; (4) the logarithmic transformation of the numbers of unemployed, (5) the distortions resulting from the different time periods used to compute the three-month average unemployment rate and (6) the extremely high unemployment rate on Western Indian reservations.

The amendments adopted by the Committee on Public Works and Transportation will alleviate these problems by repealing sections 108 (f), revising section 108(d) and amending section 108(c) to provide that the unemployment rate for applications will be based on the 12 most recent consecutive months.

Changing the unemployment rate to a 12-month basis and the repeal of section 108(f) will require that applications that were filed for the first round of funding be reevaluated. Project areas will have to be modified to reflect the requirement that applicants can no longer claim the unemployment statistics of adjoining areas. Project areas will have to be in the jurisdiction of the applicant.

A number of witnesses testified that too much weight was given to per capita income in the project scoring system during the first round of funding. This was a major factor in the low number of projects funded in larger cities. The weight given to per capita income in future project selection should not exceed 5 per centum in a system based on 100 per centum.

The committee strongly urges the Office of Management and Budget, the Civil Service Commission and the General Services Administration to provide the Economic Development Administration with the necessary employment ceiling authorization, recruiting assistance and office space so that it can effectively administer the local public works program.

**1010**

[page 4]
The Committee feels very strongly that higher levels of funding are necessary for the regular EDA program in order that the longer term attack on creating jobs in depressed areas can be strengthened.

### OVERSIGHT

During the final markup of the new legislation, Chairman Harold T. (Bizz) Johnson stated that the Committee on Public Works and Transportation, through its Subcommittees on Ecomonic Development and Investigations and Review, would monitor the operation of the program most carefully and thoroughly. The first step in this procedure, he stated, would be an exhaustive committee review of any proposed new rule or regulation to carry out this legislation *before* it is put into effect.

### MAJOR PROVISIONS IN THE BILL, AS REPORTED

#### LIMITATIONS

*Section 1.*—Section 106 of the Local Public Works Capital Development and Investment Act of 1976 (hereinafter called Act) would be amended to add a new subsection (e) which would prohibit any project from being constructed by any State or local government through the use of its own employees. Construction would be required to be performed by private contractor through competitive bidding unless some other method of award would be in the public interest.

This section is not intended to make it obligatory that the Secretary has to concur before a contract is awarded for project construction.

Another new subsection (f) would be added to section 106 which would require all supplies and materials going into projects funded under the program to be produced in the United States from supplies or materials mined or produced in the United States. Reliance for compliance can be based on assurances given by the applicant.

#### AMENDMENTS TO SECTION 108

*Section 2.*—Section 108 of the Act would be amended to change the timespan for the unemployment data to be used in making grants from the 3 most recent consecutive months to the 12 most recent consecutive months to avoid seasonal fluctuations in the unemployment rate to be applied.

The section would be further amended to provide that up to 2½ percent of amounts appropriated shall be granted to Indian tribes. This will eliminate the competition with local non-Indian projects and insure the Indian tribes of an equitable share in the program. It will also free-up additional funds for State and local governments that have Indian tribes within their borders. For the remaining States that have no Indian tribes within their borders this section is further amended to increase the minimum percentage to be granted from one-half of 1 percent to three-quarters of 1 percent.

[page 5]

The provision requiring 70 percent of the funds appropriated to go for projects of State and local governments having an unemployment rate in excess of the national rate and the remaining 30 percent of funds to go to other areas would be deleted.

The provision in this section that permits the Secretary to consider the unemployment rate in adjoining areas from which the labor force for a project may be drawn would be repealed.

In the case of projects that are located within the jurisdiction of a local government, if the application is cosponsored by the local government, the application will receive the priority given to applications submitted by local governments of the same type.

The committee is aware of the problems which exist in obtaining timely, accurate, and uniform measurements of unemployment for all areas of the country. However, the committee is also aware that the Bureau of Labor Statistics (BLS) cannot, at this time, provide unemployment data for all jurisdictions in the country. Unemployment statistics gathered by the Department of Labor through the BLS generally cover jurisdictions above 50,000 population and prime sponsor areas designated under the Comprehensive Employment and Training Act (CETA), unless special studies of a labor force have been undertaken at the request of a local jurisdiction or the State Employment Security Agency. Prior to August 1976, the BLS was unable to provide comparable unemployment statistics on a county-by-county basis. The BLS has assured the committee that unemployment data is now available to the Economic Development Administration on a county-by-county basis.

Although the committee recognizes the need to have comparable unemployment data from one source to assure uniform and accurate measurements of a community's distress, it is also important that a community not be denied assistance under the Act because national unemployment figures are unavailable for a local jurisdiction.

The BLS is currently engaged in establishing benchmarks for all States based on the current population survey method now used in calculating unemployment statistics nationwide. The committee urges the States to develop data on jurisdictions smaller than 50,000 as soon as possible so that eligible areas under both the Local Public Works Act and the Public Works and Economic Development Act can be qualified for assistance in a timely manner. To provide the optimum opportunity for participation in this program the Committee specifically provided in section 108(c) that information regarding unemployment rates may be furnished by the Federal Government, or by States or by local governments provided that the Secretary of Commerce determines that such unemployment rates are accurate. The Secretary is also required to provide assistance to the States or local government in the calculation of such rates to insure their validity and standardization. Where a State has already developed unemployment data for jurisdictions between 25,000 and 50,000 population this data shall be utilized by the E.D.A. in qualifying local jurisdictions under the Act.

Under the Office of Management and Budget's Circular A–46, Federal agencies are required to use the unemployment data provided by the Department of Labor, Bureau of Labor Statistics. It is the com-

1012

mittee's intent under section 108(c) that if the Economic Development Administration cannot obtain unemployment data from the BLS for a jurisdiction smaller than 50,000 population, or for other jurisdictions where the data is not available for the most recent 12 consecutive months, that the EDA shall request such unemployment information from the State employment security agencies. It is not the committee's intent to delay the updating of unemployment statistics for project applications on file at EDA in allowing the agency to obtain data from the States but the committee wants to insure that EDA has the maximum flexibility in obtaining unemployment data in a timely manner for all eligible applicants under the Act.

Under section 108(e) "pockets of poverty" within urbanized areas would receive assistance under the Act. It is the Committee's intent that projects approved under this section shall be located in the community or neighborhood whose unemployment rate was used in the application for the project.

The committee also recommends that where possible, States should use the data collected for those areas of "substantial unemployment" under Title II of the Comprehensive Employment and Training Act. However, unemployment rates must be calculated for the 12 most recent consecutive months.

Section 108 is further amended to require the Secretary to give priority and preference to building project applications made after enactment of this bill that will result in energy conservation.

In addition section 108 is further amended to require that whenever an applicant submits more than one project for consideration, the applicant must establish its own priority in regard to these projects and submit it as part of the applications.

Section 108(g) is amended in order to put emphasis on the need to recognize plans and programs for improving social as well as economic conditions.

### FAIR LABOR STANDARDS

*Section 3.*—A clarifying amendment is made to section 109 of the Act to delete the words "by contractors or subcontractors" to make sure that all laborers and mechanics employed on projects assisted under this Act are paid in accordance with the prevailing wage provisions of the Davis-Bacon Act.

### CORRECTION OF ERRORS

*Section 4.*—Section 111 of the Act as amended would authorize the Secretary to make grants for projects that were not received, not considered, or were rejected solely because of error made by an officer or employee of the United States. A sum not to exceed $1\frac{1}{2}$ percent of the funds authorized by the Act may be used for this purpose.

This amendment is intended to cover instances where applicants prepared and submitted their applications in good faith, with the full confidence that they had complied with every regulation and guideline, and had applied within the time limits. In some cases, applicants first submitted their applications to other Federal agencies for clearance and were assured by those agencies that their applications would be delivered to EDA before the deadline. In spite of those assurances, the

[page 7]

applications were not delivered on time, were not delivered at all, or were never logged in by EDA.

. The applications prepared last fall represent those projects which were ready to be implemented first. December 23, 1976 should be set as the cut-off date for applications to have been received by EDA to be considered for this next round of funding. This date would take into account those projects which were delayed in the mails and missed the original early December deadline. Any projects which were returned for deficiencies would also be considered for this round.

Section 112 of the Act as amended would provide that whenever a State certifies to the Secretary that the State has standards for the construction of jails that such standards will be the criteria governing the approval of the grant application for jail construction under this Act. The committee's intent is that the criteria under Part E of the Omnibus Safe Streets and Crime Control Act of 1968, as amended, apply to grant applications for the construction of detention or correctional institutions other than jails. Section 112 applies to jails as that term is generally defined. The Committee is informed that to date some 30 States have standards covering the jails; 3 States are in the process of formulating standards.

### AUTHORIZATION

Not to exceed $6 billion is authorized to carry out the Act. This would increase the authorization by $4 billion which would be available for appropriation upon enactment of this legislation.

### OTHER PROVISIONS

*Section 5.*—This section provides that the Secretary of Agriculture and the Secretary of the Interior shall immediately initiate the construction of those Federal public works projects (A) which are the responsibility of their respective departments, (B) which have been authorized, and (C) which can be commenced within 60 days of the date of enactment of this section and completed no later than the 180th day after commencement of construction. No funds authorized by section 113 of the Local Public Works Capital Development and Investment Act of 1976 (Public Law 94–369) may be used to carry out this section.

### COMPLIANCE WITH CLAUSE 2(1) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES

(1) With reference to clause 2(1)(3)(A) of rule XI of the Rules of the House of Representatives, hearings were held jointly by the Subcommittee on Economic Development and the Subcommittee on Investigations and Review of the Committee on Public Works and Transportation on August 31, 1976, relating to this legislation (Committee Print 94–67). The purpose of the hearings was to review the rules and regulations promulgated by the Economic Development Administration of the U.S. Department of Commerce to be followed in administering the Local Public Works Capital Development and Investment Program enacted July 22, 1976 (Public Law 94–369).

[page 8]

(2) With reference to clause 2(1)(3)(B) of rule XI of the Rules of the House of Representatives, the bill, as reported, does not provide new budget authority or increased tax expenditures. Accordingly, a statement pursuant to section 308(a) of the Congressional Budget Act is not required.

(3) With reference to clause 2(1)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee has received an estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act. The report is as follows:

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., February 14, 1977.*

Hon. HAROLD T. JOHNSON,
*Chairman, Committee on Public Works and Transportation, U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for H.R. 11, a bill to increase the authorization for the Local Public Works Capital Development and Investment Act of 1976.

Should the committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

ROBERT A. LEVINE,
*Deputy Director.*

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

FEBRUARY 14, 1977.

1. Bill number: H.R. 11.
2. Bill title: To increase the authorization for the Local Public Works Capital Development and Investment Act of 1976.
3. Bill status: As reported by the House Committee on Public Works and Transportation.
4. Purpose of bill: This bill increases the authorization for the Local Public Works Capital Development and Investment Act of 1976 from its current level of $2 billion to $6 billion. This is an authorization bill which requires subsequent appropriation action.
5. Budget impact: (Function 450)—

| Authorization: | *Millions* |
|---|---|
| Fiscal year: | |
| 1977 | $4,000 |
| 1978 | ------ |
| 1979 | ------ |
| 1980 | ------ |
| 1981 | ------ |
| Estimated cost: | |
| Fiscal year: | |
| 1977 | 160 |
| 1978 | 2,160 |
| 1979 | 1,400 |
| 1980 | 280 |
| 1981 | ----- |

[page 9]

6. Basis for estimate: The authorization level is that stated in the bill. (This estimate addresses only the $4 billion increase in authorization level from the present $2 billion.) For the purpose of this estimate, it is assumed that this legislation and the necessary appropriation action will be enacted by March 15, 1977. The spendout rate from date of enactment is estimated to be 30, 46, 23, and 1 percent, respectively for years 1 through 4. These rates are based on the experience of the Public Works Impact Program (PWIP) of 1972 and 1973, as well as the type, size, and length of the recently approved projects for the first Local Public Works Capital Development and Investment Act of 1976 (LPWCD). They are identical to the rates used by CBO in estimating the costs of the Local Public Works Capital Development and Investment Program of 1976 based on a $2 billion program. Adjusted for a March 15 starting date, these spendout rates are as follows:

| Fiscal year: | Percentage spendout |
|---|---|
| 1977 | 4 |
| 1978 | 54 |
| 1979 | 35 |
| 1980 | 7 |

The PWIP, on which the spendout rate is partially based is similar to LPWCD, but not identical. The size of the average PWIP project was $0.5 million in 1977 dollars while the average size of the LPWCD projects selected is $1 million. The PWIP involved 200 grants, while LPWCD at the $6 billion level can be expected to involve 6,000 grants. The Federal share of PWIP grants was 70 percent of costs whereas LPWCD grants can be expected to average near 100 percent. In comparing these programs, there are factors which would both increase and decrease the expected spendout rate of LPWCD relative to the PWIP experience. However, on the whole, these factors are likely to balance out.

It is expected that it will take the EDA until June 15, 1977 to rework information and to make final project selection. From June 15 to September 30, it is estimated that 4 percent of the total will be spent. The law requires that assurances be given by the grantee that on-site construction can begin within 90 days of selection. However, the PWIP experience with a similar 90 day requirement was that the average start-up time was over 100 days for projects half the size of the LPWCD projects. In addition, 78 percent of the applications for LPWCD grants are for new construction, which has a longer start-up time than repair work. To the extent that EDA completes the selection process more quickly than assumed and that start-up time is shorter than that of the PWIP, spendouts in FY 1977 will be faster. To the extent that the selection process is slower and that start-up time is longer, the spendout will be slower in FY 1977.

7. Estimate comparison: Administration estimates of year 1 spendout rates have been 40 percent compared to CBO's 30 percent. For FY 1977, the Administration has been using an estimated 10 percent spendout rate in comparison to the 4 percent spendout rate used by CBO in this estimate. Crucial assumptions in determining the FY 1977 spendout rate are the time required for EDA to complete the selection process and the start-up time for the construction projects from date of selection.

[page 10]

8. Previous CBO estimate: CBO estimate the costs of the Local Public Works and Capital Development Investments Act of 1976 based on a $2 billion program. The yearly spendout rates used in that estimate are identical to those used in this estimate; however, a slight adjustment has been made to account for a faster spendout expected in the second quarter due to the summer construction period.

9. Estimate prepared by: Terry Nelson.

10. Estimate approved by:

R. SCHEPPACH,
(For James L. Blum,
Assistant Director for Budget Analysis).

(4) With reference to clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, the committee has not received a report from the Committee on Government Operations pertaining to this subject matter.

(5) With reference to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the following information is provided: The effect of carrying out H.R. 11, as reported, should be minimal with respect to prices and costs. The funds under this legislation are directed to areas of high unemployment for the construction of public works projects. The unemployment in the construction and the construction materials industries far exceed the general level of unemployment. Accordingly, the enactment of H.R. 11, as reported, will not have an inflationary impact on prices and costs in the operation of the national economy.

### COST OF THE LEGISLATION

Rule XIII(7) of the Rules of the House of Representatives requires a statement of the estimated costs (that is, authorizations) to the United States estimated by the committee and a comparison with any estimate of such costs made by any Government agency and submitted to the committee which would be incurred in carrying out H.R. 11 as reported in fiscal year 1977 and each of the following 5 years.

H.R. 11, as reported, authorizes a total of not to exceed $6 billion to carry out this Act, $2 billion of this amount (authorized by Public Law 94–369) has already been appropriated for fiscal year 1977. The additional $4 billion will be available for appropriation upon enactment of this bill and will remain available for appropriation until it is appropriated. The Department of Commerce recommends the costs to the United States be at a rate of $2 billion per fiscal year. The comparison chart follows:

*Additional authorizations*

| | Billion |
|---|---|
| Fiscal year 1977: | |
| Committee | $4 |
| Department of Commerce | 2 |
| Fiscal year 1978: | |
| Committee | |
| Department of Commerce | 2 |

### DEPARTMENTAL OR ADMINISTRATION VIEWS

This bill is supported and recommended by the Carter administration. President Carter has requested an immediate $4 billion reauthor-

[page 11]

ization of this program, with the actual expansion to occur in two steps:

>An immediate $2 billion expansion in fiscal year 1977 based on existing applications and on minor modifications in the allocation process.
>
>A further $2 billion appropriation in fiscal year 1978 which will permit consideration of additional applications and further changes in the criteria for allocating funds.

## COMMITTEE RECOMMENDATIONS

The committee in compliance with rule XI(2)(1)(2)(A), the majority of the committee having actually been present, reports favorably the bill H.R. 11, as amended, and recommends its enactment as reported.

## VOTE

The committee ordered the bill reported by voice vote.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

[page 15]

## ADDITIONAL VIEWS OF JAMES C. CLEVELAND

Nearly two years have passed since this Committee reported out what ultimately became the Local Public Works Capital Development and Investment Act of 1976 which is being extended and expanded by H.R. 11. The reason for both its enactment and extension is simple: A separate, multi-billion-dollar program is the only way the Congress can conceive to speed the flow of Federal construction funds into the economy, create construction jobs and produce needed public works. Never mind the fact that many times over the amount authorized by this bill is available under conventional programs; they are so mired in regulations, statutory constraints and bureaucratic red tape as to be incapable of acceleration. This stood as an indictment of all concerned two years ago: the Congress, the Federal agencies, and those organized interests in our society which enjoy some success in influencing public policy. And in light of subsequent developments, it stands as a stronger indictment today.

It is instructive to recall that the local public works jobs program was not introduced initially in isolation, but rather was offered as part of a House leadership package of economic stimulus measures. Significantly, one would have required Federal agencies with public works responsibilities to review their procedures and requirements, eliminating those which serve no useful purpose and accelerating the administration of those which do. It sank without a trace.

### PUBLIC WORKS JOBS: HIGHWAYS

What of conventional, traditional programs of financial assistance for public works which have been considered of such national priority as to warrant enactment of multi-billion-dollar programs? First, take

**1018**

highways. For two consecutive fiscal years the same Congress so infatuated with public works as a job-creating mechanism has clamped ceilings on obligations from the Highway Trust Fund in the name of budgetary exigencies. This despite vigorous opposition on the part of the Committee on Public Works and Transportation. (For similar reasons, a lid remains on trust fund obligations under the Airport Development Assistance Program.) Protracted disputes finally revolved at the secretarial level—resolved, that is, if they don't come unstuck—have delayed construction of major Interstate projects. One, involving reconstruction of the West Side Highway in New York as an Interstate facility at a cost of $1.2 billion means: direct construction jobs on the highway facility itself; direct construction jobs in massive private development committed to occur in the adjacent corridor; long-term improvement of job opportunities resulting from minority training, hiring and business participation in the project; private jobs preserved and newly created by what is being hailed as the City's major urban redevelopment opportunity of the century.

[page 16]

PUBLIC WORKS JOBS: CLEAN WATER

Or take water pollution control. Under P.L. 92–500, the Water Pollution Control Act Amendments of 1972, $18 billion was authorized. This has since been supplemented by another $480 million as an add-on to the original public works jobs bill. As of January 31, 1977, more than four years after enactment of the 1972 Act, unobligated balances stood at $6.3 billion, while actual outlays were only $4.2 billion. Actual translation of paperwork into projects has been hampered by a morass of red tape and bureaucratic delay well documented by our Subcommittee on Investigations and Review. Yet resistance in the other body to a number of critically needed amendments to the Clean Water Act last year led to the demise of a package of House-passed provisions which included the Cleveland-Wright State Certification Bill. This bill is designed explicitly to reduce red tape, accelerate construction of sewage treatment facilities, and to put construction workers back on the job.

The job implications go beyond the projects' creation of direct employment and demand for materials and equipment in related industries. Countless communities are under sewer moratoria, with the result that residential, commercial and industrial construction is halted. Lifting of such moratoria upon installation or expansion of wastewater treatment facilities could trigger a surge of private construction, possibly followed by expansion of private job opportunities as affected communities are freed to resume normal development. One might have hoped that the funds provided under the initial $2 billion local public works authorization might have enabled numerous hard-pressed communities to raise the 25 percent non-Federal matching share of sewage treatment project costs. It is evident that it did not, possibly due to the legislation's built-in time constraints and the prohibition against land acquisition.

Problems plaguing the Environmental Protection Agency's administration of the construction grants program find their parallel in the Agency's regulatory activities. EPA's Regional Administrator for

New England has paralyzed a $2 billion nuclear generating facility under construction at Seabrook, N.H., by reversing two earlier decisions approving the proposed method of handling thermal discharge under the Clean Water Act. This has resulted in immediate lay-offs of construction workers on site and a long-term threat to both the utility and the ability of New Hampshire to meet its long-term energy needs, with serious economic implications including employment. Seabrook has national implication far transcending its immediate impact to New Hampshire. It is more than jobs—it is at the heart of the national paralysis afflicting our energy policy—or nonpolicy.

### PUBLIC WORKS JOBS: ECONOMIC DEVELOPMENT

Both construction jobs and long-term economic enhancement, cited above as substantial side benefits in the case of water pollution control and an energy facility like Seabrook, are the explicit objectives of the traditional assistance programs of the Economic Development Administration. This involves projects targeted directly toward economic development on the basis of local plans and priorities. In my

[page 17]

view, it would make much more sense to increase authorizations—and appropriations—for this continuing program by $1 billion to $2 billion per year. But no, the basic EDA program (plus assistance for regional commissions) limps along with $1.6 billion annually in authorizations for fiscal years 1977, 1978 and 1979, but actual appropriations far lower—$422 million for 1977. (If anything heartening came out of this year's Committee action to extend the jobs bill, it was the discussion reflecting an apparent consensus that the EDA program urgently warrants full funding.) Plus which, Congress is still skirting the basic confrontation with bureaucracy which must be joined and resolved if the full resources of this country are to be put to work on priority programs.

I regret also that H.R. 11 is being brought before the House in such haste; its original $2 billion is being doubled without the slightest scrap of experience under the program. Members have no way of knowing to what extent projects have actually been delayed while applicants have exhausted all possibilities of obtaining 100 percent Federal financing.

Numerous amendments have been adopted and without doubt have merit. But these have been based on experience limited to the application process rather than analysis of projects. They accomplish one objective, however, which is to lay to rest the allegations that the program has been poorly administered by EDA. Two of the principal sources of controversy and confusion, the 70–30 split as to categories of unemployment severity and the gerrymandering problem, had to be amended out of the Act because the Committee wrote them in in the first place.

### PUBLIC WORKS JOBS: WHY NOT THE BEST?

My principal problem with the bill lies more in what needs to be done, what the bill does not do, and the extent to which it provides an excuse to escape the sweaty, gritty job of overhauling our public works programs and their administration so they can proceed as the Congress intended. That's the reported bill as it stands now. But there

are problems, too, with respect to what can be expected from the other body in conference, in light of the so-called countercyclical assistance tacked onto the original $2 billion bill and the extra ration of water pollution control funds limited to selected states. This eliminated some incentive for the other body to confront the need to enact the Water Pollution Control Act Amendments of 1976. At this writing, there are proposals to add Clean Water authorizations totaling roughly $10 billion for two years to the jobs bill pending in the other body. This would again diminish prospects of obtaining a Clean Water bill containing authorizations and much needed reforms in the program, reforms to accelerate the programs and spur employment. This must be vigorously resisted. Otherwise, the jobs bill extension will result in forfeiture of an opportunity to stimulate jobs in the water pollution control and achieve clean water objectives.

### A CALL FOR CONGRESSIONAL COMMONSENSE

These supplemental views are by necessity regretfully brief. More time and space would invite a wider discussion of the entire "jobs issue."

[page 18]

How many jobs are being held by illegal aliens and what has or does Congress propose to do, if anything?

How many jobs have been lost to excessive government regulation, not only federal—but state as well?

How many jobs have been lost to the cause of judicial activism? How many jobs have been lost by governmental import and export policies?

Conversely, we should also ask how many jobs could be created if governmental commitment to mass transit, safe bridges, housing, clean water, safe streets, and recreation, to mention a few, were effectively implemented.

At the present time and from this writer's perspective, there is but one melancholy conclusion. It is a hard and indisputable fact that government and government policies are putting more people out of work and keeping more people out of work than this legislation can possible put back to work.

It is regrettable that Congress lacks the determination and organizational capability to do the real job of creating jobs.

This legislation will of course pass and with much fanfare. Those who oppose it of course are the heartless ones who are uncaring for the unemployed.

Another chapter will close on the continuing failure of Congress to do its real job of making government work by exercising properly our oversight and study function.

JAMES C. CLEVELAND.

[page 19]

## ADDITIONAL VIEWS OF CONGRESSMAN BUD SHUSTER

The Local Public Works Employment Act of 1976, designed to stimulate a sagging economy by creating private sector jobs in the construction industry and produce community assets of enduring value, has so far succeeded only in illustrating that the application procedure

can be more demanding than the project itself. Seldom has a federal program promised more, and the 24,000 project applications received by the Economic Development Administration attests to the irresistibility of 100 percent Federal funding.

Now, due in large measure to the popularity of the program, the Committee on Public Works and Transportation has reported H.R. 11 to extend and expand the Title I jobs program. During subcommittee and full Committee mark-up, the criteria used to establish the relative merits of project applications was amended, not on the basis of real-life experience, but rather as a result of confusion and misunderstanding in applying the EDA guidelines to individual projects. Not one dime has yet been spent to create a job or lay a brick, yet we have proceeded to "correct" alleged inequities in the program.

Unfortunately, the most blatant injustice—and one that is shockingly apparent now—remains unchanged. That is the discriminatory character of the ranking formula which makes it impossible for rural and urban areas to compete for funding on an equal footing by counting the absolute numbers of unemployed, regardless of the unemployment rate, for 30 out of a possible 120 points in the ranking procedure.

I offered a simple amendment in full Committee—which was not adopted—to correct this inequity by changing the statutory criteria from "unemployment" to "unemployment rate." I contended that because rural areas did not have the levels of concentration of unemployment that you find in urban areas, they could never hope to compete with urban areas on an equal basis.

During the oversight hearing conducted last fall following publication of the guidelines and regulations for implementation of Title I, I voiced this concern to John W. Eden, Assistant Secretary for Economic Development. I later wrote to Mr. Eden asking for a detailed explanation of the formula that would guarantee an equitable allocation of the $2 billion in Title I money. I envisioned major urban areas, with high density unemployment, ranking consistently higher than rural areas where, while the density of unemployment may not be as great, the rates in many cases are higher and the absolute numbers of unemployed over a larger area may be as great or greater than the urban areas.

In each case, during the hearing, in private conversation with Mr. Eden and his staff, and in response to my letter, I was assured that the logarithmic formula designed by EDA would make possible equitable competition among project areas of all sizes and compositions.

[page 20]

I was told that the logarithmic computation of absolute unemployment numbers would enable rural areas to compete for funding on an equal footing with high density areas.

The Round I final selection listing published in the December 23, 1976, Federal Register proved conclusively that my concerns were well founded, and the constant assurances I received from EDA were hollow.

In the Commonwealth of Pennsylvania, for example, where nearly $83 million was allocated to 68 project applicants, over $60 million went to 49 applicants in areas that are urban in socio-economic characteristics, while only 19 applicants in rural areas received $22.7 million in Title I designations.

While defenders of the logarithmic formula might argue that the major urban areas received their fair share in terms of the proportion of absolute numbers of unemployed in those areas to state totals, I contend that the inequity lies not in what the urban areas received, but in what the rural areas, with comparable unemployment, rate, and labor force figures, did not received.

In many cases, projects in the peripheral areas around urban centers received grant approvals because, by nature of their political distinction, they were not construed to be part of the urban center to which they are inextricably married by socio-economic factors, although in many cases they gerrymandered their project areas to include urban-core unemployed, beefing up their unemployment rates.

To illustrate this point, I selected twelve non-urban (rural and small town/city) political subdivisions in Pennsylvania as identified in the Department of Commerce's October 18, 1976, CETA unemployment listing. For purposes of this illustration, I shall refer to this grouping as the "rural sample," but it should be understood that the sample includes such urban areas as the cities of Altoona and York, and the portion of Cumberland County comprising suburban Harrisburg. The unemployment rate, absolute numbers of unemployed, and labor force totals for the rural sample are in every way comparable to the cities of Pittsburgh (including Allegheny County) and Philadelphia, but that comparability ends there. It does not extend to equal treatment in the allocation of funds under the "Jobs" Bill, as the following table clearly illustrates:

| Area | Unemploy-ment rate | Number unemployed | Labor force | Number selected projects | Total project cost |
|---|---|---|---|---|---|
| Philadelphia | 9.29 | 65,424 | 704,169 | 7 | $12,942,923 |
| Percent of State | | 16.5 | 13.8 | 10.3 | 15.6 |
| Pittsburgh (including Allegheny County) | 7.16 | 45,532 | 635,654 | 14 | $11,017,055 |
| Percent of State | | 11.5 | 12.5 | 20.6 | 13.3 |
| Rural sample | 7.39 | 51,079 | 690,482 | 4 | $5,779,940 |
| Percent of State | | 12.9 | 13.6 | 5.9 | 6.9 |
| State | 7.77 | 394,527 | 5,075,366 | 68 | $82,879,610 |
| Rural (27 percent) | | | | 19 | $22,735,369 |
| Urban (73 percent) | | | | 49 | $60,144,241 |

Despite the fact that the rural sample resembles Pittsburgh and Philadelphia in every economic factor, it will receive roughly half the Title I benefits. Why? Because the area is primarily a low-density area that, when viewed in terms of individual political sub-divisions,

[page 21]

cannot compete with the high density absolute unemployment figures of Pittsburgh and Philadelphia. The formula so highly touted by EDA failed miserably in living up to its advance billing as the great balancer between rural and urban areas—just as I predicted it would.

Sure, it's easy to rationalize the formula. It's easy to say that it's the best that could be had under the circumstances and with the severe time constraints imposed by the Congress. But that just doesn't cut it!

This program, as clearly stated in hearings and floor debate, was established to put people back to work, particularly in the construction trades where the unemployment rates have been consistently double the national average. But it was not created as a panacea for our Nation's urban ills at the expense of the jobless in rural America,

as it turned out. The hard working taxpayers of rural America have to eat, too—and most of them don't have the benefit of fat welfare programs that are so prevalent in our Nation's big cities.

This is one—and perhaps the only—instance where a gross injustice to a major sector of America is painfully apparent from the final project list, without waiting for the results from project experience. Yet, the Committee, while attempting to correct other deficiencies, turned its back on this one.

I supported H.R. 11 despite its problems, because half a loaf is better than no loaf at all. But I fervently hope that the obvious discrimination against rural America, inherent in this Act, can be dealt with, either through Administrative regulation procedures or by amendment on the floor of the House, so that the "Jobs" Bill can have true significance to all Americans—not just those in big cities.

| | Unemployment rate | Number unemployed | Labor force | Number selected projects | Total project cost |
|---|---|---|---|---|---|
| Philadelphia | 9.29 | 65,424 | 704,169 | 7 | $12,942,923 |
| Percent of State | | 16.5 | 13.8 | 10.3 | 15.6 |
| Pittsburgh (including Allegheny County) | 7.16 | 45,532 | 635,645 | 14 | $11,017,055 |
| Percent of State | | 11.5 | 12.5 | 20.6 | 13.3 |
| Rural sample | 7.39 | 51,079 | 690,482 | 4 | $5,779,940 |
| Percent of State | | 12.9 | 13.6 | 5.9 | 6.9 |
| State | 7.77 | 394,527 | 5,075,366 | 68 | $82,879,610 |
| Rural (27 percent) | | | | 19 | 22,735,369 |
| Urban (73 percent) | | | | 49 | 60,144,241 |
| Rural sample: | | | | | |
| Altoona City | 7.27 | 1,861 | 25,615 | | |
| Balance Blair County | 7.71 | 2,298 | 29,792 | 1 | 1,440,000 |
| Cumberland County | 4.74 | 3,892 | 82,040 | | |
| Franklin County | 7.24 | 3,406 | 47,035 | | |
| Southern Allegheny Consortium | 7.65 | 15,175 | 198,253 | 1 | 1,060,136 |
| Adams County | 8.12 | 2,248 | 27,686 | | |
| Cambria County | 6.72 | 5,007 | 74,527 | 1 | 1,637,809 |
| Centre County | 5.25 | 2,337 | 44,487 | 1 | 1,641,995 |
| Fayette County | 8.47 | 4,569 | 53,948 | | |
| Mercer County | 10.65 | 5,582 | 52,434 | | |
| Somerset County | 7.24 | 2,219 | 30,646 | | |
| York City | 10.35 | 2,485 | 24,019 | | |
| Average | 7.39 | 51,079 | 690,482 | 4 | 5,779,940 |

Signed,

BUD SHUSTER.

[page 22]

# SUPPLEMENTAL VIEWS OF GARY A. MYERS OF PENNSYLVANIA

While H.R. 11 has made a number of improvements to the Local Public Works Capital Development and Investment Program, three major problems with the structure of the legislation remain. They are the gerrymandered unemployment figures provision, the complete removal of the 70 percent/30 percent allocation of monies, and the failure to impose a deadline for the expenditure of public works project funds.

H.R. 11 strikes the provision which allowed communities to gerrymander labor/unemployment districts between communities. In the 1976 program, much to the surprise of us all, many of the large central cities received no funds because outlying communities selectively used central city figures, as well as their own, in constructing labor dis-

tricts. In H.R. 11, this will not take place. However, internal gerrymandering still is allowed. This program still affords communities and cities the opportunity to gerrymander unemployment districts within their own political jurisdictions. Communities will be able to select specific blocks which have the highest unemployment. While the cities did not effectively compete in the last round of funding, this program now builds in a distinct advantage for them. This is the provision that will, for all practical purposes, greatly minimize the opportunity for smaller communities to compete for funding on an equal basis.

This legislation was designed to stimulate regional areas with the highest unemployment. Gerrymandering distorts this purpose by deemphasizing dependence of surrounding communities to each other in favor of small, isolated pockets within cities. In this report, the Committee has emphasized that should gerrymandering take place, the project applicant must use only those figures within the gerrymandered area in its applications (i.e., rate of unemployment, numbers of unemployed, per capita income, etc.). Rather than regional areas being funded according to real unemployment needs, overweighted and secular unemployment needs will be served. Gerrymandering skews the unemployment figures and places a roadblock to alleviating large-scale regional and rural unemployment. Elimination of all gerrymandering provisions will place each community and each regional area on an even keel with the others. Gerrymandering is not equitable in any form.

Second, H.R. 11 makes all communities with unemployment rates of 6.5 percent and higher eligible for funding on an equal basis. Since the 70 percent/30 percent allocation no longer differentiates between unemployment above or below the national average, each community is competing against all of the others. Members should take another look at the complete elimination of the 70 percent/30 percent distribution formula. I personally believe that provision provided far too

[page 23]

much money to those areas where unemployment was below the national average. I would prefer that an 85 percent/15 percent allocation be utilized as opposed to 100 percent of the money being available to all as proposed in H.R. 11.

The 15 percent provision would give EDA flexibility in determining the impact that projects will have on unemployment in regional areas. Because a community alone does not have high unemployment, that is, highest unemployment, does not imply that its project is not better or will not effectively minimize regional unemployment. 100 percent availability locks EDA into funding projects that may or may not adequately assist an area in grappling with unemployment. An 85 percent/15 percent distribution would give to EDA the flexibility needed to not only select those projects in localities of highest unemployment, but also those areas where unemployment is not as high, but whose projects will be as effective in encouraging employment regionally.

I am not concerned with the specific site of this project. I am concerned that the best projects be funded which will stimulate and encourage the employment of those individuals who are unemployed or underemployed. The 100 percent availability of funds, coupled with the gerrymandering provision, virtually denies the EDA the alterna-

tives it should have in addressing regional unemployment, and does not properly implement the intent of this legislation. Gerrymandering does not address regional unemployment because projects in those areas will in practice, only be available to help the gerrymandered areas. 100 percent availability further depreciates the regional emphasis because it heightens the potential gains of gerrymandering. The region with its interdependence must be the first consideration. Unemployment in outlying areas is not less important than that in the cities. When one is unemployed, it does not matter where.

Thirdly, this program is also designed to be a short-term stimulus to alleviate unemployment. It is, in effect, an unemployment countercyclical program.

If communities delay spending the monies received under this program we may dull the stimulus of this short term emergency measure and risk transferring the spending into an improving economic period which could spur inflation. In order to protect against this occurrence, I will propose an amendment which would instruct the EDA only to approve projects which can be completed within 18 months after onsite construction has begun. Under the present program, there is no provision to ensure that monies will be spent immediately on these projects.

This program can be improved easily. As the Committee indicated, the intent of H.R. 11 is to provide for greater equity in the distribution of funds. H.R. 11 does provide greater equity, but further changes need to be made on the floor of the House of Representatives.

GARY A. MYERS.

## HOUSE CONFERENCE REPORT NO. 95-230

\* \* \* \* \* \* \* \* \* \*

[page 9]

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the amendment of the Senate to the bill (H.R. 11) to increase the authorization for the Local Public Works Capital Development and Investment Act of 1976, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment to the text of the bill struck out all of the House bill after the enacting clause and inserted a substitute text. The House amendment to the Senate amendment struck out the proposed substitute text and inserted another substitute text.

The Senate recedes from its disagreement to the amendment of the House to the amendment of the Senate with an amendment which is a substitute for the House bill, the Senate amendment, and the House

■■■■■■

■■■■■

■■■■■

amendment to the Senate amendment. The differences between the House amendment, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.

[page 10]

# TITLE I

### PROJECTS WHICH PROVIDE RELIEF TO DROUGHT-STRICKEN AREAS

*House provision*

Amends section 102 of the Local Public Works Capital Development and Investment Act of 1976 (hereafter in this statement referred to as the "Act") to provide that the term "public works project" includes the transportation of water to drought-stricken areas.

*Senate provision*

Provides that the Secretary of Commerce, acting through the Administrator (hereafter in this Statement referred to as the "Secretary"), may permit any applicant who received a grant for a project to substitute one or more other projects (including those to provide water to drought-stricken areas) for the project for which the grant was made if the Administrator finds that (1) the total cost of the substituted projects does not exceed the grant for the initial project, (2) each substitute project is consistent with section 106(d) of the Act, (3) any substitute project meets the certain job creation and completion time criteria, and (4) each substitute project will aid in alleviating drought or other emergency or disaster related conditions or damages. In addition, the prohibitions of section 106(a) of the Act are inapplicable to any substitute project.

*Conference substitute*

Combines the House and Senate provisions except that the conference substitute does not contain the requirement that a substitute project meet the job creation and completion time criteria set forth in section 102(d)(7) of the Senate provision.

### DEFINITION

*House provision*

Amends section 102(2) of the Act to include the Trust Territory of the Pacific Islands within the definition of the term "State".

*Senate provision*

No comparable provision.

*Conference substitute*

Same as the House provision with the addition of a conforming amendment to section 108(a) of the Act to clarify that grants for the Trust Territory of the Pacific Islands are to be made out of the percentage of funds for the named territories and possessions. For purposes of the Act, Samoan villages are local governments.

## CONSTRUCTION CONTRACTS

*House provision*

Amends section 106 of the Act by adding a new subsection (e) which would prohibit any project from being constructed by any

[page 11]

State or local government through the use of its own employees. Construction would be required to be performed by private contractor through competitive bidding unless some other method of award would be in the public interest.

In addition, this provision requires an applicant for a project to certify that no contract will be awarded in connection with such project to any bidder who will employ on the project any alien illegally in the United States.

*Senate provision*

No comparable provision.

*Conference substitute*

Same as the House provision.

## AMERICAN SUPPLIES AND MATERIALS

*House provision*

Amends section 106 of the Act by adding a new subsection (f). Paragraph (1) of the subsection requires all articles, materials, and supplies to be used in projects funded under the Act to be produced in the United States from articles, materials, and supplies mined or produced in the States, except in any case where the Secretary determines it inconsistent with the public interest, the cost to be unreasonable, or if the needed articles, materials, or supplies are not available in sufficient and reasonable commercial quantities and of a satisfactory quality.

Paragraph (2) of the subsection provides that, except to the extent the Secretary determines otherwise, no grant shall be made under the Act unless the applicant gives the Secretary satisfactory assurances that a minimum of 10 per centum of the amount of the grant will be expended for minority business enterprises.

*Senate provision*

Section 108 is the same as the new paragraph (1) of subsection (f) added to section 106 of the Act by the House provision.

Section 106 is the same as the new paragraph (2) of subsection (f) added to section 106 of the Act by the House provision, except that subsection (b) of section 106 provides that the Secretary will determine the correct level of minority participation with respect to any project in an area with minority population of less than 5 per centum.

*Conference substitute*

New paragraph (1) of subsection (f) added to section 106 of the Act is the same as Senate section 108.

New paragraph (2) of subsection (f) added to section 106 of the Act is the same as the House provision. This provision shall be dependent on the availability of minority business enterprises located in the project area.

## ACCESSIBILITY STANDARDS

*House provision*

Amends section 106 of the Act by adding a new subsection (g) which prohibits a grant for a project to be made unless the applicant gives satisfactory assurances to the Secretary that the project will be

[page 12]

designed and constructed in accordance with the standards for accessibility to the handicapped and elderly under the Act of August 12, 1968.

*Senate provision*

Section 102(d)(8) is basically the same as the House provision, except that the Architectural and Transportation Barriers Compliance Board is authorized to insure that any construction or renovation carried out be accomplished in accordance with the assurances provided to the Secretary.

*Conference substitute*

Essentially the same as the Senate provision.

## FUNDS FOR STATES AND INDIAN TRIBES

*House provision*

Amends subsection (a) of section 108 of the Act to provide that not more than 2½ per centum of amounts appropriated to carry out the Act shall be granted to Indian tribes.

In addition, subsection (a) is amended so that the minimum percentage to be granted for local public works projects within any State which has no Indian tribes within its borders is increased from one-half of one percent to three-quarters of one percent.

*Senate provision*

Provides up to 2½ per centum of appropriated funds be set aside and be the exclusive source of funds available for grants to Indian tribes and Alaska Native villages.

In addition, section 102(c)(3) provides that no State shall receive under any allocation less than three-quarters of one per centum nor more than twelve and one-half per centum of the amount appropriated pursuant to section 102, except that no State whose unemployment data was converted initially in 1976 to the benchmark data of the current population survey annual average compiled by the Bureau of Labor Statistics shall receive a percentage of funds appropriated under this provision less than the percentage of funds allocated to the State from funds appropriated pursuant to title I of the Public Works Employment Act of 1976.

*Conference substitute*

Same as the Senate provision.

## PRIORITY FOR ENERGY CONSERVING PROJECTS

*House provision*

Amends section 108(b) of the Act to require the Secretary to give priority and preference as between building project applications made

after the date of enactment of this amendment to those project applications which will result in energy conservation.

*Senate provision*

Section 102(d)(10) is basically the same as the House provision except that this provision would apply to pending applications.

*Conference substitute*

Essentially the same as the Senate provision.

[page 13]

### APPLICABLE UNEMPLOYMENT PERIOD

*House provision*

Amends subsection (c) of section 108 of the Act to change the time-span for the unemployment data to be used in making grants from the 3 most recent consecutive months to the 12 most recent consecutive months to avoid seasonal fluctuations in the unemployment rate to be applied. The Secretary may waive the priorities required by section 108(c) of the Act as to States which receive the minimum allocation of funds under section 108(a)(3).

*Senate provision*

Section 102(d)(2) provides that the Secretary may require State and local governments that have submitted applications for funding under this provision to use unemployment data for the most recent twelve-month period for which data are available. This provision also permits the Secretary to require State and local governments to revise estimates of project costs as appropriate.

*Conference substitute*

Same as the House provision.

In order to avoid an undue concentration of funds and to ensure a wider distribution of projects throughout a State, if the Secretary waives the priorities in section 108(c) the Secretary shall, in States receiving a minimum allocation of funds, select projects without regard to the priority provision in section 108(c).

States receiving the minimum allocation (of which there are 29) may contain several areas having unemployment rates in excess of those entitled to priority. As a general rule the greater part of the State contains communities in need of projects although their unemployment rate is below 6½ per centum. The Secretary, in an effort to achieve the widest distribution of funds, may award projects to areas having unemployment rates below 6½ per centum. This is not to say that a number of projects will not be located in areas of the State with the highest unemployment rate. This provision will actually aid the Secretary in locating projects in areas of highest unemployment within a State, especially those States with lower unemployment. However, a strict adherence to selecting projects in areas having an unemployment rate in excess of 6½ per centum might result in an undue concentration of funds in one or two communities. It is intended that the Secretary shall consider factors other than the rate of unemployment when necessary to ensure a wider distribution of funds in minimum States.

FUNDS TO BE GRANTED BASED ON UNEMPLOYMENT IN EXCESS OF THE
NATIONAL AVERAGE AND STATE AND LOCAL GOVERNMENT PRIORITIES

*House provision*

Deletes subsection (d) of section 108 of the Act which requires 70
percent of the funds appropriated pursuant to the Act to be granted
for projects of States and local governments having an unemployment
rate in excess of the national rate and the remaining 30 percent of the
funds to be granted for projects in other areas and inserts in its place
a requirement that a State and local government submitting more than
one project for consideration must establish its own priority in regard
to each project and submit it as part of the project application.

[page 14]

*Senate provision*

Provides that in lieu of 70 percent-30 percent requirement in sub-
section (d) of the Act the applicable percentage requirement will be
85–15. The Secretary may waive application of the 85 percent ceiling
in States with unemployment rates above the national average and
the 15 percent ceiling in minimum allocation States.

*Conference substitute*

Same as the House provision.

UNEMPLOYMENT DATA FROM ADJOINING AREAS

*House provision*

Repeals subsection (f) of section 108 of the Act which permits the
Secretary upon request of the applicant to consider the unemployment
rate in adjoining areas from which the labor force for a project may
be drawn.

*Senate provision*

Section 102(d)(6) makes subsection (f) of section 108 of the Act
inapplicable to project applications for funding under the Senate
provision.

*Conference substitute*

Same as the House provision.

PROJECTS FOR IMPROVING SOCIOECONOMIC CONDITIONS

*House provision*

Amends subsection (g) of section 108 of the Act to have States and
local governments where feasible make project requests which pro-
mote or advance longer range plans and programs for improving
socioeconomic conditions.

*Senate provision*

No comparable provision.

*Conference substitute*

No comparable provision

#### APPLICABILITY OF DAVIS-BACON

*House provision*

Amends section 109 of the Act to delete the words "by contractors or subcontractors" to make sure that all laborers and mechanics employed on projects assisted under this Act are paid in accordance with the prevailing wage provisions of the Davis-Bacon Act.

*Senate provision*

No comparable provision.

*Conference substitute*

Same as the House provision.

#### STATE ALLOCATION FORMULA

*House provision*

Adds a new section 111 to the Act which provides that subject to the minimum-maximum requirement contained in section 108(a) of

[page 15]

the Act the Secretary is to allocate the appropriated funds among the States on the basis that the average number of unemployed persons in each State for a specified 12-month period bears to the average number of unemployed persons in all the States during the 12-month period.

*Senate provision*

Section 102(c)(3) contains a formula for allocation among the States providing that 65 percent of the funds be allotted on total numbers of unemployed and 35 percent on the basis of relative severity of unemployment, with States participating in the 35 percent allocation if their unemployment rates exceed 6.5 percent.

*Conference substitute*

Same as the Senate provision.

#### FUNDS FOR CORRECTION OF ERRORS

*House provision*

Adds a new section 112 to the Act which authorizes the Secretary to make grants for projects that were not received, not considered, or were rejected solely because of error made by an officer or employee of the United States. A sum not to exceed 1½ percent of the funds authorized by the Act may be used for this purpose.

*Senate provision*

Section 102(c)(2) sets forth that one percent of the total authorization in such section 102 shall be set aside before the 65–35 percent formula allocation is made and that the amount set aside shall be available to fund projects that were not selected in the first round due to procedural errors.

*Conference substitute*

Provides a $70 million set aside for grants to be made by the Secretary for projects that were not received, not considered, or were rejected solely because of error made by an officer or employee of the

United States. Projects eligible for grants under this section must meet all of the requirements of the Act as in effect at the time of the error. In addition, any applicant receiving an allocation of funds for public works projects under the Act is to have that allocation reduced by the amount of any grant made to it from the $70 million set aside for these grants.

## STANDARDS FOR JAIL CONSTRUCTION

*House provision*

Adds a new section 112 to the Act to provide that whenever a State certifies to the Secretary that the State has standards for the construction of jails that such standards will be the criteria governing the approval of the grant application for jail construction under the Act.

*Senate provision*

No comparable provision.

*Conference substitute*

No comparable provision.

[page 16]

## AUTHORIZATION

*House provision*

Not to exceed $6 billion is authorized to carry out the Act. This would increase the existing $2 billion authorization by an additional $4 billion which would be available for appropriation upon enactment of this provision.

*Senate provision*

Basically the same as the House provision, except that the funds are only authorized through fiscal year 1978.

*Conference substitute*

Basically the same as the Senate provision, except that the funds are authorized through calendar year 1978.

## PROJECT APPLICATIONS ELIGIBLE FOR CONSIDERATION

*House provision*

No comparable provision.

*Senate provision*

Section 102(b) limits consideration by the Secretary for the funding of projects to those projects for which applications were received prior to December 23, 1976, and not funded and those projects for which application were submitted prior to December 23, 1976, and not considered for funding because they were not received in a timely manner or were improperly rejected, except that units of local government which have projects pending, the grant total of which is less than 150 per centum of the residual benchmark for the unit, may submit projects not to exceed such per centum.

*Conference substitute*

Provides that the Secretary may not consider or make a grant with respect to any project for which an application was not submitted

after the date of enactment of the Act and on or before December 23, 1976, except that the Secretary may receive applications from (1) the Trust Territory of the Pacific Islands, (2) Indian tribes and Alaska Native villages, and (3) any applicant to use any allocation which may be made pursuant to regulation, to the extent necessary to expend such allocation, if a sufficient number of applications were not submitted on or before December 23, 1976, to use such allocation.

### UNDUE CONCENTRATION OF FUNDS

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(3) authorizes the Secretary, in determining whether certain grants for projects may result in an undue concentration of funds in a particular area, to consider grants made in the area under the Act relative to the severity of unemployment in the area.

*Conference substitute*

No comparable provision.

[page 17]

### ENDORSEMENT OF PROJECTS BY UNITS OF LOCAL GOVERNMENT

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(4) provides that if a general purpose local government endorses, upon request, a project proposed by a State or special purpose unit of local government the project for which the endorsement is received shall be given priority and preference as set forth in section 108(b) of the Act.

*Conference substitute*

Basically the same as the Senate provision.

### SCHOOL DISTRICT ELIGIBILITY

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(5) provides that a project application for a school district shall be accorded equal priority with those of general purpose local governments under the Act.

*Conference substitute*

Same as the Senate provision.

### PROJECT LOCATION

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(6) changes the application of section 108(e) of the Act by requiring that projects must be within the community or

neighborhood whose unemployment rate is used in the project application.

*Conference substitute*

Basically the same as the Senate provision.

#### IMMEDIATE JOB-CREATING POTENTIAL AND TIME FOR COMPLETION

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(7) directs the Secretary in the case of projects submitted by different applicants which are of equal priority, to consider the potential of each project to create immediate jobs and the length of time required to complete the project.

*Conference substitute*

No comparable provision.

#### ENVIRONMENTAL IMPACT ASSESSMENT

*House provision*

No comparable provision.

[page 18]

*Senate provision*

Section 102(d)(9) requires an applicant for a project grant under the Act to give satisfactory assurances to the Secretary that the project will not have significant adverse effect on the human environment, except that these assurances are not required if the Secretary has, with respect to the project, previously complied with the provisions of the Environmental Policy Act of 1969 and the regulations of the Council on Environmental Quality thereunder.

*Conference substitute*

No comparable provision.

The Conferees wish to clarify that, in every case, the National Environmental Policy Act shall be implemented, to the fullest extent possible consistent with the time constraints imposed by the Local Public Works Development and Investment Act of 1976. The Secretary shall review each grant application, its potential environmental impacts, and the applicant's assurances regarding environmental effects in order to determine whether such assurances are adequate. This review must be accomplished without undue burden on the applicant to submit additional information, and without any delay in project consideration. The statutory limit on the period in which project selection decisions are to be made must be observed.

If the Secretary determines that a proposed project is likely to have significant direct or indirect adverse effects that would normally require full review in an environmental impact statement, that project will ordinarily not be funded under the Local Public Works Development and Investment Act of 1976. If, however, the Secretary's review determines that the effect of a proposed project has been adequately evaluated in accordance with section 102(2)(C) of the

National Environmental Policy Act the Secretary may fund the proposed project.

## CONSIDERATION OF CERTAIN OTHER FACTORS

*House provision*

No comparable provision.

*Senate provision*

Section 102(d)(11) provides that the Secretary in determining projects to be funded shall give consideration to projects which demonstrate a probability of reducing unemployment by (1) stimulating private investment, (2) generating construction in addition to the project, and (3) creating new long-term employment opportunities in accordance with long-range economic development plans.

*Conference substitute*

No comparable provision.

## HEALTH CARE AND REHABILITATION FACILITY PROJECTS

*House provision*

No comparable provision.

*Senate provision*

Section 103 provides that if funds authorized in section 102 of the Senate provision are appropriated for the fiscal year 1978, projects

[page 19]

eligible for grants from such appropriated funds shall include, as well as projects otherwise eligible for grants under the Act, projects for the construction, renovation, repair, or other improvements of health care or rehabilitation facilities owned and operated by private nonprofitmaking entities.

In addition, section 103 requires the Secretary to receive and consider new applications for grants under the section in addition to applications received under the Act. Applications submitted prior to the enactment of this provision shall be revised and new information shall be submitted, as appropriate.

*Conference substitute*

Provides that if any funds authorized by the Act are appropriated in fiscal year 1978, projects eligible for grants under the Act from such appropriated funds shall include projects for the construction, renovation, repair, or other improvements of health care or rehabilitation facilities owned and operated by private nonprofit entities.

## PUBLIC WORKS INVESTMENT STUDY

*House provision*

No comparable provision.

*Senate provision*

Section 104 authorizes a Presidential study of public works investment in the United States. A report on the findings and any recommendations would be transmitted to the Congress 18 months after enactment.

The Presidential study is to analyze public works investment over the last 30 years, including the types, location, and level of investment, and to assess the meaning of these trends.

The study is to also analyze the pattern of regional distribution of public works investment; the role of the Federal Government, States and local communities in funding public facilities; ways to determine our total public works needs; and how public works are financed and how financing arrangements affect the pattern and type of investment.

*Conference substitute*

Same as the Senate provision except that the Secretary of Commerce is to carry out the study and report to Congress.

## EMPLOYMENT OF VETERANS

*House provision*

No comparable provision.

*Senate provision*

Section 105 requires the Secretary, pursuant to regulation and in consultation with the Secretary of Labor, to give special consideration to the employment of disabled veterans (as defined in section 2011(1) of title 38, United States Code) and those qualified Vietnam-era veterans (as defined in section 2011(2)(A) of such title) who are twenty-seven years of age, in projects carried out under this title.

*Conference substitute*

Provides that the Secretary, in consultation with the Secretary of Labor and consistent with applicable collective bargaining agreements

[page 20]

and practices, shall promulgate regulations to assure special consideration to the employment of qualified disabled veterans and Vietnam-era veterans.

## ADDITIONAL PUBLIC WORKS INVESTMENT STUDY

*House provision*

No comparable provision.

*Senate provision*

Section 109 requires a Presidential study of public works investment with a report to Congress 18 months after enactment which study is to be separate and independent of the study authorized by section 104 of the Senate provision. The study is to include, but not be limited to, an analysis of (1) economic stimulus created by public works jobs, (2) tax expenditure per job, (3) evaluation of the criteria for assessing public works needs relative to other national spending priorities, (4) impact on construction costs in the private sector, and (5) the comparison between public works and private sector construction costs on similar facilities.

*Conference substitute*

No comparable provision.

## PROJECTS UNDER THE AUTHORITY OF THE SECRETARIES OF AGRICULTURE AND THE INTERIOR

*House provision*

Provides that the Secretary of Agriculture and the Secretary of the Interior shall immediately initiate the construction of those Federal public works projects (1) which are the responsibility of their respective departments, (2) which have been authorized, and (3) which can be commenced within 60 days of the date of enactment of this section and completed no later than the 180th day after commencement of construction. No funds authorized by section 114 of the Local Public Works Capital Development and Investment Act of 1976 (Public Law 94–369) may be used to carry out this section.

*Senate provision*

No comparable provision.

*Conference substitute*

Same as the House provision.

### SHORT TITLE

*House provision*

No comparable provision.

*Senate provision*

Provides that the title (relating to public works projects) may be cited as the "Public Works Employment Act of 1977".

*Conference substitute*

Same as the Senate provision.

### PROGRAM POLICIES

Regulations implementing the revisions in the act made by this conference substitute are to be prescribed within 30 days of the date

[page 21]

of enactment of these revisions. The conferees expect the next phase of the public works jobs program to be implemented in accordance with the following assumptions and policy directions. A project area will be a city; a county; the balance of a county in which such city is located; or a pocket of poverty under section 108(e) where the project is within an urbanized area. Unemployment statistics (as to total number of unemployed and rate) are to be determined for project areas. not for applications. It is intended that all communities, regardless of size, that otherwise qualify, are to be treated as applicants.

The conferees are aware of the problems which exist in obtaining timely, accurate, and uniform measurements of unemployment for all areas of the country. However, the conferees are also aware that the Bureau of Labor Statistics (BLS) cannot, at this time, provide unemployment data for all jurisdictions in the country. Unemployment statistics gathered by the Department of Labor through the BLS generally cover jurisdictions above 50,000 population and prime sponsor areas designated under the Comprehensive Employment and Training Act (CETA). unless special studies of a labor force have

been undertaken at the request of a local jurisdiction or the State Employment Security Agency. Prior to August 1976, the BLS was unable to provide comparable unemployment statistics on a county-by-county basis. The BLS has assured that unemployment data is now available to the Economic Development Administration on a county-by-county basis.

Although the conferees recognize the need to have comparable unemployment data from one source to assure uniform and accurate measurements of a community's distress, it is also important that a community not be denied assistance under the act because national unemployment figures are unavailable for a local jurisdiction. In such cases as unemployment data is not available from the Bureau of Labor Statistics, the Secretary shall accept State or local data.

The BLS is currently engaged in establishing benchmarks for all States based on the current population survey method now used in calculating unemployment statistics nationwide. The conferees urge the States to develop data on jurisdictions smaller than 50,000 as soon as possible so that eligible areas under both the Local Public Works Act and the Public Works and Economic Development Act can be qualified for assistance in a timely manner. To provide the optimum opportunity for participation in this program the Congress specifically provided in section 108(c) that information regarding unemployment rates may be furnished by the Federal Government, or by States or by local governments provided that the Secretary of Commerce determines that such unemployment rates are accurate. The Secretary is also required to provide assistance to the States or local government in the calculation of such rates to insure their validity and standardization. Where a State has already developed unemployment data for jurisdictions between 25,000 and 50,000 population this data shall be utilized by the EDA in qualifying local jurisdictions under the act.

Under the Office of Management and Budget's Circular A–46, Federal agencies are required to use the unemployment data provided by the Department of Labor, Bureau of Labor Statistics. It is the conferees' intent under section 108(c) that if the Economic Development Administration cannot obtain unemployment data from the BLS

[page 22]

for a jurisdiction smaller than 50,000 population, or for other jurisdictions where the data is not available for the most recent 12 consecutive months, that the EDA shall request such unemployment information from the State employment security agencies. It is not the conferee's intent to delay the updating of unemployment statistics for project applications on file at EDA in allowing the agency to obtain data from the States but the conferees want to insure that EDA has the maximum flexibility in obtaining unemployment data in a timely manner for all eligible applicants under the Act.

Only project areas in excess of 6.5 percent unemployment may receive grants, except (1) where the State unemployment rate is less than 6.5 percent, in which case only project areas in excess of the State average unemployment rate may receive grants, and (2) in minimum allocation States where the Secretary waives the priorities of section 108(c). A share of the State's allocation of funds shall be established for each such project area, based on numbers and rate of unemployment in such area, to serve as a benchmark or planning target.

The Secretary of Commerce shall assure equity, and a substantial portion of project awards, for each category of general purpose local government applicants and projects endorsed by such applicants, within each project area. An applicant may select projects for funding with its planning target only in the project area on which that planning target is based. A school district shall be treated on the same basis as a general purpose local government, for all purposes. New applications shall be received only where there are insufficient pending applications to use a States' allocation or a project area's planning target. In such cases applications may be received from any eligible recipient within the project area. Each applicant shall indicate its order of preference among its project applications.

The conferees recognize the responsibilities of county governments. Accordingly, the intent of the conferees is for applicant counties to receive an equitable share of funds in any area which reflects their level of responsibility and unemployment.

In cases of projects of different applicants within a county or balance-of-county project area which are otherwise equal in priority, consideration shall be given to the relative unemployment statistics of the applicants, if recent comparable data is available, and, if necessary, to various criteria for differentiating the projects themselves, such as the job-creating potential and time necessary for completion of the project, the energy conservation potential of a building project under section 108(b)(2), the project's value in alleviating drought or other critical local needs, or the long-term economic benefits of the completed project.

Two cases where project funding was erroneously charged against a local benchmark have been called to the conferees' attention. In one case, State projects located in Long Island were charged against the planning target for Albany, the State capital. In another case, the funding of projects was charged against the benchmark for Schenectady even though the projects were located outside the city.

The conferees intend this type of error will be corrected in the next round of funding without penalizing local governments like these. In such cases the cities will receive a full planning target or allocation based on the $6 billion authorized program and projects funded in the first round will be charged against allocation of the area where the project was located.

[page 23]

## APPENDIX E

## CIVIL RIGHTS ACT OF 1964

### House Report No. 914

𝕿 HE Committee on the Judiciary, to whom was referred the bill (H.R. 7152) to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in education, to establish a Community Relations Service, to extend for 4 years the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill do pass.

### PURPOSE AND CONTENT OF THE LEGISLATION

The bill, as amended, is designed primarily to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States. In furtherance of these objectives the bill: (1) provides for the appointment of a three-judge district court in voting suits and for the expeditious determination of such suits, and also provides against the discriminatory use of literacy tests in Federal elections; (2) prohibits discrimination in enumerated public establishments; (3) authorizes the Attorney General to initiate suits to desegregate public facilities, other than public schools, and to intervene in suits charging deprivation of equal protection of the laws; (4) authorizes the Attorney General to initiate suits to desegregate public schools; (5) makes the Civil Rights Commission a permanent agency; (6) prohibits discrimination in any Federal financial assistance program; (7) establishes a Federal Equal Employment Commission designed to eliminate discriminatory employment practices by business, labor unions, or employment agencies; (8) provides for the compilation of registration and voting statistics by race, color, and national origin; (9) makes a remand of a civil rights case from a Federal court back to a State court reviewable on appeal.

### HISTORY OF THE LEGISLATION

Early in the 88th Congress a substantial number of broad civil rights bills were introduced by members of both political parties.

On February 28, 1963, the President of the United States transmitted to the Congress a message of recommendations pertaining to civil rights (H. Doc. 75, 88th Cong., 1st sess.). Subsequently, on June 19, 1963, the President of the United States transmitted to the Congress a second message containing recommendations pertaining to civil rights (H.Doc. 124, 88th Cong., 1st sess.).

A judiciary subcommittee conducted hearings on 172 bills which had been referred to it. These proposals related to almost every aspect and facet of civil rights including such topics as voting; public accommodations; school desegregation; prohibition of discrimination in Federal financial assistance programs; equal protection of laws; antilynching; fair employment practices; the Civil Rights Commission; establishment of a Community Relations Service; voting and registration statistics according to race, color, and national origin; and authorization for the Attorney General to institute civil actions to protect and enforce civil rights.

## LEGISLATIVE HISTORY

Hearings were held on May 8, 9, 15, 16, 23, 24, 28; June 13, 26, 27; July 10, 11, 12, 17, 18, 19, 24, 25, 26, 31; and August 1, 2, 1963 (civil rights hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 88th Cong., 1st sess., serial No. 4).

During the course of these hearings, the testimony related to all the subjects of the legislative proposals. The witnesses included the congressional authors of the proposals; other Members of both Houses of Congress; the Attorney General; the Secretaries of Labor and of Health, Education, and Welfare; representatives of the Civil Rights Commission; and of the President's Committee on Equal Employment Opportunity, State and local officials, private citizens, as well as representatives of various organizations specifically concerned with this legislation. The subcommittee afforded to all who were interested a reasonable opportunity to present their views on the proposals. Those who did not appear personally were given an opportunity to submit any relevant matter for the record.

Upon conclusion of the hearings, the subcommittee met in executive session a total of 17 days to consider the legislation. Thereafter the subcommittee struck out of H.R. 7152, as amended, all after the enacting clause and inserted in lieu thereof an amendment in the nature of a substitute. The amended version was recommended to the full Judiciary Committee.

The substitute version of the legislation before the full Judiciary Committee contained 11 titles. Briefly, these were:

(I) Voting rights;

(II) Injunctive relief against discrimination in public accommodations;

(III) Authorization to the Attorney General to institute civil proceedings to protect against the deprivation of rights;

(IV) Desegregation of public education and other public facilities;

(V) Establishment of a Community Relations Service;

(VI) Permanent extension of the Civil Rights Commission;

(VII) Nondiscrimination in federally assisted programs;

(VIII) Creation of a Federal Equal Employment Opportunity Commission;

(IX) Provision for the compilation of registration and voting statistics according to race, color, and national origin;

(X) Provision for review of an order remanding a civil rights case from a Federal court back to a State court; and

(XI) A general separability provision and a general appropriations authorization.

The full Judiciary Committee in its deliberation and consideration of the bill, H.R. 7152, adopted an amendment in the nature of a substitute. This substitute retained amended titles on voting rights; public accommodations; authorization to the Attorney General to intervene in or initiate certain civil rights suits; desegregation of public education; permanent extension of the Civil Rights Commission; nondiscrimination in federally assisted programs; creation of a Federal Equal Employment Opportunity Commission; compilation of registration and voting statistics according to race, color, and national origin; a separability provision; and general appropriation authorization. The substitute deleted the title establishing a Community Relations Service and retained intact the title providing for review of an order remanding a civil rights case from a Federal court back to a State court.

## CIVIL RIGHTS ACT OF 1964

### GENERAL STATEMENT

In various regions of the country there is discrimination against some minority groups. Most glaring, however, is the discrimination against Negroes which exists throughout our Nation. Today, more than 100 years after their formal emancipation, Negroes, who make up over 10 percent of our population, are by virtue of one or another type of discrimination not accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens.

Considerable progress has been made in eliminating discrimination in many areas because of local initiative either in the form of State laws and local ordinances or as the result of voluntary action. Nevertheless, in the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimination with its continuance and, on the other hand, by a growing recognition on the part of all of our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated. A number of provisions of the Constitution of the United States clearly supply the means "to secure these rights," and H.R. 7152, as amended, resting upon this authority, is designed as a step toward eradicating significant areas of discrimination on a nationwide basis. It is general in application and national in scope.

No bill can or should lay claim to eliminating all of the causes and consequences of racial and other types of discrimination against minorities. There is reason to believe, however, that national leadership provided by the enactment of Federal legislation dealing with the most troublesome problems will create an atmosphere conducive to voluntary or local resolution of other forms of discrimination.

It is, however, possible and necessary for the Congress to enact legislation which prohibits and provides the means of terminating the most serious types of discrimination. This H.R. 7152, as amended, would achieve in a number of related areas. It would reduce discriminatory obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right. It would make it possible to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public. It would guarantee that there will be no discrimination among recipients of Federal financial assistance. It would prohibit discrimination in employment, and provide means to expedite termination of discrimination in public education. It would open additional avenues to deal with redress of denials of equal protection of the laws on account of race, color, religion, or national origin by State or local authorities.

H.R. 7152, as amended, is a constitutional and desirable means of dealing with the injustices and humiliations of racial and other discrimination. It is a reasonable and responsible bill whose provisions are designed effectively to meet an urgent and most serious national problem.

## LEGISLATIVE HISTORY

### SECTIONAL ANALYSIS

#### TITLE I—VOTING

\*　　　\*　　　\*

### TITLE VI—NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS

#### General

This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance and authorizes and directs the appropriate Federal departments and agencies to take action to carry out this policy. This title is not intended to apply to foreign assistance programs.

**Section 601.**—This section states the general principle that no person in the United States shall be excluded from participation in or otherwise discriminated against on the ground of race, color, or national origin under any program or activity receiving Federal financial assistance.

**Section 602** directs each Federal agency administering a program of Federal financial assistance by way of grant, contract, or loan to take action pursuant to rule, regulation, or order of general applicability to effectuate the principle of section 601 in a manner consistent with the achievement of the objectives of the statute authorizing the assistance. In seeking to effect compliance with its requirements imposed under this section, an agency is authorized to terminate or to refuse to grant or to continue assistance under a program to any recipient as to whom there has been an express finding pursuant to a hearing of a failure to comply with the requirements under that program, and it may also employ any other means authorized by law. However, each agency is directed first to seek compliance with its requirements by voluntary means.

**Section 603** provides that any agency action taken pursuant to section 602 shall be subject to such judicial review as would be available for similar actions by that agency on other grounds. Where the agency action consists of terminating or refusing to grant or to continue financial assistance because of a finding of a failure of the recipient to comply with the agency's requirements imposed under section 602, and the agency action would not otherwise be subject to judicial review under existing law, judicial review shall nevertheless be available to any person aggrieved as provided in section 10 of the Administrative Procedure Act (5 U.S.C. 1009). The section also states explicitly that in the latter situation such agency action shall not be deemed committed to unreviewable agency discretion within the meaning of section 10. The purpose of this provision is to obviate the possible argument that although section 603 provides for review in accordance with section 10, section 10 itself has an exception for action "committed to agency discretion," which might otherwise be carried over into section 603. It is not the purpose of this provision of section 603, however, otherwise to alter the scope of judicial review as presently provided in section 10(e) of the Administrative Procedure Act.

## SUMMARY JUDGMENT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Court having duly considered the entire record herein; having examined in detail all of the evidence by way of affidavits, submissions and attachments filed by all parties hereto; having heard and analyzed the arguments presented at the oral hearing on motions and counter motions for summary judgment; and having made and entered its Decision and Order, including findings of fact and conclusions of law, finding on the basis of the entire record that there is no genuine issue of material fact and concluding that the "10% quota" mandated by Section 103(f)(2) of Public Law No. 95–28—"Public Works Employment Act of 1977"—enacted May 13, 1977, amending Section 106 (42 U.S.C. § 6705) of the "Local Public Works Capital Development and Investment Act of 1976" (42 U.S.C. § 6701 et seq.) by adding a new subsection 42 U.S.C. § 6705(f)(2), and the rules and regulations implementing said statute issued by the delegate of the Secretary of Commerce, through the Economic Development Administration of the Commerce Department, especially Section 317.-19, 42 Fed.Reg. 27432 at 27434–5, in what is termed "Round II of the Local Public Works Capital Development and Investment Program," are, and each is unconstitutional and illegal under the United States Constitution particularly Amendment V thereof, and Title VI of the Civil Rights Act of 1964, particularly 42 U.S.C. §§ 2000d and 2000d–1; and good cause thereby appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Court hereby issues its Declaratory Judgment declaring and determining that said Section 103(f)(2) of Public Law No. 95–28, 42 U.S.C. § 6705(f)(2), and the rules and regulations issued thereunder and relating thereto, especially Section 317.19, 42 Fed.Reg. 27432 at 27434–5, are and each is in and of themselves on their face and as applied here, unconstitutional under the United States Constitution, including the Fifth Amendment thereof as a denial of equal protection of the laws and as invidious and impermissible provisions for a race quota; and that the said statute and rules and regulations, and the race quota thereby mandated, are illegal, contrary to law and arbitrary, capricious and unreasonable, as violations of Title VI of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000d and 2000d–1.

2. A permanent injunction is hereby issued permanently restraining the Federal Defendants therein, the Secretary of Commerce of the United States, the United States Department of Commerce, the Assistant Secretary of Commerce for the Economic Development Administration and their delegates from enforcing, applying, carrying out or implementing in any manner whatsoever, directly or indirectly, including the allocation or grant of Federal funds authorized in the future, the provisions of said Public Law No. 95–28, Sec. 103 (f)(2), 42 U.S.C. § 6705(f)(2), and the said rules and regulations issued thereunder, especially Section 317.19, 42 Fed.Reg. 27432 at 27434–5, from and after October 31, 1977. This injunction shall not govern or apply to Federal funds heretofore granted or to any actions by the Federal Defendants with respect to such funds heretofore granted.

3. A permanent injunction is hereby issued permanently restraining the Local Defendants herein, Los Angeles County, a body corporate and politic, Los Angeles County Board of Supervisors, Los Angeles Flood Control District, Los Angeles County Engineer, Facilities Department of Los Angeles County, City of Los Angeles, a municipal corporation, Los Angeles City Council, Department of Recreation and Parks of the City of Los Angeles, and the Department of Public Works of the City of Los Angeles, from enforcing, applying, carrying out, or implementing directly or indirectly in any manner whatsoever, including the devising, approving, advertising or awarding of bids, the provisions of said statute and said rules and regulations, from and after January 1, 1978. This injunction shall not govern or apply to Federal funds heretofore granted or to any actions by Local Defendants with respect to such funds heretofore granted.